**SUMMONS ISSUED**

# CV-12 0348

FUGAZY & ROONEY LLP
Amanda M. Fugazy
afugazy@fugazyrooney.com
Sheryl L. Maltz
smaltz@fugazyrooney.com
437 Madison Avenue, 35th Floor
New York, NY 10022
(212) 346-0570 (telephone)
(484) 805-7022 (facsimile)

*Attorneys for Plaintiff*

**FILED**
IN CLERK'S OFFICE
U S  DISTRICT COURT E.D N Y

★   JAN 25 2012   ★

**LONG ISLAND OFFICE**

## SPATT, J.

## WALL, M.J.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

CHRISTOPHER BARRELLA,

                        Plaintiff,

         -against-

VILLAGE OF FREEPORT and ANDREW
HARDWICK as both Mayor and in his
individual capacity,

                    Defendants.
-------------------------------------------------------------X

Index No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

      Plaintiff Christopher Barrella by and through his attorneys, Fugazy & Rooney LLP,

as and for his Complaint against Defendants Village of Freeport and Andrew Hardwick, alleges

as follows:

### JURISDICTION AND VENUE

    1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which

confers original jurisdiction upon this Court for actions arising under the laws of the United

States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction

upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act

of Congress providing for the protection of civil rights; (ii) under the Declaratory Judgment

Statute, 28 U.S.C. § 2201; and (iii) under 42 U.S.C. §§ 2000e *et seq.*, 42 U.S.C. §§ 1981 *et seq.*, as amended and 42 U.S.C. §§ 1983 *et seq.*, as amended, violations of each of which are alleged herein. The Court's supplemental jurisdiction is invoked pursuant to 28 U.S.C. § 1367(a), which confers supplemental jurisdiction over all non-federal claims arising from a common nucleus of operative facts such that they form part of the same case or controversy.

2. Venue is proper in this Court in as much as this judicial district lies in a State in which the unlawful employment practices occurred. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(l) and (c), in that Defendants maintain offices, conduct business and reside in this district.

**PARTIES**

**Plaintiff**

3. Plaintiff Christopher Barrella ("Plaintiff" or "Barrella") is an employee of Defendant Village of Freeport and resides in Kings Park, New York.

4. Plaintiff is a Non-Hispanic White male. He began his employment with the Village of Freeport Police Department ("VFPD") in October of 1990 as a Police Officer.

5. Plaintiff earned his Bachelor's degree in or about 1990.

6. Plaintiff earned his Master's degree in Public Administration in or about 1993 being inducted into the National Honor Society of Public Administrators.

7. Plaintiff earned his Juris Doctorate from St. John's University School of Law in 1999, making the Dean's List in 1998-1999, and is admitted to the New York State Bar.

8. In 2008, Plaintiff attended the 234th session of the FBI National Academy, a two and a half month program, in Quantico, VA, a course for command-level Police Officers.

9. Plaintiff has additional command-level emergency management training.

2

10.     Plaintiff scored number one (1) on every Civil Service exam he took for Police Sergeant, Police Lieutenant, and Chief of Police.  In other words, Barrella ranked higher than every other individual in the VFPD who took each exam.

11.     During his career with the VFPD, Barrella has been promoted to the civil service ranks of Sergeant effective August 30, 2002 and Lieutenant effective May 11, 2007.

12.     The VFPD recognized Barrella many times throughout his 21 years of service. Barrella's recognitions include his work on the Ground Zero recovery effort, numerous arrests, and recovery of stolen weapons.  Additionally, Barrella received a lifesaving award in April 2002.

13.     Since 1996, Barrella has been involved in the Freeport Public Schools Adopt-A-Cop program, created to encourage students to develop an ongoing relationship with members of the VFPD.  The Mayor publicly praised the Adopt-A-Cop program, noting its effectiveness as a critical part of the Mayor's zero tolerance on crime.  Barrella is one of three Lieutenants in the VFPD to have been involved in the Adopt-A-Cop program.

