**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
CHRISTOPHER BARELLA,

               Plaintiff,

         -against-

VILLAGE OF FREEPORT and ANDREW
HARDWICK, as both Mayor and in his
individual capacity,

              Defendants.
------------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
12-CV-0348 (ADS)(WDW)

<u>**APPEARANCES:**</u>

**Fugazy & Rooney LLP**
*Attorneys for the Plaintiff*
126 Glen Street
Glen Cove, NY 11542
     By: Amanda M. Fugazy, Esq.
        Adam C. Weiss, Esq., Of Counsel

**Harris Beach PLLC**
*Attorneys for the Defendant Village of Freeport*
The Omni
333 Earle Ovington Blvd., Suite 901
Uniondale, New York 11553
      By: Keith M. Corbett, Esq., Of Counsel

**Rivkin Radler, LLP**
*Attorneys for the Defendant Andrew Hardwick*
EAB Plaza
Uniondale, NY 11556
     By: Kenneth A. Novikoff, Esq.
       Tamika N. Hardy, Esq., Of Counsel

**SPATT, District Judge**

      On January 25, 2012, the Plaintiff Christopher Barella (the "Plaintiff") commenced this

action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et*

*seq.*, 42 U.S.C. § 1981, 42 U.S.C. § 1983, and the New York State Human Rights Law,

Executive Law § 290, *et seq.* ("NYSHR"). The complaint alleges that the Village of Freeport (the "Village") and its former Mayor, Andrew Hardwick ("Hardwick"), failed to promote the Plaintiff to the position of Chief of Police, or another position within the Village Police Department, on the basis of his race/color and national origin. The Plaintiff also asserts that, during Hardwick's four years as Mayor of the Village, he systematically hired and promoted less qualified and less experienced African-American and Hispanic employees over more qualified and more experienced Non-Hispanic White employees.

On November 5, 2012, the Plaintiff filed an amended complaint.

By letter dated December 24, 2013, the Plaintiff withdrew his Title VII claims against Hardwick.

On February 10, 2014, the Court marked this case ready for trial. Jury selection is scheduled for Wednesday, April 30, 2014 at 9:00 a.m.

On March 10, 2014, Hardwick moved pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56(a) for summary judgment dismissing the amended complaint as against him in his individual capacity. That same day, the Village moved separately pursuant to Fed. R. Civ. P. 12(b)(1) dismissing the Plaintiff's state law claims against it for lack of subject matter jurisdiction and pursuant to Fed. R. Civ. P. 56(a) for summary judgment dismissing the amended complaint against it. Both motions are opposed.

For the reasons set forth herein, the motions for summary judgment are granted in part and denied in part.

Also pending before the Court are several recently-filed motions *in limine* and a motion to squash a subpoena by the parties. As these motions have not been fully briefed, the Court

reserves decision as to them.  To the extent the Court addresses issues raised in those motions *in limine*, it does so only for purposes of these summary judgment motions.

## I.  DISCUSSION

Unless stated otherwise, the following facts are drawn from the parties Rule 56.1 statements and construed in a light most favorable to the non-moving party, the Plaintiff.  Triable issues of fact are noted.

The Plaintiff, a White Non-Hispanic male born in the United States, is currently employed by the Village of Freeport Police Department (the "VFPD") as a Lieutenant.  The Plaintiff began his employment with the VFPD in October of 1990 as a Police Officer.  During his career with the VFPD, the Plaintiff was promoted to the civil service ranks of Sergeant on August 30, 2002 and to Lieutenant on May 11, 2007.

The Plaintiff earned a bachelor's degree in 1990 and a Master's degree in Public Administration in 1993.  In addition, the Plaintiff earned a law degree in 1999, and is admitted to the New York State bar.

The Village is a municipal corporation.  Hardwick, an African-American, was the Mayor of the Village from April 2009 through April 2013.

The three highest-ranking positions in the VFPD, in ascending order, are Deputy Chief; Assistant Chief; and Chief of Police.  These positions are collectively known as the "Command Staff."

The position of the Chief of Police is a civil service title and, therefore, eligibility for promotion to that position is governed by the New York State Civil Service Law.  By contrast, the positions of Deputy Chief and Assistant Chief are non-civil service positions.

There is no requirement that an individual attain the positions of Deputy Chief and/or Assistant Chief prior to becoming the Chief of Police. Nor is there a time in rank requirement for the positions of Deputy Chief and Assistant Chief. Similarly, there is no requirement that an officer have a college degree of any kind to be appointed to the positions of Deputy Chief; Assistant Chief; or Chief of Police of the VFPD.

According to the New York Civil Service Law, an individual is eligible for appointment to the position of the Chief of Police of the VFPD when he/she has: (1) served as Lieutenant for four years or a Captain for two years; (2) passed a promotional examination; and (3) attained one of the three highest scores on that examination. The three highest scoring candidates on the Chief of Police promotional exam are equally eligible to be promoted. There are no other requirements that an officer must satisfy to be eligible for promotion to the position of the Chief of Police.

In the Village, the Mayor is the appointing authority, although it appears that any appointments are subject to the approval by the non-party Village Board of Trustees.

When Hardwick took office in April 2009, Lieutenant Debbie Zagaja ("Zagaja") was the Deputy Chief; Lieutenant Al Gros ("Gros") was the Assistant Chief; and Michael Woodward ("Woodward") was the Chief of Police. All three individuals are Non-Hispanic Whites.

According to the Plaintiff, one of Hardwick's primary goal upon taking office was aimed at hiring and promoting African-Americans and Hispanics rather than Non-Hispanic Whites, regardless of merit. The Plaintiff asserts, to that end, the Hardwick systematically terminated and demoted qualified, experienced Non-Hispanic White employees, and replaced them with less qualified and less experienced Hispanic and African-American employees.

For example, Hardwick allegedly demoted Lou DiGrazia, a Non-Hispanic White Superintendent of the Village Department of Public Works, and replaced him with Scott Richardson, an African-American, who had less qualifications and experience. The Plaintiff also points to the hiring of Donovan Gordon, an African-American lobbyist, for a newly created position, although neither Gordon, nor his company, were licensed lobbyists in New York. Hardwick also allegedly replaced Ray Straub, the Non-Hispanic White Executive Director of Human Resources, with Daihana Torres, an "unqualified" Hispanic and then, Stafford Byers, an African-American "suspended" attorney. Hardwick also allegedly fired Bernadine Quinton, a Non-Hispanic White Tax Assessor, and replaced her with James Smith, an African-American with no training in that field.

Further, the Plaintiff cites Village statistics which show that from April 2009 to April 2013 – Hardwick's tenure as mayor – African-Americans and Hispanics constituted 96% (191 of 198) of seasonal hires and 96% (23 of 24) of those re-hired for positions in the Village. At the same time, more than 90% of the Department heads who retired, resigned, or were not reappointed were White persons.