14.     In his 21-year career, Barrella performed numerous tasks, including the performance of preliminary investigations, assisting in the execution of search warrants, responding to emergency calls, rendering aid and assisting the public.  Barrella has been an assigned officer, and later, a supervisor at numerous homicides.

15.     As a Police Officer assigned to the patrol division, Barrella was schooled as a Field Training Officer.  As a Sergeant, Barrella worked the night tour supervising a minimum of six officers on each tour, being wholly responsible for all calls for service handled by patrol. Barrella also filled in as Watch Commander when needed.  As a Lieutenant, Barrella works the day tour taking on the role of Watch Commander making him responsible for all of the officers

3

on his shift. In his capacity as Lieutenant, he works closely with the Command Staff, and performs various Command Staff duties.

**Defendant Village of Freeport**

16.    Defendant Village of Freeport ("Freeport" or "Village") is an employer whose principle place of business is located at 46 North Ocean Avenue, Freeport, New York.

17.    The current Village of Freeport administration demonstrates bigotry towards Non-Hispanic White employees and acts to prevent equal treatment of Non-Hispanic White employees within the Village.

**Defendant Hardwick**

18.    Defendant Andrew Hardwick ("Hardwick" or "Mayor") is an individual who resides in Freeport, New York.

19.    Hardwick is a Black male.

20.    In March 2009, Hardwick was elected Mayor of the Village of Freeport.

21.    Hardwick remains Mayor at the time of this filing.

22.    The Mayor harbors a racist bias against Non-Hispanic Whites.

23.    Upon his being sworn in as Mayor, Hardwick immediately began terminating and demoting qualified, experienced Non-Hispanic White employees, and replacing them with less qualified and less experienced Hispanic and Black employees. Many of these changes were racially motivated.

## ADMINISTRATIVE EXHAUSTION

24.    On or about August 26, 2011, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No.: 520-2011-03305.

4

25.   Plaintiff received a notice of Right to Sue Letter from the EEOC on or about October 31, 2011.

26.   Plaintiff served a Notice of Claim on Defendant(s) Village of Freeport and the Mayor on or about August 25, 2011.

## STATEMENT OF FACTS

27.   There are three Command Staff positions in the VFPD, namely Deputy Chief, Assistant Chief and Chief of Police. Unlike the Chief of Police, the Deputy Chief and Assistant Chief positions are in-house designations and are non-civil service positions. There is no requirement that an individual attain the position of Deputy Chief and/or Assistant Chief prior to becoming Chief of Police.

28.   Upon information and belief, there are one Chief, seven Lieutenant and eight Sergeant civil service positions. The remainder of the civil service positions belong to Police Officers.

29.   In October of 2009, the Non-Hispanic White Deputy Chief of over two years was informed that in March of 2010 she would be demoted, and that she would no longer be Deputy Chief. The Village attorney told this Non-Hispanic White Deputy Chief that "right, wrong or indifferent," the Mayor would be replacing key leadership posts with "his people." Upon information and belief, "his people" excluded Non-Hispanic White employees.

30.   Upon information and belief, at the same time that the Non-Hispanic White Deputy Chief was being demoted, the Non-Hispanic White Assistant Chief of Police was also informed he would be demoted and would no longer remain in a Command Staff position. He was able to retain his position provided he retire by June 2010.

5

31. The civil service Chief of Police, who could not be demoted without cause, was offered a benefit package to retire.

32. Due to the pending forced retirements of the Chief and Assistant Chief, and the demotion of the Deputy Chief, three Command Staff positions would need to be filled within the next year.

33. The Mayor made it clear that Miguel Bermudez ("Bermudez"), a Hispanic male, was the only one being seriously considered for any of the Command Staff positions.

34. Beginning in or around October 2009, the Mayor referred to Bermudez, who had less than one year as a Lieutenant, as "Chief" and ordered him a department cell phone, typically reserved for Command Staff.