The Plaintiff contends that these statistics take on added significance in light of the racial composition of the Village and its neighboring areas as well as applicable workforce figures. In particular, according to 2010 census data, White persons constituted 40.5% of the Village's population and 68.3% of the Town of Hempstead, in which the Village is situated. Of the eligible labor force in Nassau County, White persons constituted 66.1% of eligible workers, while African-Americans totaled 11% and Hispanics 14.5%.

As a general matter, the Defendants do not dispute these statistics, but rather contend that

they are irrelevant to the issue in this case, namely whether Hardwick and the Village discriminated against the Plaintiff in failing to promote him to the Command Staff.

The Plaintiff contends that, in furtherance of Hardwick's race-based agenda, Hardwick set his sights on altering the racial makeup of the Command Staff. On the other hand, the Defendants contend that Hardwick desired to make changes to the Command Staff because the cost of the combined salaries and benefits of Zagaja, Gros, and Woodward – approximately $1,000,000 annually – was unsustainable for the Village. Hardwick also believed that the VFPD should become more community-oriented and that an effort should be made to improve the residents' opinions about the VFPD. Finally, Hardwick believed that certain problems needed to be addressed in order to accomplish these goals, including, but not limited to, resolving crime at the local train station and putting an end to loitering; littering; graffiti; and public urination.

At some point, Hardwick initiated discussions for a retirement package with Woodward, which he ultimately accepted. The Plaintiff contends that Woodward did so unwillingly.

Hardwick also decided not to renew the contracts of Gros and Zagaja when they expired. After the expiration of their respective contracts, Gros and Zagaja could each continue with the VFPD in their civil service title of Lieutenant if he or she chose. However, rather than continuing as a Lieutenant, Gros retired.

The Plaintiff asserts that, at some time in 2009, Hardwick approached Lieutenant Miguel Bermudez ("Bermudez") about a Command Staff position. Hardwick and Bermudez had known each other for approximately 25 to 30 years at the time Hardwick was elected mayor. They met through their membership in the Freeport Fire Department ("FFD") and were friends. Based on this history and relationship, Hardwick trusted Bermudez. On the other hand, before Hardwick was elected mayor, he and the Plaintiff did not know each other.

The Plaintiff describes Bermudez as a "Cuban-born, Hispanic" while the Defendants describe him as a "white latino male."

Bermudez, who does not have a college degree, joined the VFPD as a Police Officer in 1986, four years before the Plaintiff joined in 1990. Also, Bermudez was promoted to Sergeant in February 1993, approximately nine years before the Plaintiff was promoted to Sergeant in August 2002.

Bermudez served as an Administrative Sergeant under former Chief Woodward. In that capacity, he performed administrative duties for the Command Staff.

Beginning in or around October 2009, Hardwick referred to Bermudez as the "Chief" and granted him a department cell phone, a benefit typically reserved for Command Staff personnel. The Plaintiff also asserts that, prior to Bermudez's promotion to the Command Staff, Bermudez was included on Command Staff emails and other Command Staff activities.

On January 28, 2010, the Nassau County Civil Service Commission ("NCCSC") announced that a promotional examination for the position of Chief of Police of the VFPD would be held on March 6, 2010. To be eligible for the Chief of Police examination, Civil Service Law required a minimum of four years of experience in the prior rank (i.e. Lieutenant or higher) or two or more years as a Captain. At that time, in the VFPD, the only three individuals who satisfied that experience prerequisite were Non-Hispanic White individuals.

Indeed, as of March 2010, the Plaintiff was not eligible to sit for the Chief of Police examination or to be promoted to the position of the Chief of the Police because he had not been a Lieutenant for at least four years. For the same reason, as of March 2010, Lieutenant Ed Thompson ("Thompson") and Bermudez were ineligible to sit for the Chief of Police examination or to be promoted to that position.

In late February 2010, Hardwick supported a bill introduced before the New York State Assembly that would have given him wider hiring discretion and allowed him to bypass the stated requirements for the Chief of Police examination. While the bill was pending, Hardwick filed a lawsuit against the NCCSC in an attempt to prevent the Chief of Police examination from being administered and/or graded. Ultimately, on March 6, 2010, the Village participated in the Chief of Police examination, but permitted all Lieutenants to participate, regardless of their time in the rank. Utlimately, Zagaja, Paul Jurgens ("Jurgens"), Wayne Giglio ("Giglio), Thompson, Bermudez, and the Plaintiff sat for the Chief of Police examination.

The Plaintiff received the highest score; Giglio, a Non-Hispanic White lieutenant received the second highest score; and Bermudez received the third highest score.

In or about April 2010, Hardwick recommended to the Board of Trustees of the Village that Bermudez be appointed the Deputy Chief. The Board unanimously ratified this appointment. The Plaintiff was not interviewed for this position.

On or about April 6, 2010, the Village and Bermudez entered into an employment contract which provided that Bermudez would serve as the Deputy Chief until Gros's retirement became effective on July 1, 2010, at which point, Bermudez would fill the position of the Assistant Chief.

Also, in April 2010, Hardwick announced his intention to promote, Zina Leftenant, an Africa-American, to the position of Deputy Chief of Police. The Plaintiff asserts that Leftenant was woefully unqualified for the position and lacked any supervisory or police experience. The Plaintiff admits that the Board of Trustees refused to consider Leftenant's candidacy.

In or about June 2010, the Village and the NCCSC entered into a stipulation by the terms of which all VFPD Lieutenants, regardless of their time in rank, who received a passing grade on

the Chief of Police examination were eligible to be promoted to that position, subject to the provisions of New York State Civil Service Law 61.

On July 1, 2010, with no interviews being held, Hardwick promoted Bermudez to the position of the Assistant Chief.

In September 2010, after the examination scores were made public, the Plaintiff forwarded his resume to Hardwick, the Village Board of Trustees, and the Village Attorney, seeking the position of Chief of Police. The Plaintiff states that Hardwick told him that he would hold interviews for the position of Chief of Police within the next few weeks. However, no such interviews were held.

The Plaintiff further asserts that, while Hardwick essentially groomed Bermudez to be the Chief of Police, Bermudez engaged in several incidents of bigoted behavior against homosexuals and immigrants on facebook. Also, while presiding over his first supervisor's meeting as the Deputy Chief, Bermudez allegedly played a video for his subordinates of an actor portraying Adolf Hitler yelling at his troops. Bermudez twice told those present, including the Plaintiff, "I can turn into that guy," referring to Hitler. During this meeting, Bermudez allegedly referred to a list of officers not offered overtime as "Schindler's List." The Plaintiff also alleges that Bermudez displayed a history of a "severe lack of judgment," pointing to an incident, for example, when Bermudez directed the Plaintiff to draft a letter concerning a traffic infraction that contained information Bermudez allegedly knew to be untruthful.