35. Additionally, prior to his promotion to the Command Staff, Bermudez was included on Command Staff emails. Upon information and belief, no other Lieutenants were privy to such emails.

36. Furthermore, although not common practice, Bermudez was included in Command Staff activities, such as the disciplinary hearing of a Sergeant that Bermudez did not directly supervise and in which he had no part in the investigation.

37. Bermudez was woefully unqualified for any Command Staff position, let alone the Chief position.

38. In or about late 2009, when the Mayor was making clear that Bermudez was his choice for Chief, Bermudez was tied for having the shortest time in rank of all the Lieutenants.

39. Bermudez, upon information and belief, as of the time of this filing, does not have a college degree.

40.   By way of comparison, upon information and belief, Bermudez would not qualify, due to his lack of education, to be promoted to Captain in the New York City Police Department ("NYPD"), which is a rank lower than Chief.

41.   By way of comparison, upon information and belief, if Bermudez was a new hire at the Nassau County Police Department ("NCPD"), due to his lack of education, he would not qualify to receive a stipend given to police officers with a degree.

42.   In or about late 2009, when the Mayor was making clear that Bermudez was his choice for Chief, Bermudez had never been a part of the Adopt-A-Cop program.

43.   On or about January 28, 2010, Nassau County Civil Service announced that a Civil Service exam would be given on March 6, 2010 for the position of Chief of Police.

44.   To be eligible to sit for the March 6, 2010 Chief of Police Exam, Civil Service required a minimum of four years experience in the prior rank (i.e., Lieutenant or higher) or two or more years as a Captain.  The VFPD has no Captain's rank.

45.   Additionally, under the New York Civil Service "Rule of Three", in order to be considered for the position of Chief of Police, an individual must score among the top three taking the Civil Service exam.

46.   The Mayor's wish to promote Bermudez to Chief was complicated by the fact that Bermudez did not qualify to sit for the Chief of Police Exam under Civil Service requirements because he did not have four years experience as a Lieutenant.

47.   At that time, in the VFPD, the only three Lieutenants that satisfied the experience prerequisite were Non-Hispanic Whites.

7

48.     Because only Non-Hispanic White Lieutenants had the prerequisites to actually sit for the Chief's Exam, the Mayor informed Civil Service that the Village of Freeport would not be participating in the Chief's Exam.

49.     In or about February 25, 2010, rather than even consider the three Non-Hispanic White Lieutenants for the Chief of Police position, the Mayor attempted to have a law passed to allow him to hire whomever he wanted, so long as they were qualified under various civil service laws to be a Lieutenant or above; *i.e.*, to allow him to bypass the exam.

50.     This proposed law would have allowed the Mayor to appoint Bermudez to the Chief's position without obstacles.

51.     While the bill was pending, the Mayor filed a lawsuit in an attempt to prevent the Chief's exam from being administered and/or graded, requesting it being voided.

52.     Ultimately, on March 6, 2010, the Village participated in the exam, but permitted all Lieutenants to participate regardless of their time in rank.

53.     Upon information and belief, in or about March/April 2010, while the lawsuit and bill were pending, the Mayor found out that Bermudez scored number three on the exam and thus scored high enough to be promoted to Chief of Police if only he had the requisite time in rank. The Mayor then negotiated a settlement for his lawsuit, which would permit him to promote candidates regardless of their time in rank.

54.     The Mayor wrote a letter to the Deputy Speaker of the New York State assembly thanking her and asking her to withdraw the bill as he expected a favorable outcome from his lawsuit.

55.     After the bill was withdrawn, the Mayor was quoted on the Village website as follows, "The proposed law was designed to expand the pool of qualified candidates..." and

8

"The Village is working with the Nassau County Civil Service Commission to resolve the issues surrounding the selection process for Chief of Police."