Nonetheless, on November 25, 2010, Hardwick, who apparently knew about Bermudez's alleged troubling behavior, promoted Bermudez to the position of the Chief of Police. At the time of the appointment, the Village Board of Trustees was composed of two white males; a Puerto Rican female; and one Hispanic male. Hardwick apparently never interviewed the

Plaintiff or Giglio for the position of the Chief of Police. Also, Hardwick never re-filled the Assistant Chief position formerly held by Bermudez.

The Defendants maintains that Bermudez subsequently offered the position of the Deputy Chief to the Plaintiff. The Plaintiff alleges that Bermudez recommended Jergens for the Deputy Chief position. In any event, Hardwick ultimately appointed Lieutenant Raymond Horton, a White Non-Hispanic, to the position of Deputy Chief.

The Plaintiff concedes that he never heard Hardwick (1) utter any derogatory statement regarding Non-Minorities or Non-Hispanics; (2) state that Non-Hispanic Whites were not qualified for positions in the Village or that African-Americans and Hispanic were more qualified than Non-Hispanic Whites; or (3) state that he was not promoting the Plaintiff to the Command Staff because of his race or ethnicity. The Plaintiff further concedes that no witness deposed in this case, other than the Plaintiff, testified that the reason Hardwick declined to appoint the Plaintiff to the Command Staff was because of his race and/or ethnicity. Rather, the Plaintiff asserts that the overwhelming weight of circumstantial evidence suggests discrimination on the part of Hardwick and the Village, and, at the very least, triable issues of fact exist regarding these matters.

On August 25, 2011, the Plaintiff filed a charge with the United States Equal Employment Opportunity (the "EEOC"), alleging that he was discriminated against and passed over for promotions as a result of his race and national origin. The same day, the Plaintiff served a notice of claim on the Village. Thus, the Village did not receive notice of the Plaintiff's claims until approximately eight months after the Plaintiff's claims accrued. As noted below, the parties dispute whether a notice of claim is required under New York General Municipal Law when, as

here, the entity-defendant is a village rather than a county. On October 11, 2011, the Plaintiff received a "Notice of Right to Sue" letter from the EEOC.

On January 25, 2012, the Plaintiff commenced this action, asserting race and national origin discrimination in violation of Title VII; race and national origin discrimination in violation of Section 1983; race discrimination in violation of Section 1981; and race and national origin discrimination in violation of the NYSHRL. On November 5, 2012, the Plaintiff filed an amended complaint. As stated above, by letter dated December 24, 2013, the Plaintiff withdrew his Title VII claims against Hardwick.

It bears mentioning that the Plaintiff is not alleging a violation of the New York State Civil Service Law. In this regard, the Plaintiff asserts that technical compliance with the Civil Service Law does not immunize a municipal decision-maker with regard to anti-discrimination laws.

The parties engaged in extensive discovery, included eight depositions of party and non-party witnesses, including Woodward and Bermudez.

Of relevance here, at his deposition, Woodward described Hardwick as "not honest" and one with a tendency to "manipulate facts for his own benefit." Woodward also testified that he believed Hardwick discriminated against Village employees on the basis of race. On the other hand, Bermudez stated that he had no reason to believe that he was selected the Chief of Police because he was Hispanic.

Woodward also stated that the Plaintiff was not ready to be the Chief of Police, as he needed more experience and, could at times be abrasive. At the same time, Woodward testified that the fact that Bermudez did not have a college degree did not disqualify him or make him unqualified to become the Chief of Police.

Hardwick testified that he had known Bermudez for 30 years; they served together in the fire department; and they had a good professional rapport. Hardwick conceded that, when he introduced Bermudez as the new Chief of Police, he publicly referred to Bermudez as "the Village's first Hispanic Chief of Police."

The Court now considers the Defendants' respective motions for summary judgment, structuring this opinion by claim rather than by party and, where appropriate, drawing distinctions between race and national origin-related issues.

## II. DISCUSSION

A. <u>The Legal Standard on a Motion for Summary Judgment</u>

Summary judgment may not be granted unless the submissions of the parties taken together "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a material fact question, and in making this determination the court must view all facts in the light most favorable to the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on mere "allegations or denial" of the movant's pleadings. Fed. R. Civ. P. 56(c); <u>Hicks v. Baines</u>, 593 F.3d 159, 166 (2d Cir. 2010). "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment." <u>Ridinger v. Dow Jones & Co. Inc.</u>, 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted).

In cases involving claims of employment discrimination "an extra measure of caution is merited" in granting summary judgment because "direct evidence of discriminatory intent is rare

and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted). Nonetheless, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008). Ultimately, the test for summary judgment "is whether the evidence can reasonably support a verdict in plaintiff's favor." James v. N.Y. Racing Ass'n, 233 F.3d 149, 157 (2d Cir. 2000).

B. Are the Plaintiff's NYSHRL Claims Barred by the Notice of Claim Statute?

As an initial matter, the Court considers the Village's contention that the Court lacks subject matter jurisdiction over the Plaintiff's NYSHRL claims because the Plaintiff failed to timely file a notice of claim under General Municipal Law Section 50-(i), (e).

Section 50–i of the New York State General Municipal Law provides that a plaintiff may not maintain an action "for personal injury, wrongful death or damage to real or personal property" that the plaintiff alleges to have been sustained "by reason of the negligence or wrongful act" of, among other entities, a village, unless the Plaintiff has timely filed a notice of such claim. N.Y. Gen. Mun. L. § 50–i(a). New York General Municipal Law § 50–e provides that, as a condition precedent to filing suit, a notice of claim must be filed against the municipal entity within ninety days after the claim accrues. N.Y. Gen. Mun. Law § 50–e(1)(a).

However, as the plain language of the statute makes clear, this provision applies to tort actions, not to discrimination claims brought under Section 296 of the New York Executive Law. Graham v. Watertown City Sch. Dist., 7:10-CV-756 (DNH), 2011 WL 1344149, at *12 (N.D.N.Y. Apr. 8, 2011), citing Gentile v. Town of Huntington, 288 F. Supp. 2d 316, 320 (E.D.N.Y. 2003)(Spatt, J.); see also Keating v. Gaffney, 182 F. Supp. 2d 278, 290-291 (E.D.N.Y. 2001) ("employment discrimination claims [brought] against municipal as opposed to county

13

defendants are exempt from the notice of claim requirement"); <u>Hamm v. NYC Office of the Comptroller Alan Hevesi</u>, No. 95 Civ. 6367 (JFK), 1998 WL 92395, at *6 (S.D.N.Y. March 4, 1998) (holding that the discrimination claims brought pursuant to Executive Law § 296 are not tort actions and are thus not subject to Section 50–e's notice of claim requirement); <u>Dimonda v. New York City Police Dep't</u>, No. 94 Civ. 0840 (JGK), 1996 WL 194325, at *6 (S.D.N.Y. April 22, 1996) (the notice of claim provisions embodied in sections 50–e and 50–i are not applicable to the claims of discrimination brought pursuant to Executive Law § 296) (citations omitted).