56.    In a letter, the Mayor indicated that the Village was engaged in litigation for "...the selection process for Chief of Police, including qualified minority candidates."

57.    The Mayor made public his intentions to promote the unqualified and otherwise ineligible Bermudez several months prior to the test scores even being made public.

58.    At a Village Board Meeting on or about May 4, 2010, in response to a question about the Mayor's lawsuit against Civil Service and the proposed legislation, the Mayor stated, obviously referring to Bermudez; "What I'm trying to do is to hire the Chief that I want to be in that seat...The guy named Andy Hardwick is going to name the Chief".

59.    While the Mayor was busy pushing his agenda of getting Bermudez into the Police Chief spot, on or about April 6, 2010, the Mayor promoted Bermudez to Deputy Chief, taking the position of the Non-Hispanic White Deputy Chief who was demoted.  Barrella was not interviewed for this position.

60.    In or about June 2010, while presiding over his first supervisor's meeting as Deputy Chief, Bermudez played a video of an actor portraying Adolf Hitler yelling at his troops. Bermudez twice told the ten to fifteen Sergeants and Lieutenants present, including Barrella, "I can turn into that guy", referring to Hitler.  During this meeting, Bermudez also referred to a list of officers not offered overtime as "Schindler's list."  Those present, including Barrella, were offended and disgusted by Bermudez's appalling comments.

61.    On or about July 1, 2010, the Mayor promoted Bermudez to Assistant Chief, with no interviews being held.

62.     In or about September 2010, when the test scores were made public, Barrella had scored number one (1) and another Non-Hispanic White Lieutenant had scored number two (2).

63.     In or about October 2010, Barrella, unsolicited, forwarded his resume to the Mayor, the Village Trustees and the Village Attorney seeking the Chief's position.  Shortly thereafter, the Mayor and members of the Village Board of Trustees told Barrella, at a PBA function, that he had an impressive resume.  The Mayor told Barrella that he would be holding interviews for the position of Chief of Police within the next few weeks.  No such interviews ever occurred.

64.     On September 15, 2010, Bermudez, in response to a subordinate's Facebook post about being gay, wrote on the subordinate's wall "Post 58 is calling".  Upon information and belief, Post 58 is an openly homosexual Crossing Guard subordinate.

65.     Upon information and belief, on September 17, 2010, at the VFPD, Bermudez went to the same subordinate's workstation while that Police Officer's Facebook account was left open and wrote, "I feel so free after coming out of the closet.  I want to frolic in a bed of rose petals."

66.     On November 4, 2010, Bermudez posted on his Facebook wall that he "was playing 'FARMVILLE' when immigration showed up and took all of my workers!!!"

67.     Upon information and belief, on or about November 22, 2010, the Mayor became aware of Bermudez's discriminatory and harassing public postings regarding homosexual members of the VFPD and illegal immigrants.

68.     Notwithstanding such knowledge, on or about November 25, 2010, the Mayor promoted the less qualified and inexperienced Bermudez to Chief of Police without ever even interviewing Barrella (#1 on the exam) or the Non-Hispanic White Lieutenant who scored number two on the exam, both of whom were longer-tenured Lieutenants.

69.     Despite Barrella's superior qualifications, and glowing letters of recommendation, the Mayor never considered Barrella for the Chief's position, or for any of the Command Staff positions.

70.     Barrella's bachelor's degree in Criminal Justice, Master of Public Administration, Juris Doctorate, well-rounded experience, knowledge of the job, leadership, ethics and morals, as well as his unblemished record made him the best choice to promote to the Command Staff. In his roles as both the Watch Commander and Patrol Supervisor, he had worked tirelessly and flawlessly in all aspects of his assignment to the complete satisfaction of his immediate supervisors. He earned a reputation as being competent, respected, outstanding, and simply the most qualified to run the department.

71.     Although Barrella was a perfect fit to fill any of the Command Staff positions, he was not considered by the Mayor for any such positions.