The Court declines to follow <u>Hines v. Vill. of Hempstead Police Dep't</u>, 725 F. Supp. 2d 368 (E.D.N.Y. 2010), which holds to the contrary. <u>Id.</u> at 370 ("Where as here, a plaintiff brings a claim for employment discrimination against a village, failure to file a notice of claim bars the action"). In rendering that holding, the <u>Hines </u>court largely relied on <u>Cody v. County of Nassau</u>, 577 F. Supp. 2d 623, 648-49 (E.D.N.Y. 2008); <u>Alessi v. Monroe County</u>, 07-CV-6163 (MAT), 2010 WL 161488, at *11 (W.D.N.Y. 2010); and <u>Mills v. County of Monroe</u>, 59 N.Y. 2d 307, 464 N.Y.S. 2d 709, 712, 451 N. E. 2d 456 (1983), all cases against a county rather than a village. <u>Pustilnik v. Hynes</u>, No. 99 Civ. 4087 (JG), 2000 WL 914629, at * 7 (E.D.N.Y. June 27, 2000) (describing the distinction between claims brought against municipal defendants and claims against county defendants). In this regard, the Court notes that <u>Hines</u> has not been cited by any other court.

Accordingly, the Court denies the Village's motion to dismiss the NYSHRL claims against it for lack of subject matter jurisdiction with regard to the filing of a notice of claim.

C. <u>Can Hardwick be Individually Liable Under the NYSHRL?</u>

The NYSHRL provides for individual liability, where a defendant has "an ownership interest," or "the authority to 'hire and fire' employees," under a theory of direct liability; <u>see</u>

N.Y. Exec. L. § 296(1); Edwards v. Jericho Union Free Sch. Dist., 904 F. Supp. 2d 294, 304 (E.D.N.Y. 2012); see also Scalera v. Electrograph Sys., Inc., 848 F. Supp. 2d 352, 371 (E.D.N.Y. 2012) (noting the circumstances under which individuals may be liable under NYSHRL), or where a defendant "actually participates in the conduct giving rise to a discrimination claim," as an aider or abettor. Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995), abrogated on other grounds by Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633, (1998), see also Tully–Boone v. North Shore-Long Island Jewish Hosp. Sys., 588 F. Supp. 2d 419, 425-26 (E.D.N.Y. 2008).

Here, contrary to the contention of Hardwick, there is evidence in the record that he enjoyed the authority to hire and fire employees and that he did, in fact, play a role in hiring all department heads during his tenure as Mayor. Alternatively, given Hardwick's personal role in the conduct giving rise to the Plaintiff's discrimination claims, he can be held individually liable under the NYSHRL as an aider or abettor of discriminatory conduct.

D. Can the Plaintiff Bring Both Title VII and Section 1983 Claims?

Hardwick argues that the Plaintiff cannot bring both Title VII claims and Section 1983 claims concurrently. Section 1983 provides for an action at law against a "person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and law." 42 U.S.C. § 1983. "Section 1983 'is not itself a source of substantive rights'"; instead, it "merely provides 'a method for vindicating federal rights elsewhere conferred,' such as those conferred by § 1981." Patterson v. City of Oneida, 375 F.3d 206, 225 (2d Cir. 2004), quoting Baker v. McCollan, 443 U.S. 137, 144 n. 3, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979). Indeed, "the express cause of action for damages created by § 1983

constitutes the *exclusive* federal remedy for violation of the rights guaranteed in § 1981 by state governmental units. . . ." Jett v. Dall. Indep. Sch. Dist., 491 U.S. 701, 733, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989)(emphasis added).

Although a § 1983 action may not be brought to vindicate rights conferred only by a statute that contains its own enforcement structure, such as Title VII, id., a Title VII plaintiff may bring a concurrent § 1983 claim "if some law other than Title VII is the source of the right alleged to have been denied." Saulpaugh v. Monroe Cmty. Hosp., 4 F.3d 134, 143 (2d Cir. 1993); see also Patterson, 375 F.3d at 225 ("'A Title VII plaintiff is not precluded from bringing a concurrent § 1983 cause of action' . . . 'so long as the § 1983 claim is based on a distinct violation of a constitutional right.'")(citation omitted).

Here, the source of Plaintiff's § 1983 claim is 42 U.S.C. § 1981. See Reed v. Conn. Dep't of Transp., 161 F. Supp. 2d 73, 85 (D. Conn. 2001) (noting that the source of plaintiff's § 1983 claim was § 1981); see also Urquhart v. Metro. Transp. Auth., 07 CIV. 3561 (DAB), 2013 WL 5462280, at *14 (S.D.N.Y. Sept. 25, 2013).

In this regard, Hardwick's reliance on Thomas v. New York City Dep't of Educ., 938 F. Supp. 2d 334, 349 (E.D.N.Y. 2013) is misplaced. There, applying Patterson, the court noted that a "plaintiff can bring an equal protection claim based on age discrimination, but cannot use violations of employment discrimination statutes as a basis for a § 1983 claim." Id. at *12. Here, by contrast, the amended complaint can be construed as asserting a violation of 42 U.S.C. § 1981 as a basis for the Section 1983 claim. Therefore, the Court denies Hardwick's motion to dismiss the Plaintiff's Section 1983 claims based on race as precluded by his Title VII claims.

However, the Court reaches a different conclusion with respect to the Plaintiff's Section 1983 claims based on national origin, with Section 1981 as the source of that claim. Of

relevance here, Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." Patterson, 375 F.3d at 224.

However, the Court notes that Section 1981 prohibits racial discrimination only. See e.g. Anderson v. Conboy, 156 F.3d 167, 170 (2d Cir. 1998) ("Section 1981 prohibits discrimination based on race. . . . Section 1981 does not prohibit discrimination on the basis of gender or religion, national origin, or age.")(internal citations omitted); Hyunmi Son v. Reina Bijoux, Inc., 823 F. Supp. 2d 238, 242 (S.D.N.Y. 2011) ("Only suits based on racial discrimination may be maintained under" Section 1981)(internal citation omitted); Yaba v. Cadwalader, Wickersham & Taft, 931 F. Supp. 271, 275 (S.D.N.Y. 1996) (citing Albert v. Carovano, 851 F.2d 561, 572 (2d Cir. 1988)) ("Section 1981 protects against racial or ethnic discrimination, nothing else."). Therefore, the Court finds that the Plaintiff cannot assert a Section 1983 claim on the basis of national origin discrimination where, as here, the Plaintiff purports to rely on Section 1981 as the source of that claim.

Accordingly, the Court grants Hardwick's motion to dismiss the Plaintiff's 1983 claims against him based on national origin.