72.     The Mayor took bold steps to expand his pool of minority candidates without regard for their qualifications, experience and/or knowledge while simultaneously overlooking or scuttling more qualified candidates, including Barrella. Some examples:

      a.   In April 2010, knowing that he was going to promote Bermudez to Assistant Chief in July of 2010, the Mayor announced at a fundraiser that he would be promoting the first African American to the position of Deputy Chief of Police. Said African American employee had no experience as a supervisor, had never scored well enough on a competitive promotional exam to be promoted to a supervisory position, and had no police experience in an administrative role or position of authority. Said employee has the civil service rank of Police Officer, the lowest possible civil service rank in the VFPD. In addition to being

unqualified for this position, this African American officer has already been committed by the Village to a position in the Village schools in the Gangs Resistance Education and Training program, a full-time position for which the State of New York invested significant resources in training the officer in exchange for a long term commitment. The Mayor had seemingly disregarded this commitment to the Village's schools in his effort to find any Hispanic or Black employee to promote in place of more qualified and available Non-Hispanic White employees.

b. Upon information and belief, the Mayor hired a Special Counsel in a newly created position, a Black male who, at the time, was a suspended attorney under criminal investigation. Soon after leaving the Village, such Special Counsel was arrested.

c. Upon information and belief, the Mayor promoted the current Superintendent of Public Works of the Village, a Black male, who is a high school dropout and was mowing lawns immediately before his promotion. He needed to be extensively trained after his promotion. Upon information and belief, this Superintendent transferred seven Non-Hispanic White employees to menial labor. Upon information and belief, the order was rescinded but the Superintendent was not disciplined in any way.

d. Upon information and belief, the Mayor hired a Black Lobbyist into a newly created position. Neither this Lobbyist, nor this company, were licensed Lobbyists in New York. This Lobbyist was paid $7,500 to read a book.

   e. Upon information and belief, the Mayor hired a Black male as a Messenger, in a newly created position. This Messenger earned over $68,000 in overtime over a 17-month period, while a Non-Hispanic White male Messenger earned less than $10,000 in overtime during the same period.

73. While the Mayor did whatever he could to prevent Barrella, the most qualified individual, from being promoted to a Command Staff position, he also acted to harass and humiliate Non-Hispanic White employees. Some examples:

   a. The Mayor actively ignored the former Non-Hispanic White Deputy Chief at official functions and left her out of a photo shoot when police recruits were sworn in by the Mayor.

   b. After Bermudez was promoted to Deputy Chief, he was provided a comfortable seat on the dais at Village Board Meetings. Until his promotion, the Non-Hispanic White Command Staff officers sat with the public and stood to address whatever issues were presented.

   c. In the official credits, which follow the public access production of Village meetings, Bermudez's name was added as Chief of Police, replacing the not-yet retired Chief of Police, despite Bermudez not yet holding that title.

   d. The Mayor invited the President of the National Organization of Black Law Enforcement Executives to speak at a Village meeting. As part of his presentation, this speaker made numerous anti-Freeport Police statements, stating at one point, "In the Village of Freeport, the only difference between the criminal and the cop is the cop has the bigger gun." The speaker is a personal friend of the Mayor who has been honored at one of the Mayor's fundraisers.

13

74.    The Mayor has, and continues to, harass, terminate, demote and otherwise disproportionately negatively affect the terms and conditions of employment for Non-Hispanic White employees.  Some examples:

      a.  Upon information and belief, the Mayor waived all or part of Bermudez's probationary period as Chief, while he terminated a Non-Hispanic White employee as she approached her final days of her full probationary period.

      b.  Upon information and belief, the Mayor, upon learning of his pending transfer from the Nassau County Parks Department, penned an unsigned letter in which he makes his race, and the race of his superiors, the focal point as to why he should not be transferred.  He speaks of being transferred to the basement.  Then, when he became Mayor, he relocated at least three Non-Hispanic White employees to the Village Hall basement.