E.  The McDonnell-Douglas Framework

Title VII makes it unlawful for an employer, among other things, to "discharge any individual . . . because of such individual's race . . . or national origin." 42 U.S.C. § 2000e–2(a)(l).  Discrimination cases based on circumstantial evidence brought pursuant to the Title VII are analyzed under the familiar burden-shifting framework established in McDonnell–Douglas Corp. v. Green, 411 U.S. 792, 802–03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); United States v. City of New York, 717 F.3d 72, 83–84 (2d Cir. 2013) (discussing application of McDonnell

Douglas framework to race discrimination claim); Ruiz v. Cnty. of Rockland, 609 F.3d 486, 491-92 (2d Cir. 2010) (national origin claims are subject to burden shifting). Similarly, claims under Section 1983, Section 1981, and the NYSHRL are "all are evaluated according to the three-step burden-shifting framework set forth in McDonnell." Jackson v. City of New York, 11-CV-3028 (PKC), 2014 WL 1010785, at *4 (E.D.N.Y. Mar. 17, 2014); see Davis v. Oyster Bay–East, 03–CV–1372 (SJF)(JO), 2006 WL 657038, at *8 n. 12 (E.D.N.Y. Mar. 9, 2006)(noting that "discrimination claims under Title VII, 42 U .S.C. §§ 1981 and 1983, and NYHRL § 296 are analyzed together, as the same analytic framework applies to each"), aff'd 220 Fed. App'x 59 (2d Cir. 2007).

Under this burden-shifting framework, a plaintiff must first establish a *prima facie* case by showing that "(1) at the relevant time the plaintiff was a member of the protected class; (2) the plaintiff was qualified for the job; (3) the plaintiff suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination." Woodman v. WWOR–TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005). The plaintiff's burden in establishing a prima facie case is *de minimis*. Gue v. Suleiman, No. 10 Civ. 8958 (RLE), 2012 U.S. Dist. LEXIS 141295, at *18, 2012 WL 4473283, at *7 (S.D.N.Y. Sept. 27, 2012). If the plaintiff establishes a *prima facie* case, the burden of production shifts back to the employer to set forth a legitimate non-discriminatory reason for its actions. Patterson, 375 F.3d at 221 (citation omitted). The burden then shifts back the plaintiff to show that the employer's reason is pretextual and that it masks the employer's true discriminatory reason. Paterson, 375 F.3d at 221. Ultimately, the plaintiff bears the burden of persuading the trier of fact of intentional discrimination by the employer. James, 233 F.3d at 154.

The Court will now consider whether issues of fact exist as the elements of the Plaintiff's *prima facie* claims; the Defendants' non-discriminatory explanations; and pretext. The Court also will consider the Village's liability under Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691, 98 S. Ct. 2018 (1978).

1. Protected Class

In the instant case, the Plaintiff is a White Non-Hispanic employee who claims he was subjected to discrimination by the Defendants, the Village and Hardwick.

In 1976, the Supreme Court of the United States held that the terms of Title VII "are not limited to discrimination against members of any particular race." McDonald v. Santa Fe Rail Transp. Co., 427 U.S. 273, 278-79, 96 S. Ct. 2574 (1976). In describing Title VII, the Supreme Court cited Griggs v. Duke Power Co., 401 U.S. 424, 91 S. Ct. 849 (1971), where the Court stated: "Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed." Id. at 431. "Thus, it appears that the Supreme Court did not intend to limit the protections of Title VII to racial minorities only." Barounis v. New York City Police Dep't, 10 CIV. 2631 (SAS), 2012 WL 6194190, at *7 (S.D.N.Y. Dec. 12, 2012).

Despite this directive from the Supreme Court, the Second Circuit "has yet to expressly adopt a test for determining whether a non-minority plaintiff qualifies as a member of a protected group." Adamczyk v. New York State Dep't of Corr. Servs., No. 07–CV–523S (WMS), 2011 WL 917980, at *5 (W.D.N.Y. Mar. 14, 2011) (citing Tappe v. Alliance Capital Mgmt. L.P., 177 F. Supp. 2d 176, 181 (S.D.N.Y. 2001)). "While the Second Circuit may not have addressed this issue expressly, it certainly has done so implicitly." Barounis, 2012 WL 6194190, at *7.

For example, in McGuiness v. Lincoln Hall, 263 F.3d 49 (2d Cir. 2001), the Second Circuit held that the plaintiff, a white woman, established a *prima facie* case of race and sex

discrimination under Title VII when she alleged that a fellow employee, a similarly situated

African-American, received a superior severance package:

> It is not contested that plaintiff is a white woman and that she was qualified for
> the position.  Furthermore, plaintiff has proffered evidence sufficient to allow a
> trier of fact to find that defendant offered her a different and less desirable
> severance package (one which involved less money) than it offered to plaintiff's
> colleague Carlton Mitchell, a black man who like plaintiff was an executive-level
> employee, and who was discharged two days after plaintiff.  Under the
> circumstances of this case, this evidence alone satisfied plaintiff's 'minimal'
> burden to establish a prima facie case that she was treated differently on the basis
> of her race *and* gender.

Id. at 53 (emphasis added).

More recently, the Second Circuit held that a plaintiff, a white male, established a *prima*

*facie* case of race discrimination pursuant to Section 1981 under the first step of the McDonnell

Douglas burden-shifting framework. See Broich v. Incorporated Vill. of Southhampton, 462 Fed.

App'x 39, 44 (2d Cir. 2012).  In Broich, the plaintiff was a Caucasian police officer who brought

suit alleging that the defendants discriminated against him on the basis of race when they

promoted a black co-worker with less seniority to a detective position instead of him.  The court

first addressed the plaintiff's failure-to-promote claim under Section 1981, noting that the first

*prima facie* element of a section 1981 case requires a plaintiff to show is that he is a member of a

"racial minority."  In a footnote, the court stated: "It is clear that § 1981 'protect[s] all persons,

including whites, from discrimination on account of race.'" Id. at 42 (quoting Keating v. Carey,

706 F.2d 377, 383 n. 9 (2d Cir. 1983), citing McDonald, 427 U.S. at 295-96 (internal quotation

marks omitted)).

The court then analyzed the second *prima facie* element of a section 1981 case – an

intent to discriminate on the basis of race – by referring to Title VII. See id. ("A plaintiff's efforts

to establish the second element of a § 1981 claim are subject to the same burden shifting analysis

as intentional discrimination claims brought under Title VII . . . .").  The court noted that in order to establish a *prima facie* case of employment discrimination under Title VII, a plaintiff must show, among other things, that he or she belonged to a protected class. See id.  Again, without elaborating on this first element, the court held "that there is sufficient evidence for a factfinder to infer that [plaintiff] was passed over for promotion under circumstances giving rise to an inference of discrimination." Id. at 43.  Accordingly, the court found that the plaintiff established a *prima facie* case of employment discrimination pursuant to Section 1981 for purposes of the first step of the McDonnell Douglas framework. See id. at 44.  In doing so, the court assumed that a white male plaintiff could satisfy all of the *prima facie* elements of a Section 1981 case, including the first element.