      c.  In a public meeting, the Mayor complained about the school board overpaying two long-term Non-Hispanic White secretaries while his own Black, less tenured, secretaries were paid more.

      d.  The Mayor took an active role in supporting two Black candidates for School Board positions over two Non-Hispanic White, incumbent candidates.  The Mayor donated money and resources to their campaigns, going so far as to have a "robo-call" machine using his voice and position to advocate for these candidates.  Upon information and belief, the sole purpose for the Mayor supporting these candidates was their race.

      e.  In furthering his racist and bigoted agenda relating to the VFPD, the Mayor acted without the Board of Trustees' approval in filing his lawsuit and attempting to

have the legislation passed.

f. The Mayor threatened to lay off four Non-Hispanic White Civil Service employees due to "budget concerns." He chose these Non-Hispanic White employees despite there being numerous less qualified, shorter tenured Hispanic or Black employees who could otherwise have been laid off.

g. The Mayor purposefully caused one Black Police Officer's discipline to lapse while immediately signing off on two Non-Hispanic White Police Officers' discipline. The Black Police Officer has an extensive disciplinary record while the two Non-Hispanic White Police Officers did not. Numerous attorneys and the independent arbitrator who investigated the Black Police Officer recommended that the discipline be enforced, however the Mayor decided not to discipline the Black employee. Upon information and belief, a Mayor has never before gone against an independent arbitrator regarding a Police Officer's discipline.

h. In January of 2010, there was a Non-Hispanic White applicant for an open Police Officer position that was recommended to be hired. The Mayor refused to hire this Non-Hispanic White officer despite the position being open and the applicant being highly qualified.

75. The Mayor openly pushes a racist agenda. Some examples:

a. In written testimony to a Joint State Committee, the Mayor states that the members of the County and Town Industrial Development agencies "...never come from our community, look anything like us, or share our pain."

15

b. In a campaign video, the Mayor states, "To all my brothers and sisters we are the majority not the minority."

c. Ironically, upon information and belief, the Mayor has vowed, "to right the wrongs of racism."

76. There are also numerous examples of Non-Hispanic White employees who have been terminated and replaced with less qualified Hispanic and Black employees:

a. Upon information and belief, the Mayor replaced the Non-Hispanic White Executive Director of Human Resources with an unqualified female Hispanic and then, a Black male, who was a suspended attorney.

b. Upon information and belief, the Mayor demoted the Non-Hispanic White Superintendent of the department of Public Works and replaced him with a Black male who had no qualifications or experience. He had to be extensively trained following the promotion. Prior to this, he had been mowing lawns.

c. Upon information and belief, the Mayor demoted the Non-Hispanic White Superintendent of Buildings to Assistant Superintendent of Buildings, replacing him with a Black male who owed property taxes on his residence to the Village and who had no supervisory experience or other qualifications for the position.

d. The Mayor fired the Non-Hispanic White Tax Assessor who had worked for the Village for many years. In her place, he hired a Black male with no experience or degree. As a result, the former Non-Hispanic White employee was then hired as a consultant to work for the Village and do her job because the Black male hired was incapable of performing his job.

     e.  Other Non-Hispanic White employees throughout the Village of Freeport have been terminated, forced to retire or transferred without justification while less qualified Hispanic and Black employees were hired to replace them.

77.    The Mayor has acted out of racial animosity and bigotry towards Barrella and other Non-Hispanic White employees.

78.    Since the Mayor became Mayor, there is a significant Village-wide disparity in the salaries of Non-Hispanic White employees compared to minority employees.

79.    The Mayor has purposefully discriminated against Non-Hispanic Whites in an effort to fill the Command Staff and other Village positions with Hispanic and Black individuals.

80.    Barrella is a highly decorated, respected, and valued member of the VFPD.  He is experienced, extremely qualified and worthy of a Command Staff position, and because of his race, was dismissed out of hand and never considered by the Mayor.  Instead, the Mayor searched high and low and attempted to change laws and regulations for the pure reason of keeping Barrella from his well-deserved position.