"In sum, given the implicit holding in Broich, coupled with the express language in McDonald, it is fair to assume that, in cases of 'reverse discrimination,' a white plaintiff could satisfy the first *prima facie* element of a race discrimination claim under Title VII whether that element is framed as 'being a member of a racial minority' or 'belonging to a protected class.'" Barounis, 2012 WL 6194190, at *8.

That said, "[c]ourts have struggled in attempting to apply the McDonnell-Douglas burden-shifting framework to Title VII suits by white plaintiffs, and no universally accepted statement of the appropriate standard has been established.  The confusion arises from the wording of the first prong of the *prima facie* test because a white plaintiff cannot establish membership in a "protected class" in the same way a plaintiff belonging to a minority group that has been historically discriminated against can." Gorecke v. United Parcel Serv., Inc., 11-CV-6591 (MAT), 2014 WL 1315390, at *4 (W.D.N.Y. Apr. 1, 2014).

In an effort to analyze reverse discrimination cases under the established *prima facie* case standards, some courts require white plaintiffs to establish "background circumstances" supporting the suspicion that the defendant is that unusual employer who discriminates against the majority, see e.g., Parker v. Baltimore & O.R.R. Co., 209 U.S. App. D.C. 215, 652 F.2d 1012, 1017 (D.C. Cir. 1981), instead of proving membership in a historically protected class as required to state a *prima facie* case.  However, other courts have concluded that substituting "background circumstances" for the first prong of stating a *prima facie* case does, in fact, impermissibly raise the bar for pleading a cause of action, and have rejected the Parker analysis for that reason. See Ulrich v. Exxon Co., 824 F. Supp. 677, 683–84 (S.D. Tex. 1993) (describing the "background circumstances" test as imposing a "heightened burden" and citing cases that have criticized it); see also Cully v. Milliman & Robertson, Inc., 20 F. Supp. 2d 636, 641 (S.D.N.Y. 1998) (describing Parker as requiring a "higher *prima facie* burden for reverse discrimination plaintiffs.").

The Second Circuit has not taken a position on this issue, and the district courts in this Circuit have split on it. See e.g., Olenick v. New York Telephone, 881 F. Supp. 113, 114 (S.D.N.Y. 1995) (adopting "background circumstances" test); Cunliffe v. Sikorsky Aircraft Corp., 9 F. Supp. 2d 125 (D. Conn. 1998) (rejecting Olenick ); Ticali v. Roman Catholic Diocese of Brooklyn, 41 F. Supp. 2d 249, 260–262 (E.D.N.Y. 1999) (rejecting "background circumstances" test, and instead assessing whether or not an inference can be drawn from the established facts that the employer treated a Caucasian plaintiff less favorably because of his race); see also Seils v. Rochester City Sch. Dist., 192 F. Supp. 2d 100 (W.D.N.Y. 2002)) (finding "background circumstances" analysis persuasive, but declining to address the issue since the plaintiffs were unable to establish the fourth prong of the *prima facie* inquiry).

In this case, the Court declines to impose a heightened *prima facie* standard for the Plaintiff's Title VII claims.  In a closely reasoned opinion, which this Court finds persuasive, Judge Motley held that, "[a]bsent binding authority to the contrary, this court must assume that McDonald means what it says: a Title VII case is a Title VII case on the 'same terms' for plaintiffs of all races." Cully, 20 F. Supp. 2d at 641.  As such, the Court finds that the Plaintiff has satisfied this *prima facie* element of membership in a protected class based on race.

In addition, the Plaintiff alleges national origin discrimination in violation of Title VII and the NYSHRL.  In particular, the Plaintiff alleges national origin discrimination on the basis that his nationality is American.  For purposes of this summary judgment decision, the Court assumes, without deciding, that the Plaintiff plausibly alleges his membership in a protected class based on national origin.

2.  The Plaintiff's Qualifications for the Position of the Chief of Police

While some cases have interpreted the second prong of McDonnell-Douglas to mean that a plaintiff must demonstrate that before being fired or not promoted, he was "performing [her] duties satisfactorily," McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997), the Second Circuit has clarified the standard by explaining that the difference "between 'qualified for the position' and 'performing satisfactorily' is only a mere variation in terminology." Velez v. SES Operating Corp., No. 07 Civ. 10946 (DLC), 2009 WL 3817461, at *8 (S.D.N.Y. Nov. 12, 2009) (quoting Slattery v. Swiss Reins. Am. Corp., 248 F.3d 87, 91 (2d Cir. 2001)).  Because a plaintiff's burden at this stage is *de minimis*, "all that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer." Slattery, 248 F.3d at 91-92.  Similarly, for this element, the Plaintiff need not show that he was more qualified than Bermudez or any other Village personnel.

On the one hand, the Court notes that the Plaintiff earned the top score on the qualifying examination; enjoyed the requisite rank of Lieutenant; and had extensive academic credentials. There is also record evidence that the Plaintiff possessed over 20 years of experience as a decorated police officer. On the other hand, Woodward testified that the Plaintiff was not ready to be promoted to the position of Chief of Police due to his sometimes abrasive nature.

In the Court's view, triable issues of fact exist as to whether the Plaintiff was qualified for the positions for which he was passed over. Indeed, on a summary judgment motion, "the court is not to weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact. . . . Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment." United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994) (internal citations omitted). Accordingly, the Court denies the Defendants' motion for summary judgment on the basis that, as a matter of law, the Plaintiff was not qualified for a position within the Command Staff.

3. An Adverse Employment Action

As the Defendants acknowledge, "[i]t is well-established that a failure to promote is an adverse employment action." Levitant v. City of New York Human Res. Admin., 13-204-CV, 2014 WL 866480, at *2 (2d Cir. Mar. 6, 2014), citing Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002); see also Mandell v. Cnty. of Suffolk, 316 F.3d 368, 383 (2d Cir. 2003)(citation omitted)(adverse employment action includes failure to promote).

Here, it is undisputed that Hardwick and the Village failed to promote the Plaintiff on more than one occasion. The crux of the dispute is, as discussed below, whether these failures were discriminatory in violation of the Title VII, Section 1983, Section 1981, and the NYSHRL.

Accordingly, the Court denies the Defendants' motion for summary judgment on the ground of lack of an adverse employment action.

4. Whether the Adverse Employment Action Occurred Under Circumstances Giving Rise to an Inference of Discrimination

Inference of discrimination "is a 'flexible [standard] that can be satisfied differently in differing factual scenarios.'" Howard v. MTA Metro–N. Commuter R.R., 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011) (quoting Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996)). "No one particular type of proof is required to show that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination." Ofoedu v. St. Francis Hosp. & Med. Ctr., No. 04–CV–1707 (PCD), 2006 WL 2642415, at *14 (D. Conn. Sept. 13, 2006). An inference of discrimination can be drawn from circumstances such as "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action]." Abdu–Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001) (quoting Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994)); see also Abdul–Hakeem v. Parkinson, 523 F. App'x 19, 20 (2d Cir. 2013) (finding that an inference of discrimination can be raised by "showing that an employer treated [an employee] less favorably than a similarly situated employee outside his protected group" (quoting Ruiz, 609 F.3d at 493)).