81.    Barrella has been discriminated against on account of his race and/or color.  As a result, Barrella has suffered severe emotional and physical damages in addition to the lowered salary and damage to his reputation and career.

## COUNT I:
## DISCRIMINATION UNDER 42. U.S.C. § 1981 *et seq.*

82.    Plaintiff repeats and realleges each and every allegation contained heretofore in this Complaint.

83.    The Defendants unlawful discrimination on the basis of Barrella's race constitutes a violation of 42 U.S.C. §§ 1981 *et seq.*

84.    As a result of this illegal action, Plaintiff has been damaged by having lost wages and benefits since his failure to promote.  Additionally, Plaintiff has been physically and emotionally damaged in an amount that is not presently calculable due to the ongoing and future effects.

## COUNT II:
## DISCRIMINATION UNDER 42. U.S.C. § 1983 *et seq.*

86.    Plaintiff repeats and realleges each and every allegation contained heretofore in this Complaint.

87.    The Mayor acted under color of state law when he condoned this treatment and affected Plaintiff's failure to promote.  The Mayor had final policymaking authority in this regard.

88.    The Mayor took the actions he did, in whole or in part, because of Plaintiff's race.

89.    The Defendants unlawful discrimination on the basis of Barrella's race constitutes a violation of 42 U.S.C. §§ 1983 *et seq.*

90.    As a result of this illegal action, Plaintiff has been damaged by having lost wages and benefits since his failure to promote.  Additionally, Plaintiff has been physically and emotionally damaged in an amount that is not presently calculable due to the ongoing and future effects

## COUNT III:
## RACE/COLOR DISCRIMINATION UNDER TITLE VII

91.    Plaintiff repeats and realleges each and every allegation contained heretofore in this Complaint.

92.    The Defendants unlawful discrimination on the basis of Barrella's race and/or color constitutes a violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*

18

93.     As a result of this illegal action, Plaintiff has been damaged by having lost wages and benefits since his failure to promote/hire.    Additionally, Plaintiff has been physically and emotionally damaged in an amount that is not presently calculable due to the ongoing and future effects.

## COUNT IV:
## RACE/COLOR DISCRIMINATION UNDER
## THE NEW YORK STATE HUMAN RIGHTS LAW

94.     Plaintiff repeats and realleges each and every allegation contained heretofore in this Complaint.

95.     The Defendants unlawful discrimination on the basis of Barrella's race and/or color constitutes a violation of the New York State Human Rights Law, Executive Law §§ 290 *et seq*.

96.     As a result of this illegal action, Plaintiff has been damaged by having lost wages and benefits since his failure to promote.    Additionally, Plaintiff has been physically and emotionally damaged in an amount that is not presently calculable due to the ongoing and future effects.

**WHEREFORE**, as a result of the discriminatory conduct and actions of Defendants herein alleged, Plaintiff Christopher Barrella demands:

A.     That he be made whole in the form of back pay and front pay and afforded all benefits which would have been afforded him but for said discrimination;

B.     Defendants be ordered to compensate, reimburse and make him whole for compensatory damages in an amount to be determined at trial;

C.     Defendants be ordered to pay him punitive damages in an amount to be determined at trial;

D.     Defendants be ordered to pay him prejudgment interest;

E.     Defendants be ordered to pay the costs and disbursements of this action, including his

fees; and

F.     For such other and further relief as may be just and proper.

Dated: January 25, 2012
       New York, NY 10022

                                    Respectfully submitted,

                                    FUGAZY & ROONEY LLP

                                    By:_____
                                    Amanda M. Fugazy
                                    Sheryl L. Maltz
                                    437 Madison Avenue, 35th Floor
                                    New York, NY 10022
                                    (212) 346-0570

                                    *Attorneys for Plaintiff*

20