In this case, the Court finds that the Plaintiff has produced sufficient evidence giving rise to an inference of discrimination on the basis of race, including, taken together, the respective credentials of the Plaintiff and Bermudez; the fact that Hardwick did not conduct any interviews or review the Plaintiff's resume; the contemporaneous personnel decisions by Hardwick; and the statistical evidence regarding personnel decisions during Hardwick's tenure. "Given that this

[inference of discrimination] hurdle is practically at ground level, [the Court finds that the] Plaintiff makes a *prima facie* case." <u>Brown v. Crowdtwist</u>, 12CV6110 (HB), 2014 WL 1468145, at *2 (S.D.N.Y. Apr. 15, 2014); <u>see</u> <u>Zimmermann v. Assocs. First Capital Corp.</u>, 251 F.3d 376, 381 (2d Cir. 2001) (characterizing the requirement as "minimal" and "*de minimis*").

To the extent the Defendants argue that neither Hardwick nor Bermudez perceived Bermudez to be a member of the minority group and that Bermudez had the "same color complexion" as the Plaintiff, the Court finds that this evidence simply raises factual disputes appropriately reserved for a fact-finder.

In separate motions *in limine* before the Court, the Defendants also seek to exclude (1) as irrelevant the evidence of Hardwick's contemporaneous personnel decisions; (2) as unreliable the statistical evidence regarding personnel decisions; and (3) and, as a stray, non-discriminatory remark, Hardwick's public introduction of Bermudez as the "first Hispanic Chief of Police." As noted above, the Court reserves decision on these motions *in limine*, and any other motions *in limine*, pending full briefing by the parties.

That said, with respect to the contemporaneous personnel decisions, the Defendants claim that none of the proposed witnesses on this issue have first-hand knowledge of the events or surrounding circumstances that support the Plaintiff's claims for discrimination. However, in <u>Graham v. Long Island Rail Road</u>, 230 F.3d 34 (2d Cir. 2000), the Second Circuit explained that one method by which the plaintiff may raise an inference of discrimination is to show that he was treated less favorably than similarly situated employees outside of his protected class. <u>See</u> <u>Graham</u>, 230 F.3d at 39. The court provided guidance on when employees are similarly situated, stating that the plaintiff must establish that she was "similarly situated in all material respects to the individuals with whom she seeks to compare herself." <u>Id.</u> (internal quotations and citation

omitted). "Typically, a key determinant as to the employees who are proper comparators with an employment discrimination plaintiff is whether, [as here], they shared a common supervisor." Russo–Lubrano v. Brooklyn Fed. Sav. Bank, CV06–672 (CPS)(VVP), 2007 WL 2126086, at *1 (E.D.N.Y. July 23, 2007), citing Shumway v. United Parcel Service, Inc., 118 F.3d 60, 64 (2d Cir. 1997).

Thus, the Court concludes that, for purposes of these motions for summary judgment, the Plaintiff may rely on these contemporaneous personnel decisions by Hardwick as circumstantial evidence of disparate treatment on the basis of race.

Similarly, the Court concludes that, for purposes of these motions for summary judgment, the Plaintiff may rely on the proffered statistical evidence regarding the personnel decisions during Hardwick's tenure. As this Court previously held in resolving a discovery dispute between the parties, "[w]hile the Plaintiff does not advance a theory of disparate impact, the Second Circuit has held 'that an individual disparate treatment plaintiff may use statistical evidence' to support a disparate treatment claim in an employment discrimination case." Barella v. Vill. of Freeport, 296 F.R.D. 102, 106 (E.D.N.Y. 2013), quoting Hollander v. Am. Cyanamid Co., 895 F.2d 80, 84 (2d Cir. 1990) (citing cases). "If [the Plaintiff] were to uncover information indicating that he was treated differently from other similarly-situated [Hispanic and African–American] applicants, such information might assist him in proving his allegations that the defendants' [actions were], in fact, due to an impermissible motive." Mitchell v. Fishbein, 227 F.R.D. 239, 249 (S.D.N.Y. 2005).

Turning to Hardwick's public remark characterizing Bermudez as the "first Hispanic Chief of Police," the Court notes that the Second Circuit has held that "[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly

discriminatory behavior, the more probative that remark will be." <u>Tomassi v. Insignia Fin. Grp.</u>, Inc., 478 F.3d 111, 115 (2d Cir. 2007) (citation omitted). "The relevance of discrimination-related remarks . . . depend[s] . . . on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class." <u>Id.</u> at 116. In considering whether a remark is probative of discrimination or whether it is a non-probative "stray remark," a court should consider factors such as: "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." <u>Henry v. Wyeth Pharm., Inc.</u>, 616 F.3d 134, 149 (2d Cir. 2010); <u>see also</u> <u>Obinabo v. Radioshack Corp.</u>, 522 F. App'x 55, 57 (2d Cir. 2013) ("When considering 'stray remarks' as evidence of discrimination, courts consider who made the remark, when the remark was made in relation to the employment decision, the remark's content, and the context in which the remark was made."), citing <u>Henry</u>, 616 F.3d at 149.

Here, in assessing these factors, the Court notes that Hardwick, a supervisor and decision-maker as the Mayor, made the remark in question, after the decision-making process. However, the Court need not conclude that this complained-of remark constitutes sufficient evidence to establish an inference of discrimination. Rather, the Court finds that the complained-of remark, taken together with the evidence in the record as a whole, including the contemporaneous personnel decisions during Hardwick's tenure as Mayor, constitutes sufficient circumstances giving rise to an inference of discrimination. Stated otherwise, the Court finds that a jury could reasonably conclude that Hardwick's decision to promote Bermudez, and his concomitant failure

to consider the Plaintiff for any Command Staff position, resulted from discrimination on the basis of race.

However, the Court reaches a different conclusion with respect to the Plaintiff's claims based on national origin. Aside from the fact that Bermudez was born in Cuba and the Plaintiff was born in America, the Plaintiff fails to set forth any evidence of discrimination on account of national origin. The Court also notes that Hardwick and the Plaintiff are both American in nationality.

To be sure, the Second Circuit has rejected the "suggestion that an inference of discrimination cannot be drawn" when the plaintiff and his employer are members of the same protected group. Feingold v. New York, 366 F.3d 138, 155 (2d Cir. 2004) (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)). In Oncale, the Supreme Court held:

> In the . . . context of racial discrimination in the workplace we have rejected any conclusive presumption that an employer will not discriminate against members of his own race. "Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group."

523 U.S. at 78, 118 S. Ct. 998 (quoting Castaneda v. Partida, 430 U.S. 482, 499, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977)). On the other hand, the fact that the decision-maker, Hardwick is a member of the Plaintiff's protected class "not only weakens any suggestion of discrimination but 'strongly suggest[s] that invidious discrimination is unlikely . . . .'" Adams v. Canon USA, Inc., CIVA 07-3512 (DRH)(WDW), 2009 WL 3064856, at *14 (E.D.N.Y. Sept. 22, 2009)(citation omitted).

In any event, the Court finds that the Plaintiff has not come forward with sufficient evidence to create an issue of fact as to circumstances giving rise to an inference of

discrimination on the basis of national origin. Accordingly, the Court grants the Defendants' motions for summary judgment to the extent the Court dismisses the Plaintiffs' remaining Title VII and NYSHRL claims sounding in national origin discrimination.

5. Legitimate, Non-Discriminatory Reasons

Once, as here, a plaintiff has established a *prima facie* case of unlawful discrimination on the basis of race, the employer must then "articulate some legitimate, nondiscriminatory reason" for the complained-of conduct. Gorzynski v. JetBlue Airways Corp., 596 F.3d 96, 106 (2d Cir. 2010), quoting McDonnell-Douglas, 411 U.S. at 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668. The employer need not prove that its actions were nondiscriminatory; it need only "articulate" a legitimate, nondiscriminatory reason for them. Board of Trustees of Keane State College v. Sweeney, 439 U.S. 24, 25, 99 S. Ct. 295, 58 L. Ed. 2d 216 (1978).

Here, the Court finds that, for purposes of these summary judgment motions, the Defendants have discharged their burden to provide a legitimate, nondiscriminatory explanation for failing to promote the Plaintiff to the Command Staff: namely, Woodward's deposition testimony concerning the Plaintiff's sometimes abrasive attitude and his need for more experience with regular public contact. As the Second Circuit has held, "[t]here is nothing unlawful about an employer's basing its hiring decision on subjective criteria[.]" Byrnie v. Town of Cromwell Public Schools, 243 F.3d 93, 104 (2d Cir. 2001).

6. Pretext

If, as here, the defendant offers a legitimate, nondiscriminatory reason for its promotion decision, the plaintiff may then prove, by a preponderance of the evidence, that the proffered reason is pretextual and that the real reason for the failure to promote the plaintiff was, as in this case, race discrimination. Fisher v. Vassar College, 114 F.3d 1332, 1333 (2d Cir. 1997); Holt v.

KMI–Continental, Inc., 95 F.3d 123, 129 (2d Cir. 1996), cert. denied, 520 U.S. 1228, 117 S. Ct. 1819, 137 L. Ed. 2d 1027 (1997).

To prove pretext, a plaintiff must show that the employer was more likely than not motivated by a discriminatory reason or that the employer's reason is unworthy of belief. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). A "plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." Holcomb, 521 F.3d at 138 (quoting Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir. 1995)); see also Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. ___ , ___ , 133 S. Ct. 2517, 2522-23, 186 L. Ed. 2d 503 (2013); Garcia v. Hartford Police Dep't, 706 F.3d 120, 127 (2d Cir. 2013).

In this case, the Court finds that a triable issue of fact exists as to pretext. For one thing, it is not clear that that Hardwick was aware of the Plaintiff's alleged attitude issues, much less anything else about the Plaintiff. In addition, there is evidence in the record of apparently equal if not greater concerns about Bermudez's professional judgment, issues of which Hardwick was aware.

The Defendants' reliance on Byrnie and its progeny is misplaced. In Byrnie, the Second Circuit held that, where a plaintiff opposes summary judgment solely on the basis that there is a discrepancy in the qualifications of the two candidates, "the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." Byrnie, 243 F.3d at 103.

While "the court must respect the employer's unfettered discretion to choose among qualified candidates," Presser v. Key Food Stores Coop., Inc., 316 F. App'x 9, 11 (2d Cir. 2009), there is evidence in the record that the decision-maker, Hardwick, was not aware of both candidate's credentials or qualifications. Further, the heightened standard applied in Byrnie is applicable only where, unlike here, the plaintiff's disparate treatment claims rests solely on his comparative employment qualifications. Here, other indicia support the Plaintiff's claim of pretext, including: (1) contemporaneous personnel decisions during Hardwick's tenure as the Mayor; (2) and the statistical evidence regarding those personnel decisions.

Viewing the disputed facts in a light most favorable to the Plaintiff and resolving all inferences in the Plaintiff's favor, the Court concludes that a jury could reasonably find that the Defendants' proffered reasons for not promoting the Plaintiff are a pretext for race discrimination in violation of Title VII, Section 1983, Section 1983, and the NYSHRL.

7. The Village's Liability Under Monell

In addition, to "prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008). There must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton v. Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989); see Cash v. Cnty. of Erie, 654 F.3d 324, 333 (2d Cir. 2011) (a plaintiff asserting Monell claim must prove that action taken pursuant to official municipal policy caused the alleged injury). "Official municipal policy [ ] includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent

and widespread as to practically have the force of law." Connick v. Thompson, __ U.S. __ , __, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011) (citing Monell). The "plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." Roe, 542 F.3d at 37 (quoting Board of Cnty. Commis v. Brown, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)).

Whether the official in question is a final policymaker "is a legal issue to be determined on the basis of state law," Terminate Control Corp. v. Horowitz, 28 F.3d 1335, 1349 (2d Cir. 1994), and decided by the court before the case is submitted to the jury. Jett, 491 U.S. at 737, 109 S. Ct. 2702. A plaintiff bears the burden of establishing an official's status as a final policymaker with proof of the official's scope of employment and his role within the municipal or corporate organization. Jeffes v. Barnes, 208 F.3d 49, 57–58 (2d Cir. 2000). "An official's title, though not dispositive of his authority to make policy, is relevant for the inferences fairly to be drawn therefrom." Rookard v. Health and Hospitals Corp., 710 F.2d 41, 45 (2d Cir. 1983) (citation omitted).

In this case, it is undisputed that the Mayor of the Village is an appointing authority. While the appointments are subject to the approval of the Village Board of Trustees, the Defendants concede that the Mayor is entitled to make appointments "in his sole discretion." Under these circumstances, the Court concludes that Hardwick served in a final policy-making position for the Village so that the Section 1983 claims against the Village may proceed.

### III. CONCLUSIONS

In sum, the Court grants in part and denies in part the Defendants' motions for summary judgment. In particular, the Court grants the motions as to the Plaintiff's claims based on national origin discrimination and dismisses those claims. Otherwise, the Court denies the

Defendants' motions for summary judgment.  The Court reserves decision on the other pending

motions.

**SO ORDERED.**
Dated: Central Islip, New York
April 26, 2014


_Arthur D. Spatt_
ARTHUR D. SPATT
United States District Judge