**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
CHRISTOPHER BARRELLA,

                 Plaintiff,

        -against-

VILLAGE OF FREEPORT and ANDREW
HARDWICK, as both Mayor and in his
individual capacity,

                 Defendants.
------------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
12-CV-0348 (ADS)(WDW)

**APPEARANCES:**

**Fugazy & Rooney LLP**
*Attorneys for the Plaintiff*
126 Glen Street
Glen Cove, NY 11542
     By: Amanda M. Fugazy, Esq.
        Adam C. Weiss, Esq., Of Counsel

**Harris Beach PLLC**
*Attorneys for the Defendant Village of Freeport*
The Omni
333 Earle Ovington Blvd., Suite 901
Uniondale, New York 11553
     By: Keith M. Corbett, Esq., Of Counsel

**Rivkin Radler, LLP**
*Attorneys for the Defendant Andrew Hardwick*
EAB Plaza
Uniondale, NY 11556
     By: Kenneth A. Novikoff, Esq., Of Counsel

**SPATT, District Judge**

      On May 28, 2014, following a trial, the jury returned a verdict in favor of the Plaintiff

Christopher Barrella (the "Plaintiff) against the Defendants Village of Freeport (the "Village")

and its former Mayor, Andrew Hardwick ("Hardwick")(collectively the "Defendants") awarding

him $150,000 in damages for loss of back pay, $1,000,000 for loss of future pay, and punitive damages in the amount of $200,000 against Hardwick only. Presently pending before the Court are several post-verdict motions brought by the parties, described in more detail below, seeking various forms of relief, including to set aside the verdict and for attorneys' fees.

By way of background, on January 25, 2012, the Plaintiff commenced this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, 42 U.S.C. § 1981, 42 U.S.C. § 1983, and the New York State Human Rights Law, Executive Law § 290, *et seq.* ("NYSHRL"). The complaint alleged that the Village and Hardwick failed to promote the Plaintiff to the position of Chief of Police, or another position within the Village Police Department, on the basis of his "race/color" and national origin. The Plaintiff also asserted that, during Hardwick's four years as Mayor of the Village, he systematically hired and promoted less qualified and less experienced African-American and hispanic employees over more qualified and more experienced white employees.

Previously, on August 25, 2011, the Plaintiff filed a charge with the United States Equal Employment Opportunity Commission (the "EEOC"), alleging that he was discriminated against and passed over for promotions as a result of his race, color, and national origin. In this regard, the Court notes that, in fact, an EEOC charge provides for separate causes of action for discrimination based on race versus color.

On November 5, 2012, the Plaintiff filed an amended complaint. At various points throughout the amended complaint, the Plaintiff makes reference to "race/color" and "race and/or color." The Court notes that "[d]espite the legal distinction between the concepts, many courts,[including the parties and at times the Court in this case], conflate claims of racial and color discrimination." Salas v. Wisconsin Dep't of Corr., 05-C-399-C, 2006 WL 1049469, at *6

(W.D. Wis. Apr. 17, 2006)(citing <u>Colorable Claims: The Continuing Significance of Color under Title VII Forty Years After Its Passage</u>, 26 Berkeley J. Emp. & Lab. L. 435, 464 (2005)).

By letter dated December 24, 2013, the Plaintiff withdrew his Title VII claims against Hardwick.

On March 10, 2014, Hardwick moved, pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56(a), for summary judgment dismissing the amended complaint as against him in his individual capacity only. That same day, the Village moved separately, pursuant to Fed. R. Civ. P. 12(b)(1), to dismiss the Plaintiff's state law claims against it for lack of subject matter jurisdiction and, pursuant to Fed. R. Civ. P. 56(a), for summary judgment dismissing the amended complaint against it.

In the parties' Rule 56.1 statements, while the national origin claims were still in the case, the Plaintiff conceded that Bermudez, the current Chief of Police, is "White" and "Hispanic." (Rule 56.1 Statement, at ¶ 50.) However, it does not appear that the Plaintiff conceded that Bermudez's race, as opposed to his skin color, was white.

In their respective memoranda in support of their motions for summary judgment, the Defendants maintained that Bermudez's race was white and that his national origin was American. In his opposing memorandum of law, the Plaintiff, in a single section devoted both to his race and national origin claims, stated as follows: "Bermudez is Cuban-born and Hispanic." (Doc. 118, at 14.)

However, at no point did any of the parties expressly argue that this Court should treat the Plaintiff's claims based on race and color separately.

On April 26, 2014, the Court granted in part and denied in part the motions for summary judgment. In particular, the Court granted the motions as to the Plaintiff's claims based on

national origin discrimination and dismissed those claims. The Court denied the motions as to the Plaintiff's claims based on race discrimination. Finally, in tracking the parties' briefs, the Court did not directly address any claim based on the Plaintiff's color as opposed to race.

Specifically, in its decretal paragraph, the Court stated as follows:

the Court grants the motions as to the Plaintiff's claims based on national origin discrimination and dismisses those claims. Otherwise, the Court denies the Defendants' motions for summary judgment.

(Memorandum and Order, at 33-34.)(emphasis added). Therefore, to the extent the Plaintiff brought any independent claims based on the color of the Plaintiff's skin, those claims survived the Defendants' motions for summary judgment.

In the fact and discussion sections of the decision, the Court noted that the Plaintiff described Bermudez as a "Cuban-born, Hispanic" while the Defendants described him as a "white latino male." (Id. at 7.) At various points throughout the decision, the Court referred to certain individuals, including the Plaintiff, as "non-Hispanic whites." However, in doing so, the Court did not credit the Defendants' later argument that hispanic is a type of national origin, as opposed to race, for purposes of the anti-discrimination statutes. Fairly read, the Court was referring to certain individuals' skin color, rather than race, as white. In any event, the Court did not nor was it in a position to make any findings of fact as to any individual's race or skin color.

Ultimately, in denying the motion for summary judgment on the race discrimination claims and granting the motion for summary judgment on the national origin claims, the Court assumed, as a matter of law, that hispanic is a type of race for purposes of the anti-discrimination statutes notwithstanding how any individuals self-identify their race in other contexts. Indeed, in finding that the Plaintiff raised a triable issue of fact as to whether Hardwick's decision to promote Bermudez, and his concomitant failure to consider the Plaintiff for any Command Staff

4

position, resulted from discrimination on the basis of race, the Court relied in part on evidence indicating that Hardwick publicly referred to Bermudez as the "first Hispanic Chief of Police." To be sure, the Court found that "[t]o the extent the Defendants argue[d] that neither Hardwick nor Bermudez *perceived* Bermudez to be a member of the minority group and that Bermudez had the 'same color complexion' as the Plaintiff . . . this evidence simply raises factual disputes appropriately reserved for a fact-finder." (Id. at 26)(emphasis added).

With regard to the Plaintiff's national origin claims, the Court noted as follows:

Aside from the fact that Bermudez was born in Cuba and the Plaintiff was born in America, the Plaintiff fails to set forth any evidence of discrimination on account of national origin. The Court also notes that Hardwick and the Plaintiff are both American in nationality.

(Id. at 29.) Although the Court may have inartfully used the terms "national origin" and "nationality" interchangeably, it is clear that the Court assumed that Cuban – as opposed to hispanic – was a type of national origin.

In sum, for an analysis under the anti-discrimination statutes, the Court assumed as a matter of law that Hispanic was a type of race. What is clear is that had the Court concluded, for an analysis under the anti-discrimination statutes, that Hispanic is a type of national origin, the Court likely *would have* permitted the national origin claims to proceed on the basis that a factual question existed as to whether Hardwick promoted Bermudez rather than the Plaintiff because Bermudez was of an hispanic national origin.

On April 30, 2014, this case proceeded to a jury trial. The Court heard testimony from twelve witnesses over a three-week time period. Following five days of deliberation, the jury returned a verdict against both the Defendants for the sum of $150,000 in back pay damages, $1,000,000 in front pay damages, and $200,000 in punitive damages as against Hardwick only. Before reviewing the testimonial and documentary evidence adduced at the trial, the Court will

discuss some of the issues involved in the motions *in limine* and the arguments made by counsel in the opening statements insofar as they are relevant to the present motions before the Court. The Court cites certain lengthy excerpts of the record to shed light on the litigating positions taken by the parties.

## I.    THE TRIAL

A.  The Motions *in Limine*

Prior to the trial, the Defendants moved for, among other matters, an order precluding the Plaintiff from offering at the trial any evidence concerning any national origin-based terminations, retirements, hiring, and promotions in the Village during Hardwick's term as Mayor. (Tr. 19-20.)  Portending disputes to come – Hardwick's counsel noted the following:

> They want to introduce evidence of Hispanic employees.  Well, that is out, respectfully.  This is a race case.  This is a case as to whether or not Mayor Hardwick has a racial bias against Mr. Barrella on account of the fact that he was White.  Chief Bermudez is the person that they are pointing to [] say he is not White and you hired him.

> Well, the evidence is going to suggest that he is White.  But the issue here is not whether Mayor Hardwick favored Hispanics.  So therefore to bring in Hispanics as potential evidence of racial animus in a White-Black case I think is improper.  And I don't believe that that is the subject of this lawsuit in light of your Honor's summary judgment motion.  You knocked out the national origin case.  Hispanic is not a race.  Hispanic can be, according to the census and according to all governmental documentation, those of Hispanic ethnicity can identify themselves as White or they can identify themselves as black.  Hispanic is not an identifiable race.

> Now, the evidence [is] going to suggest from our side that, and it hasn't been disputed, that Chief B[e]rmudez identifies as White.  Your Honor decided in the summary judgment motion that the perception of Mr. Bermudez and Mr. Hardwick as to whether he is White is a subject for the jury.

> While I may respectfully disagree with that, I understand what the position is of the court and I understand that it is now a jury question as to whether or not Hardwick and Bermudez perceived themselves to be White.  If they agree, we win.  If they don't agree, then we get to the next level of the <u>McDonnell Douglas</u>

analysis. Whether or not a Hispanic was hired or not is irrelevant from our standpoint.

(Tr. at 25-26.)

In this same vein, the Village's counsel argued as follows:

This case is a very simple case, in my mind, your Honor. It comes down to two people. Two people. Former Mayor Hardwick. Christopher Barrella. That's it. And I believe when the court sees Miguel Bermudez and he is here, I think you will see that Mayor Hardwick actually did appoint a White male to a position of chief of police and I don't think the plaintiff will be able to overcome that fact. I don't believe they will meet their burden.

(Tr. at 30.) Similarly, in reference to potential evidence regarding Hardwick's introduction of

Bermudez as "the first Hispanic Chief of Police" of the Village, Hardwick's counsel argued as

follows:

in light of your Honor's decision, the fact that the statement was even made and made reference to Hispanic is now, in our respectful opinion, off the table.

…

Now, this is not a Hispanic case anymore. This is a White and Black case.

(Tr. at 37.)

In response to the Defendants' arguments that hispanic is a type of national origin

and that the evidence would show that Bermudez's race was, in fact, white, the Plaintiff's

counsel argued as follows:

By referring to Chief Bermudez as Hispanic – and we respectfully disagree. I mean, they are confusing the issue of skin color with race. I mean, this is a question for the jury, but Hispanic is a race as far as I'm concerned. And this is just a comment to show that the mayor's state of mind in making these decisions was that he was taking into account the person's race because he was referring to them in terms of their race.

(Tr. at 38.). The Court denied the Defendants' motion *in limine*. (Tr. at 39.)

These arguments foreshadowed the parties' respective trial strategies, in particular that of

the Defendants.  In plain terms, the Defendants intended to argue that, as a matter of law,

hispanic is not a type of race, but rather a type of national origin and therefore, any reference to

the fact that Bermudez is hispanic would be irrelevant and prejudicial to the Defendants because

the national origin claims had been previously dismissed.  In this regard, the Defendants

expressed their intention to introduce evidence that Bermudez's race was, in fact, white.

B.  The Court's Opening Description of the Case

Prior to the opening statements by counsel, the Court briefly described the case to

the jury as follows

> Very briefly, I can tell you that the plaintiff, a lieutenant in the
> Village of Freeport police department, alleges that the Village of Freeport
> and its former mayor, Andrew Hardwick, failed to promote him to
>  the position of Chief of Police or another command position within the
> village police department on the basis of his race, being namely the plaintiff
> is a White Caucasian man and the mayor is a Black African-American man.
> So that the alleged discrimination is by a Black African-American
> mayor against a White Caucasian police lieutenant.
>
> On the other hand, for his part, former Mayor Hardwick contends that
> he did not discriminate against the plaintiff on the basis of race.
> In addition, former Mayor Hardwick contends that he had legitimate,
> nondiscriminatory reasons for not appointing the plaintiff
> to the position of Chief of Police.
>
> Also, the Village of Freeport denies that it discriminated against
> the plaintiff. The village also asserts that it does not have any
> employment policy or custom that is either discriminatory or unconstitutional
> or violated the law in any way.

(Tr. at 67-68.)  Thus, the Court made no reference to claims based on skin color as opposed to

race.

C.  The Opening Statements

Of relevance here, in his opening statement, the Plaintiff's counsel stated as follows:

the evidence will show at the time the only people that were
being seriously considered for any of these three chief positions were
Blacks and Hispanics.

. . .

Blacks and Hispanics also constituted 69 percent of all part-time hires, 61
percent of full-time hires.  And on the flip side, Caucasians constituted 67
percent of those terminated or otherwise separated from their employment
with the village in non-seasonal positions.

. . .

Now the defendants may also try to cloud the issue by confusing the concepts
of skin color and race.  Skin color is not the issue here.  Barrella and
Bermudez are both light-skinned.  However, evidence will show that it was
Miguel Bermudez's race, Hispanic, that played the motivating factor in the
mayor's decision to handpick him for that chief job.

(Tr. at 87, 90, 91.)

In the Village's opening statement, the Village's counsel stated, in pertinent part:

Lo and behold, the person who does get promoted is Miguel Bermudez.  And
unless my eyes deceive me, and unless I'm missing something, I think Miguel
Bermudez's skin color is actually whiter than Mr. Barrella's.  There is no question
that if I asked you to describe one of them, I think we would all use the term
White.  In fact, I think when police officers – and you will see evidence of
in, actually call in instances of crime, or they call in instances of misconduct they
generally refer to people as White or Black.  I'm pretty confident that a sergeant at
the desk when he picks up the phone and hears a call concerning Chief Bermudez,
they would describe him as White.  I think we can all see here they're both White.
So the crux of this whole case is that Mayor Hardwick discriminated against him
because of his race.  Yet he promoted someone of the same race.  Very simple.

. . .

You have two White males, and one became chief, one didn't.  I implore you to
find the racial animosity, that inference, it doesn't exist.

(Tr. at 95-96, 100.)

Finally, in Hardwick's opening statement, his counsel stated:

Mr. Bermudez is White. And if you don't believe your own eyes, you will hear
Mr. Bermudez when he testifies that he is White.  Merely because you have a

9

Hispanic or Latino surname doesn't make you non-White.  Mr. Bermudez will
testify that he is White.  Mr. Hardwick will testify that in the 30 or 35 years that
he has known Mr. Bermudez, he has always considered him to be White.

(Tr. at 102.)

D.  <u>The Plaintiff's Case</u>

    1.  <u>The Plaintiff</u>

The Plaintiff first testified on his behalf.  The Plaintiff stated that, within the Village of

Freeport Police Department, he had held the positions of police officer, sergeant, and lieutenant.

(Transcript "Tr." 120-21, 23.)  The Plaintiff testified that, in 2010, the position of Chief of Police

opened up due to the retirement of Chief Michael Woodward.  The Plaintiff applied for that

position and testified that the Hardwick "bypassed [him] for that position and he promoted []

Bermudez because he wanted a minority." (Tr. at 119.)

At the time of the trial, the Plaintiff served as a lieutenant, having started as an officer in

1990.  The Plaintiff testified that the positions that outranked lieutenant were the Deputy Chief,

the Assistant Chief, and the Chief of Police, collectively known as the "command staff." (Tr. at

121-22.)

The Plaintiff earned a degree of Associate of Science in Criminal Justice at SUNY

Farmingdale in 1988; a Bachelor of Arts with a major in Criminal Justice from C.W. Post in

1990; a Master of Public Administration from C.W. Post in 1993; and a *Juris Doctor* from the St.

John's Law School in 1999. (Tr. at 124.)

While working at the Freeport Police Department, the Plaintiff scored first on each of the

civil service promotional exams he took. (Tr. at 130.)  The Plaintiff also participated in a 12-

week training course with the FBI in Quantico, Virginia.  The Plaintiff testified that no other

individual in the Police Department had taken the FBI academy course. (Tr. at 131-32.)  The

Plaintiff also testified about various accolades he received from the Nassau County Police Department and the Village of Freeport Police Department and recognition from members of the community. The Plaintiff further stated that he was a member of the Freeport Police Benevolent Association ("PBA") and other community organizations in Freeport.

In May 2010, the Plaintiff sat for the civil service promotional examination for the Chief of Police position to fill the impending vacancy to be created by the retirement of Michael Woodward. (Tr. at 148.) In addition to the Plaintiff, the examination was taken by Detective Lieutenant Wayne Giglio, Lieutenant Bermudez, Ed Thompson, Debbie Zagaja, and Paul Jurgens. (Tr. at 150.) The Plaintiff explained the "one-in-three" rule, which allows the appointing authority, Hardwick, to choose one of the top three scoring individuals for the position under the Civil Service Law. The Plaintiff scored number one, Giglio scored two, and Bermudez scored three. The results became public in September 2010.

The Court admitted the Plaintiff's October 2010 letter to Hardwick declaring his interest in the open position of the Chief of Police. (Tr. at 151.) The October 2010 letter included a letter of intent, a resume, and references, including one from former Assistant Chief Al Gros, who is white. However, the Plaintiff was never granted an interview by Hardwick for the position of Chief of Police nor was the position posted anywhere. (Tr. 153, 179) The Plaintiff testified that he spoke with Hardwick at a PBA association function to express his interest in the position of Chief of Police. (Tr. at 154.) According to the Plaintiff, Hardwick told the Plaintiff that he had "a very impressive resume, and that the interviews would be held in the next couple of weeks." (Tr. at 154.)

The Plaintiff testified that Bermudez had previously been appointed by Hardwick to Deputy Chief in April 2010. (Tr. at 157-58) Similarly, the Plaintiff testified that only

"[r]udimentary" interviews were held for the position of Deputy Chief. (Tr. at 158.)  The

Plaintiff testified that he did not bother applying for the position of Deputy Chief because, in his

view, Bermudez was always going to be appointed to that position. (Tr. at 159.)  In support of

that assertion, the Plaintiff stated that, at a Hispanic Heritage party gathering in late 2009,

Hardwick referred to Bermudez as "Chief," even though Bermudez had not yet been appointed

to a Command Staff position. (Tr. at 159.)

The Plaintiff also testified that, as Deputy Chief, Bermudez began a meeting by playing a

"parody of Hitler screaming at his commanders," which in the Plaintiff's view reflected "poor

judgment" (Tr. at 161-62.)  The Plaintiff stated that, at the end of the meeting, Bermudez stated

"I can be that guy." (Tr. at 162.)  Bermudez also referred to an overtime list as "Schindler's list."

(Tr. at 162.)

The Plaintiff also testified regarding a conversation he had with Woodward regarding his

retirement.  The Plaintiff stated that Woodward told him that he did not want to leave, but that

Hardwick "made a deal he couldn't refuse." (Tr. at 164.)  The Plaintiff also testified that then-

Assistant Chief Gros also did not want to leave the Command Staff. (Tr. at 165.)

In about July 2010, Bermudez was promoted to Assistant Chief, although there was no

job posting; nobody contacted the Plaintiff about this position; and no interviews were

conducted. (Tr. at 165-66.)  The Plaintiff testified that he heard that an "automatic promotion" to

Assistant Chief had been put in Bermudez's Deputy Chief contract.  (Tr. at 166.)

The Plaintiff testified that he believed the decision to appoint Bermudez to the position of

Chief of Police was discriminatory because Bermudez had "[l]ess time as [a] lieutenant, less

education, scored less on the test." (Tr. at 179.)

The Plaintiff also testified that, during Hardwick's campaign for Mayor, he watched a campaign video where Hardwick said "We are no longer the minority. We are the majority. It's time we get our share." (Tr. at 189.)

The Plaintiff testified that he would have expected to stay as Chief of Police for 12 years and that, in that position, "you're not getting fired but for cause." (Tr. at 196-97.) He also testified regarding lost back pay and future pay, loss of pension, and the "demoralizing" effect of not being promoted to the Chief of Police. (Tr. at 197.) The Plaintiff testified that he applied for Chief positions in other departments, but never received a call. (Tr. at 198-199.)

On cross-examination, the Plaintiff conceded that the only person from the Village who put in a recommendation on his behalf for the position for Chief of Police was Gros. (Tr. at 207.) When asked if Bermudez was white, the Plaintiff said "yes" while also stating that Bermudez was a minority person. (Tr. at 211.) The Plaintiff further conceded that one did not need a college degree or any advanced degree to be considered for the position of Chief of Police. (Tr. at 217.) The Plaintiff also conceded that he never heard Hardwick make any derogatory comments about race. (Tr. at 217.) The Plaintiff also testified that Bermudez was qualified to be Chief of Police, but insisted that he was more qualified than Bermudez. (Tr. at 230.)

The Plaintiff also conceded that, during his tenure, Hardwick appointed a white Village Clerk, a white Village Attorney, and a white Deputy Chief of Police. (Tr. at 233, 246, 262.) The Plaintiff further conceded that Bermudez was "running the [Police] Department" when he was made Deputy Chief in April 2010 until he was made Chief of Police in November 2010. (Tr. at 249.)

The Plaintiff also testified that Hardwick, a Democrat, had unseated William Glacken, a Republican, and was the first Democratic Mayor in Freeport in 25 years. (Tr. at 301.)

The Plaintiff also conceded that before the March 2010 promotional test, he had no relationship with Hardwick. (Tr. at 321.) The Plaintiff further stated that the Deputy Chief position and the Assistant Chief position have to be approved by a majority of the Board of Trustees, which included the Mayor. (Tr. at 324.) Finally, the Plaintiff testified that Woodward never told him that he felt he was discriminated against because he was white. (Tr. at 331.)

On re-direct examination, the Plaintiff testified that, when Bermudez was Deputy Chief and Assistant Chief, he delegated certain Command Staff duties to the Plaintiff. (Tr. at 348.) The Plaintiff stated that, in October 2010, Bermudez told him that Hardwick had chosen him to be the Chief of Police. (Tr. at 350.) The Plaintiff indicated that he did not ask Woodward to write him a letter of recommendation for the Chief of Police position because, among other reasons, he did not want to put Woodward "in the middle of choosing" between the Plaintiff and Bermudez. (Tr. at 359.)

In addition, the Plaintiff testified about how Hardwick attempted to promote a less qualified police officer, Zina Leftenant, an Africa-American female, to the position of Assistant Chief. The Plaintiff also stated that the Command Staff positions and Lieutenants do not receive the same quantity of overtime pay per year, in that command staff positions garner about 20 hours a year at different rates of pay. (Tr. at 373-374.)

2. Hardwick

Hardwick admitted that he played a role in the majority of hires during his tenure. (Tr. at 377, 79.) When asked if the Mayor of Freeport is akin to the "CEO of a company," Hardwick responded "absolutely" and that he was responsible for the day-to-day operations of the Village (Tr. at 377.)

Hardwick stated that although the Board of Trustees was ultimately responsible for making the final hiring decisions of department heads, he made "recommendations" "in most instances," "especially for department heads." (Tr. at 380-82.) For example, Hardwick made recommendations or appointments to the Board of black and hispanic individuals to replace white individuals for the position of Superintendent of Buildings, the Buildings Department, Assessor, and the Secretary to the Mayor. Indeed, Hardwick conceded that eleven of twelve department heads who retired, resigned, or were not reappointed during his tenure were white and that he could not remember any other department heads. (Tr. at 417, 422.)

Hardwick conceded that when making a hiring decision for department heads, interviews were important "[i]n most cases." (Tr. at 392.)

Through Hardwick, the Plaintiff admitted documentary evidence revealing that, during Hardwick's tenure, 191 of 198 seasonal hires were hispanic or black. (Tr. at 401.). Hardwick admitted that he was involved in some of these hires. (Tr. at 399.) Hardwick explained this statistic by alluding to the fact that a majority of Freeport were minority races. (Tr. 412.)

Hardwick testified that he knew Bermudez for over 30 years and considered him to be a white Latino male. (Tr. at 471.) On the other hand, Hardwick did not know the Plaintiff well. (Tr. at 475.)

As to Bermudez's appointment to be Chief of Police, Hardwick testified that the Board of Trustees did not need to approve that appointment. (Tr. at 491.) Hardwick conceded that he never interviewed the Plaintiff for the position of Chief of Police even after he discovered that the Plaintiff had scored number "1" on the promotional examination. (Tr. 477.) Hardwick also did not interview Giglio, who is white. (Tr. at 493.) On the other hand, Hardwick interviewed Bermudez for this position. (Tr. at 493) In this regard, Hardwick admitted that he reviewed none

15

of the Plaintiff's disciplinary records, personnel files, resumes, or police records of any kind in connection with his decision to appoint Bermudez. (Tr. 496-98.). Hardwick testified that he accorded "very little" weight to recommendations from people outside the police department. (Tr. at 507.) Hardwick stated that Bermudez shared his vision for Freeport, but that he did not know the Plaintiff's vision for Freeport (Tr. at 514.)

Hardwick also testified that, at the time he appointed Bermudez to the position of Deputy Chief, he had already decided that he was later going to be promoted to Assistant Chief. (Tr. at 479.)

Hardwick explained that he did not appoint the Plaintiff primarily because he did not receive "any real noticeable encouragement" from any of the members of the Board of Trustees or anybody else regarding the Plaintiff's candidacy. (Tr. at 513.)

On cross-examination, Hardwick testified that although he had sole authority to appoint Bermudez as Chief of Police, the Board of Trustees had the sole authority to appoint the other various department heads to their respective positions. (Tr. at 544.) Hardwick stated that the other four members of the Board were white. (Tr. at 544)

Hardwick reiterated that he knew Bermudez for over 40 years; that they grew up together; and that they served in the Village Fire Department together. (Tr. at 545-46.) Hardwick also stated that he loved Freeport and that Bermudez loved Freeport as well.

Hardwick also testified that, prior to the promotional examination for Chief of Police, Woodward recommended Bermudez and Zajaga for the position of Chief of Police. (Tr. at 549-550.) After the results of the examination, with regard to Bermudez and Zajaga, only Bermudez was qualified for the position, per the rule of three.

Hardwick also stated that between February 2010 and April 2010, Bermudez was in fact running the day-to-day operations of the Police Department and that he performed that task in an excellent manner during that time period. (Tr. at 556-57.) Bermudez was also the *de facto* leader of the Police Department from April 2010 through his November 2010 appointment to Chief of Police. His performance during this period "weighed heavily" in Hardwick's decision to ultimately appoint Bermudez to the position of Chief of Police. (Tr. at 559.)

Hardwick also accorded a "good amount of weight" to the fact that Bermudez was still a volunteer firefighter for Freeport. (Tr. at 580.) Hardwick also stated that, after he received the test results, he had a conversation with Woodward who described the Plaintiff as "abrasive." (Tr. at 583.) Hardwick also considered the fact that the Plaintiff lived 31 miles outside of Freeport, which he referred to as a "long haul." (Tr. at 583.)

On re-direct examination, Hardwick conceded that did not ascertain whether the Plaintiff loved Freeport, nor did he ask Giglio whether he loved Freeport. (Tr. at 587.) Hardwick also acknowledged that the Freeport census indicated that Freeport is one-third white, one-third black, and one-third hispanic. (Tr. at 591.) Hardwick also stated that Woodward never told him that Bermudez was a better candidate than the Plaintiff. (Tr. at 595-96.)

3.  Alfred Gros

Former Assistant Chief, Al Gros, testified about his contract not being renewed by Hardwick; that he was essentially forced to retire; and he described the manner in which Hardwick dismantled the Command Staff of the Village Police Department in "not an orderly fashion." (Tr. at 653-54, 58.) Gros expressed his belief that race was a motivating factor in Hardwick's personnel decisions and that the Plaintiff was a stronger candidate for the Command

Staff than Bermudez as a result of his experience working with both individuals for many years. (Tr. at 611, 613-21.)

Gros stated that he and Woodward often had conversations about the future of the Police Department and that the Plaintiff "was a definite person in consideration to be brought up" to the Command Staff. (Tr. at 630.) Bermudez was never so mentioned. (Tr. at 648.) According to Gros, the Plaintiff was the strongest Lieutenant candidate for Chief of the Police. (Tr. at 633.) Indeed, Gros provided the Plaintiff with a letter of recommendation for the position of the Chief of Police. However, Hardwick never discussed the letter of recommendation with Gros, or asked Gros for his opinion on any of the candidates. (Tr. at 645.)

Gros testified that he thought "there might been a component of race involved in the decision" to not promote the Plaintiff. (Tr. at 613.) In support of this assertion, Gros pointed to "promotions that were going on at the time with the Mayor's office." (Tr. at 613.)

On cross-examination, Gros conceded that he never served in any official capacity in the Human Resources Department of the Village (Tr. 659.), nor did he have any personal knowledge as to what criteria or information Hardwick used in determining how to make his appointments.

Gros also acknowledged that he served effectively as Assistant Chief of Police, even though he did not have a Master's Degree or a Law Degree. (Tr. at 664.) Gros also noted that, although his contract expired in February 2010, the Village allowed him to stay on through June 2010 so he could accrue time for certain pension credits. (Tr. at 665.) Gros also stated that Bermudez performed adequately; was a good officer; and had the personality and temperament to deal with the public effectively. (Tr. at 667.) Gros also testified that Bermudez looked white to him. (Tr. at 673.) Gros also conceded that the Mayor needs department heads that are loyal to him and committed to his vision. (Tr. at 685.)

18

On re-direct examination, Gros asserted that six months is not sufficient time to prepare oneself to become the Chief of Police. (Tr. at 719.) Gros also stated that, at the time of his retirement, Bermudez was not ready to become Chief. (Tr. at 720.) Gros also stated that the Plaintiff possessed the temperament and personality to be Chief of Police. (Tr. at 721-22.)

4. John Maguire

John Maguire served in the early part of 2009 as Hardwick's Chief of Staff. Maguire was charged with meeting regularly with the Village Department heads and confirmed that the Mayor made all the decisions as to the department head selections.

Maguire expressed his belief that race was a motivating factor in Hardwick's personnel decisions. (Tr. at 750-51.) Indeed, Maguire testified as to at least 10 department head decisions, including assessor, that Maguire personally witnessed. He voiced disagreement with Hardwick because the candidates selected by Hardwick, who were minorities, had inferior credentials to the persons they were replacing and other eligible candidates who were white. (Tr. 751-60.) Maguire further stated that, although in many circumstances Hardwick replaced a white person with a minority, in no case did he replace a minority with a white person. (Tr. 782.). Finally, Maguire testified that Hardwick often made comments that he wanted the Village government to "look like the Village." (Tr. 789-90.)

Maguire stated that his interactions with the Plaintiff were "[v]ery professional" and there was nothing negative Maguire would say about the Plaintiff. (Tr. at 800.)

On cross-examination, Maguire conceded that, under Hardwick, the Superintendent of the Electric Department, the Village Attorney, and the Village Clerk were white. Maguire also stated that he lacked first-hand knowledge with regard to Hardwick's selection criteria for the

position of Chief of Police. (Tr. at 827-28.) Hardwick eventually relieved Maguire of his duties as Chief of Staff.

On re-direct examination, Maguire stated that, in his experience, there never came a time that anyone was able to convince Hardwick to not appoint someone that he wanted to appoint in that position. (Tr. at 849.) The basis for Maguire's position that Hardwick engaged in race-based personnel decision-making was that the individuals actually promoted were not qualified for the relevant jobs. (Tr. at 851.)

5. <u>Shawn Randall</u>

Shawn Randall, a police officer in the Village and the President of the PBA, also testified. Randall stated that although the Chief of Police usually recommended the Deputy Chief and Assistant Chief, during Hardwick's tenure, Hardwick made the recommendations. (Tr. at 858-59.) Randall testified that members of the Command Staff earn more holiday overtime throughout the year. (Tr. at 874.) Randall also stated that that the Chief of Police remains in that position until 65 years of age; that Woodward was not 65 years of age when Hardwick became mayor; and that thus Hardwick needed to incentivize Woodward to leave. (Tr. at 877.) Randall stated that nobody on the Command Staff "wanted to leave" when Hardwick became mayor. (Tr. at 878.) When Hardwick initially appointed Bermudez as the Deputy Chief, he referred to Bermudez as the "first male Hispanic" chief of the Freeport police department. (Tr. at 889.)

On cross-examination, Randall conceded that he was not involved in most of Hardwick's decisions relating to personnel in the police department. (Tr. at 910.) Randall testified that between 2011 and 2013, the PBD did not get along with Hardwick and that it did not support his reelection. (Tr. at 917.) Randall also conceded that he never communicated to Hardwick that the

Plaintiff should be considered for a Command Staff position. (Tr. at 921-22.) Randall also stated that Bermudez was qualified to be the Chief of Police. (Tr. at 923.)

6. Bruce Jonas

Bruce Jonas, C.P.A., testified as the Plaintiff's expert on damage calculations. Jonas was employed by Jonas & Welsch and practiced litigation support services. (Tr. at 954.) Jonas testified that he had no financial stake in the outcome of the case. (Tr. at 959.) The Court admitted into evidence Jonas's expert report dated December 2013, which calculated all past and future monies to which the Plaintiff allegedly would have been entitled to but for Hardwick's allegedly discriminatory decision. Jonas considered the amended complaint; the Freeport Detail Check history of Bermudez from April 14, 2011 through March 28, 2013; the memorandum of agreement dated September 2010 between the Village of Freeport and the PBA; the terms of Employment for Chief of Police Bermudez from 11/26/2010 through 11/26/2012; the New York State and Local Police and Fire Retirement System; the PBA contract, March 1, 2004, through February 28, 2010; the VFPD purchase order for Bermudez for plain clothes; allowances as well as maintenance for uniform and equipment; tax forms; W-2 and 1040 for the Plaintiff from 2008 through 2012; and other publications of a scholarly nature from the United States Department of Bureau of Labor Statistics. (Tr. at 961.)

Jonas explained that his role as a damages expert is find out "what would have – what compensation would the plaintiff have earned and what perks would he gotten had the alleged wrongdoing not occurred." (Tr. at 962.) Jonas further described the manner in which he computed the damages figures, including but not limited to accounting for past and future wages and benefits, and reducing all for net present value. Jonas calculated that, in his opinion to a

reasonable degree of certainty, the Plaintiff's past lost compensation that resulted from the Village's failure to promote him to the Chief of Police was $148,419. (Tr. at 966.)

Jonas used the year 2022 as the end of the damage period, when the Plaintiff would have been 55. (Tr. at 969.) Jonas estimated, to a reasonable degree of certainty, that $414,125 represented the net present value of the Plaintiff's future wages lost due to the Village's failure to promote him to the position of the Chief of Police. (Tr. at 973.) Jonas further estimated, to a reasonable degree of certainty, that $529,767 represented the Plaintiff's lost pension benefits. (Tr. at 974.) Adding in unused sick pay and other perks, according to Jonas, the total economic damage amounted to $1,259,078 after accounting for net present value. (Tr. at 982.)

On cross-examination, Jonas conceded that he had received the Plaintiff's counsel's estimate of damages, which exceeded 2 million dollars. (Tr. at 983.) Jonas also stated that Bermudez's contract as Chief of Police expired after a two-year term. (Tr. at 985.) Ultimately, Jonas conceded that "[n]one of us had a crystal ball." (Tr. at 986.)

7. Anthony Miller

Anthony Miller, a current Village employee, had known Hardwick since Miller's childhood. Miller testified that, on one occasion, Hardwick confronted him saying "You are going to let these white folks kill me like this at these board meetings?" (Tr. at 1019.). Miller also overheard Hardwick refer to Bermudez as the "first Latino Police Chief" at various gatherings and events. Similarly, Miller stated that he heard Hardwick refer to Deputy Mayor, Carmen Pinero, as the first "Latina Deputy Mayor" many times. (Tr. at 1014-15.)

On cross-examination, Miller conceded that he was not involved with any personnel decision by Hardwick nor was he privy to any conversations that Hardwick had with other Village employees concerning personnel decisions. (Tr. at 1032.) However, Miller insisted that

Hardwick often said he wanted the Village government to look more like the Village. (Tr. at 1063.)

On re-direct examination, Miller testified that he was concerned when Hardwick appointed Scott Richardson, an African-American male, as Superintendent of Public Works, because Miller considered him unqualified for the position. (Tr. at 1075-77.)

8. Michael Woodward

Michael Woodward, the former Chief of Police for the Village of Freeport, testified by deposition because he no longer resided in the New York metropolitan area. Woodward, who is white, testified that Hardwick forced his retirement. Woodward also stated that the non-renewal of the contract of Gros, also white, and the demotion of Deputy Chief Debbie Zagaja, also white, occurred within the first year of Hardwick's term of office. (Tr. at 1140-42.)

Woodward further testified that he did not believe Bermudez was the most qualified individual at the time of his promotion to Deputy Chief. (Tr. at 1150.). Woodward lauded the Plaintiff's qualifications and experience. Woodward stated that he was aware that Hardwick wanted to promote a black female, Leftenant, to Assistant Chief and testified that the Plaintiff was "much more qualified" than Leftenant. (Tr. at 1156.)

Indeed, Woodward testified as follows:

Q. Do you believe that during the course of his term as mayor, Andrew Hardwick consistently terminated, demoted, and refused to promote non-Hispanic white employees in favor of Black and Hispanic employees?

A. Yes.

(Tr. at 1158.) Woodward also stated that a number of personnel decisions by Hardwick were racially motivated, including the hiring of, among others, Richardson for Superintendent of

Public Works, Richard Brown for Superintendent of Buildings, James Smith for Assessor, and Dianna Torres for Human Resources.

Woodward agreed with Maguire that it was not a good idea for Hardwick to replace the entire Command Staff at the beginning of his term, stating "you just can't take the whole head of the organization and wipe it out," stressing the need for "continuity" (Tr. at 1132, 1140.) Woodward confirmed that Gros was not ready to retire and that he was upset about being forced to retire. (Tr. at 1140.) Woodward also felt that Zagaja was more qualified than Bermudez. (Tr. at 1150.) Woodward further stated that Hardwick never asked him who he would recommend for any Command Staff position. (Tr. at 1152.) Woodward disagreed with Hardwick's attempts to promote Zena Leftenant to a Command Staff position, labeling her "unqualified." (Tr. at 1156.) Woodward testified that he believed Hardwick wanted Leftenant on the Command Staff because she was black. (Tr. at 1156)

9. Howard Colton

Howard Colton, the current Village Attorney, who served in a similar capacity during Hardwick's tenure as Mayor, also testified. Colton confirmed that the Mayor exclusively appoints persons to department head positions in the first instance and that an appointee may remain in his or her position as a "holdover" for successive terms until a replacement is voted in by the Board of Trustees. Hardwick, as the Mayor, was a voting member of the Board of Trustees.

Notably, Colton testified at his deposition that Isamaela Hernandez and Dianna Torres, two Village employees, were of the hispanic race. (Tr. 1260). However, at the trial, Colton reversed himself and declared that both persons were actually of the white race. (Tr. 1259-60.). Colton described Asians as "white." (Tr. 1294.) Finally, although every other witness at the trial

considered the Plaintiff to be more qualified than Leftenants for a Command Staff position,

Colton contradicted his deposition testimony and asserted that Leftenant was more qualified than

the Plaintiff. (Tr. 1272-73.)

On cross-examination of Colton, Hardwick's counsel attempted to offer into evidence the

2010 United States Census.  The Plaintiff's counsel objected, and this Court sustained the

objection on the ground of relevancy. (Tr. at 1352.)

The following day, Hardwick's counsel renewed his objection, explaining that:

The census is relevant to this case in my opinion since this entire case is about race discrimination.  We spent the better part of two weeks going back and forth over who is white, who is not white, what is Hispanic, what isn't Hispanic.

In fact, plaintiff's counsel in opening statement told the jury that Hispanic is [a] race.  He said that specifically.  And I presume he will be arguing that on closing.

The United States census, your Honor, provides five categories of race, and they are as follows:

White, black or African American, American Indian, and Alaska native, Asian, native Hawaiian, or other Pacific Islander.

Hispanic under the United States census, the government's view, is not a race.

In fact, according to the census, it provides a separate category for Hispanic or Latino.  And so there is no confusion it says: Hispanic or Latino, and race.  And then it breaks out by Freeport the population.

So I would respectfully submit, your Honor, the issue – and we will be arguing this on our motion for a directed verdict at the end of plaintiffs case.

(Tr. at 1370.)

The Plaintiff's counsel maintained that this Court should continue to sustain the

Plaintiff's objection, and that whether hispanic is a race different from the white or black race

was an issue of law.  In particular, the Plaintiff's counsel stated:

My proposition is, your Honor, that as your Honor previously ruled yesterday, the census figures are irrelevant as to the issues in this case.  The issue

is whether the plaintiff was discriminated because of his race. So whatever the population of Freeport is not relevant here.

And I would submit that they are claiming that being Hispanic is not a race. And they want that position submitted to the jury.

We are entitled as part of our jury instructions, and it is an issue of law, and it is for the Court to determine and not the jury.

And it is very clear in this Circuit, and I cite Cassanova, C-A-S-S-A-N-O-V-A, versus General Mills Restaurants, Inc. That is 94-VV 4386, an Eastern District of New York from 1997. And it says very clearly that although the plaintiff intends to discriminate against here on the basis of Hispanic origin, the Court construes that that complaint is racial rather than national origin discrimination.

So I believe it is an issue of law and not an issue of fact for the jury to determine. There are many other cases citing that.

. . .

There is an often cited case on this issue that says in terms of race or racial discrimination, there may be such doubt sociological validity as to be scientifically meaningless that these terms nonetheless are subject to commonly accepted, albeit sometimes vague understanding, on this admittedly unscientific basis whites are claiming a race susceptible to race discrimination. Hispanic persons and Indians, like blacks, have been traditional victims of group discrimination. And however inaccurately or stupidly are frequently and even commonly subject to racial, in quotes, identification as non-whites. And that is cited from Dubinsky, D-U-B-I-N-S-K-Y, versus Corning Glass Works, 425 Supp. 786, Western District of Pennsylvania, 1977.

That case, your Honor, has been well-cited for this proposition, that being Hispanic is a race as a matter of law, it is not treated as national origin.

I would also submit that it appears that the defendants in this case, because your Honor dismissed the national origin claims that were brought initially, we had alleged that because the plaintiff is American and the person who was promoted was Cuban, that that alleged national origin discrimination. That was the basis of our national origin claim.

Your Honor said there wasn't sufficient evidence in the record to support that claim and dismissed it. Now the defendants are claiming that our claim that he was promoted because he was Hispanic is national origin discrimination in order to use your decision as a sword and a shield at the same time.

I would submit this whole discussion is inappropriate for the jury and it is a matter of law. Therefore, whether the census lists Hispanic as being separate from race is really irrelevant because it is a question of law.

(Tr. at 1372-74.)

The Court sustained the objection, stating:

This case is a simple case. Everyone is making it very complicated, but it really isn't. Did the former mayor discriminate by not selecting a white candidate for chief of police? And he instead appointed number three on the list, a Hispanic candidate. That is the alleged discrimination, period. It is very simple.
All of this other business is just clouding all the issues in my view.

(Tr. at 1375.)

10. <u>Debbie Zagaja</u>

Debbie Zagaja, the former Deputy Chief, who was not re-appointed by Hardwick, was the Plaintiff's final witness. At the time of her testimony, Zagaja was a Lieutenant in the Village Police. (Tr. at 1387.) Zagaja testified that she became Deputy Chief in 2007 and served in that position until March 2010, after which she was "demoted" to Lieutenant. (Tr. at 1388.)

Zagaja testified that she knew the Plaintiff for approximately 20 years from the time he became a police officer. (Tr. at 1389.) As the Deputy Chief, Zagaja supervised the Plaintiff, both when he was Sergeant and Lieutenant. Zagaja praised the Plaintiff's leadership, dedication to his job, and his experience handling functions typically reserved to the Command Staff. (Tr. at 1392.)

Zagaja testified that the Plaintiff was more qualified than Bermudez for the position of Chief of Police, yet the Plaintiff was not interviewed for this position. (Tr. at 1411, 1464.)

On cross-examination, Zagaja admitted that she was not happy about her demotion. (Tr. at 1453.) Zagaja also admitted that she never publicly voiced concern about Bermudez's appointment to the Command Staff. (Tr. at 1456.)

On re-direct examination, Zagaja stated that after Bermudez was promoted to the position of Deputy Chief in 2010, Chief Woodward still performed many functions, including finalizing discipline. (Tr. at 1461.) Zagaja also expressed her belief that if she did voice opposition to Bermudez and he was ultimately appointed to the position of Chief of Police, he might retaliate against her in some way. (Tr. at 1467.)

Zagaja also related the following as to a supervisors meeting held by Bermudez in 2010:

> At the very first supervisors meeting in early 2010, I think shortly after he was made deputy chief, he played a video, a parody on the movie Valkyrie, the actual scenes from the movie. But had a lot of curse words, vulgarity, and told all his supervisors he could turn into Hitler and referred to an overtime list as "Schindler's List." And I was taken aback by that.

(Tr. at 1468.)

E. <u>The Motions at the Close of Plaintiff's case</u>

At the close of the Plaintiff's case, the Defendants each moved pursuant to Fed. R. Civ. P. 50 for judgment as a matter of law, arguing that there was not a legally sufficient basis for a verdict in the Plaintiff's favor. (Tr. at 1473.)

The Village's counsel argued, among other matters, that (1) "plaintiff himself testified that Bermudez is white, that [] Bermudez is qualified, that there is no documentary evidence to point to or show any inference of discrimination on the part of former Mayor Hardwick;" (2) the evidence of other personnel decisions was irrelevant because the ultimate authority to appoint individuals to those positions rested with the Board of Trustees rather than the Mayor; (3) the Plaintiff failed to proffer any evidence regarding a policy, practice, or custom of discrimination as required by <u>Monell</u>. (Tr. at 1473-76.)

In opposition, the Plaintiff's counsel argued, among other things, that (1) the evidence indicated that Hardwick made the recommendations in the first instance with regard to the other

personnel decisions, thereby establishing their relevance; (2) Hardwick repeatedly filled the open positions with unqualified "minority" candidates; (3) and the Plaintiff had "superior" qualifications to Bermudez. (Tr. at 1476-78.)

Hardwick's counsel argued on behalf of his own motion for judgment as a matter of law. Hardwick's counsel urged, among other things, that (1) the evidence set forth was a "parade of personal opinion based on nothing," (2) "there is not a piece of evidence to suggest that Chief Bermudez, who is white, was picked over Mr. Barella, who is white, for any reason based on race;" (3) Hardwick was entitled to qualified immunity; (4) the Court should take judicial notice of the 2010 United States Census; (5) while the Plaintiff's maintained that hispanic was a race, "[t]hey provided no evidence to support that being a Hispanic is also a race."(Tr. at 1482-85.)

In opposition, the Plaintiff's counsel argued that (1) "there is no qualified immunity under any statute or any case or anything that says that the civil service law allows the municipality to violate Title VII, 1981, or 1983;" (2) Bermudez's race was an "issue of law, not of fact" and therefore no expert was necessary on the issue; (3) under Albert versus Carovano, 851 F.2d 561 (2d Cir. 1988), "race for the purpose of 1981, comprehend[s] ethnicity." (Tr. at 1487-1489.)

Of relevance here, in denying the motions for judgment as a matter of law, the Court stated as follows:

> First of all, as far as the village is concerned – and really we have a village and we have the chief executive officer of the village. We have the man who speaks for the village. We have the man who makes the decisions for the village, the mayor. The mayor really, in fact, is almost like the village. He is the village.
>
> So he speaks certainly for the village, and he spoke here. He made the decision involving this case. It is like the village making the decision because the village said to the mayor, you make the decision. We authorize you to make the decision.

The policy, practice and custom stated by counsel?

The policy, practice and custom is to say to the mayor, you
make the decision and we're responsible for it.  That's what in fact happened.

Now, as far as the Chief of Police Bermudez being a white person and
that his Hispanic background does not lay the foundation for this kind
of case, I disagree I think his Hispanic background is a difference.  Even
though he's a white, he's a white man of Hispanic background.

And one case among others talked about that.  The case is Serrano
against The New York State Department of Environmental Conservation.
It has one of these crazy titles, 2013 WL 6816787.  It's in the Northern
District of New York, and it was decided December 20, 2013, less than
a year ago.  This is what it says:

While national origin and race are often distinct elements, the term
 Hispanic may trigger the concept of race.

Boy, that's right on the ball.  "The term 'Hispanic' may trigger the
concept of race," citing Alonzo against Chase Manhattan Bank, 25
Fed. Supp 2d 455 (Southern District of New York 1998).  That case
determined that there's a  reasonable relationship between race and
national origin when an employee described as Hispanic checked the
national origin box and not the race box in an EEOC charge.  And they
held, no, Hispanic is not only national origin, it is race as well.

So – so here we have a case where there is some evidence that Mayor
Hardwick's decision-making tended toward race rather than competency,
some evidence of that with his appointments; enough, I think, to go to the jury.

And as far as qualified immunity is concerned, this is certainly a
discrimination case which is classic of a violation of a clearly
established constitutional and statutory right.  I don't think there could be any
more clearly established violations, if there is a violation, if the jury finds a
violation.

So, here it is clear that there is sufficient evidence to go to the jury, and Rule
50 is not a basis for a dismissal of this case.

(Tr. at 1490-1493.)

F.  The Village's case

    1.  Miguel Bermudez

The Village called Miguel Bermudez as its first and only fact witness.  Bermudez held

the title of Sergeant from 1993 to 2008 and Lieutenant from August 2008 until April 2010. (Tr.

at 1496-97.)  In April 2010, Bermudez was elevated to the rank of Deputy Chief. (Tr. at 1497.)

Bermudez stated that he grew up in Freeport and knew the Mayor well as they were

growing up. (Tr. at 1500.)  Bermudez testified about various volunteer organizations, including

the PBA, that he was involved with in Freeport.  He also described the commendations that he

has received.

Prior to being appointed as Deputy Chief, Bermudez served as "interim chief" for less

than a month. (Tr. at 1514.)  In that role, Bermudez ran the daily operations of the police

department, without the pay and benefits that go with that position. (Tr. at 1515.)

Bermudez stated that Hardwick never discussed race with him or promised him in March

2010 that he would become the Chief of Police. (Tr. at 1516.)

Bermudez testified that he belonged to the white race. (Tr. at 1516.)

Asked if Freeport is one-third black, one-third white, and one-third hispanic, Bermudez

stated that "[i]t's a black and white community with a third of the members of that community

identifying themselves of Hispanic origin." (Tr. at 1528.)

Asked to explain the Hitler video, Bermudez stated:

Based on a movie called "The Underground."  It deals with Adolph Hitler's
last ten days in the bunker.  It is all German.  The movie is done in German
and English subtitles.

The movie I showed at the supervisors meeting was a parody where
the subtitles change with the theme of the movie to the New York
Giants beating the Dallas Cowboys at a playoff game.

During the movie, Adolph Hitler is ranting and raving: How can the
Cowboys possibly lose to the New York Giants?
. . .

The purpose of showing the movie, this is my first supervisors
meeting, and I wanted to start off light, with a little bit of humor,
to talk about a biblical subject about expecting things to be done,
and it wasn't done in a proper fashion.  And I had to read to the
supervisor two or three times to do the correct chore they were
tasked to do.  During the movie I had it shown as a parody Adolph
Hitler ranting and raving.

The idea is sometimes I feel like this person inside, that I have that much
rage, to go to a seasoned supervisor to explain to them two or three times.
This is something they should get the concept once and do it correctly.

(Tr. at 1537-1538.)

Bermudez stated that there was nothing sexual about that clip or derogatory of the Jewish

faith in the clip; denied ever mentioning "Schindler's List"; and expressed regret for this attempt

at humor. (Tr. at 1538-1539.)

Bermudez further stated it was important for the Chief of Police, like him, to be a resident

of the Village of Freeport, and that Hardwick agreed. (Tr. at 1545-46.)

On cross-examination, Bermudez somewhat contradicted his prior deposition testimony

where he conceded that his race was hispanic and testified at the trial that he now considered his

race to be "White." (Tr. at 1551.)  Bermudez also conceded that for a 16-year period when he

was a police officer, he did not reside in the Village, and that this did not affect his ability to

perform his functions as an officer. (Tr. at 1552.)

Bermudez testified that he never approached Hardwick to apply for the Deputy Chief,

Assistant Chief, or Chief of Police positions and that Hardwick simply promoted him on his own

to Assistant Chief and Chief of Police.  (TR. at 1558-1559.)  Hardwick never asked Bermudez

for a resume or letters of recommendation. (Tr. at 1560.)  Bermudez admitted that he was tied for

32

the lowest ranked Lieutenant at the time of his promotion to the Command Staff and that Hardwick did not interview him for the position of Chief of Police. (Tr. 1572-73.) Bermudez also conceded that, in October 2009, Hardwick called him "Chief" even though he was still a Lieutenant at that time. (Tr. at 1565.) Bermudez also confirmed prior testimony by Miller that Hardwick referred to Bermudez as the "first Hispanic Police Chief" on more than one occasion. (Tr. at 1574.) Bermudez also conceded that he told Hardwick that Zina Leftenant was unfit for the position of Deputy Chief. (Tr. at 1578.)

    2. <u>Josafina Tranfa-Abboud</u>

The Village called Josafina Tranfa-Abboud, Ph.D. as a damages expert. (Tr. at 1597.) She testified that she is an economist who consults in litigation matters for the accounting firm of Marks Paneth. (Tr. at 1599.) The Court admitted into evidence Tranfa-Abboud's expert report on damages prepared in connection with this case. (Tr. at 1607.)

Tranfa-Abboud calculated that the total potential compensation lost if the Plaintiff established liability was $204,500. (Tr. at 1616.) Asked why her calculation of the Plaintiff's potential damages was significantly less than that in the Jonas & Welsch report, Tranfa-Abboud stated as follows:

> The main difference is the fact that Mr. Barrella continues to be employed with the Village of Freeport Police Department, and if there is a finding of liability – because he is still employed. He hasn't retired. He's there. If there is a finding of liability, his compensation can be remediated and be adjusted going forward. So future damages in this case are untimely to be calculated.
>
> One thing that I would like to explain is the fact that when we look at economic damages – the claim here is a claim of alleged failure to promote to a certain level. But when it comes to the damages, it really has to do with the financial aspect of it, with an income that plaintiff would have allegedly derived or earned for that position.
>
> So what I'm analyzing is how much money Mr. Barrella would have

lost if indeed it was found there was liability in this case.

Because he's still employed, if there is liability, his salary, his compensation, can be remediated going forward. So beyond today's date there is no reason to calculate damage. That is one reason for the difference.

The other reason for the difference is because there are certain elements that Mr. Jonas and Mr. Welsch included in their calculation of damages that are not really categories of damages.

The third reason is Mr. Jonas and Mr. Welsch conducted a calculation of the pension. But Mr. Barrella has not lost a pension yet because he's still working, still employed, hasn't retired. And if his compensation is remediated, if there is a finding of liability, his pension will be automatically adjusted, which is something that would happen a few years in the future.

. . .

Based on the records that I've reviewed, Mr. Barrella is still employed. Damages are about whether someone in a case like this has suffered a loss in compensation. That loss of compensation can be remediated, the damages are limited to the past, meaning through the date of trial.

For ease of calculation I've extended the damages to the end of the current contract of the chief of police, which is November of this year, so it's a little bit into the future for now, just for convenience of calculation. But it's really to the past, limited to the past.

(Tr. at 1608-11.)

Tranfa-Abboud also testified that the calculation by Jonas and Welsh for certain items,

like the clothing allowance; the use of a department vehicle; and the loss of a cell phone – should

not have been considered lost income because it was not an expense incurred by not being the

Chief of Police. (Tr. at 1612-13.)

On cross-examination, Tranfa-Abboud stated that she was not a C.P.A. (Tr. at 1617.)

Tranfa-Abboud also stated that she attributed zero dollars for future damages because if liability

were established, the Plaintiff's salary could be "remediated" going forward. (Tr. at 1618-20.)

However, Tranfa-Abboud conceded that it was not her belief that salaries as provided for in the

collective bargaining agreement could be altered without bargaining with the union. (Tr. at 1621.)

Following Tranfa-Abboud's testimony, the Village rested.

G. Hardwick's Case

Hardwick's case consisted of reading certain portions of Woodward's deposition testimony. Hardwick then rested.

H. The Motions at the Close of the Case

At the close of all evidence, the Village renewed its motion under Fed. R. Civ. P. 50 for judgment as a matter of law. The Court denied that motion. (Tr. 1638.)

Hardwick, in his individual capacity, also renewed his motion for judgment as a matter of law. Hardwick's counsel refined his defense of qualified immunity, arguing as follow:

> On the qualified immunity issue, while I don't think there is any debate that Title VII, 1981, is the only one applicable to Mayor Hardwick in addition to the state law claim, that it is well established that you can't discriminate on the basis of race, qualified immunity purposes, 1981 specifically refers to white citizens.
>
> What I don't think is clearly established, your Honor, is that if the jury comes back with a finding of race discrimination because of the Hispanic origin, because Mr. Bermudez's last name is Bermudez, that it is clearly established under the case law – because I don't think there is any Second Circuit or Supreme Court ruling – that the mayor knew it was clearly established that race would constitute also Hispanic ethnicity; that if the jury comes back and finds liability, then what they are saying, Mayor Hardwick, in his individual capacity, discriminated on the basis of race because the chief is Hispanic.
>
> I think there's one thing that is clear here, that the law is somewhat unclear on the interrelationship between race and national origin.
>
> So on that basis I renew my motion.

(Tr. at 1638-39.)

In response, the Court stated as follows:

> Plaintiff disagrees that that issue is not well settled.  There is a
> Second Circuit case I previously cited, Albert versus Carovano,
> 851 F.2d 561 (2d Cir. 1988), stating that, finding that
> "in accordance with the understanding of the statute's drafters,
> race, for the purposes of Section 1981, comprehends ethnicity."

(Tr. at 1639-40.)  Ultimately, the Court denied the motions "for the same reasons [it]

gave at the end of the plaintiff's case." (Tr. at 1640.)

I.  <u>The Charge Conference</u>

Of relevance here, during the charge conference, the Plaintiff "object[ed] altogether" to

the use of the <u>McDonell Douglas</u> test on the following basis:

> as the courts have said in the Second Circuit, that that is appropriate
> for the purpose of summary judgment, but that the prevailing test in
> jury charging is just whether race was a motivating factor in the
> decision.  End of story.
>
> That is the prevailing test for the purposes of establishing race discrimination
> in this circuit.  So we object altogether to the use of McDonell Douglas in this
> regard[].

(Tr. at 1687.)

> The Plaintiff also argued
>
> it is an issue of law for the courts to state that a person of Hispanic heritage or
> background is to be considered of a difference race.
>
> . . .
>
> Based on the cases in this circuit, it is not an open question as to whether
> being Hispanic is race discrimination or not.  Therefore, we want a jury
> instruction that they should understand that being of Hispanic heritage
> or background is to be considered a different race from White or Black people.
>
> . . .
>
> I was just going to state further that the defendants have thoroughly tried to
> confuse the as regards the issue of what is race.  And because it is an issue
> of law, I think it is appropriate for the court to instruct them in that regard.

(Tr. at 1694-95.)

The Court responded:

I think you are right. And I think that I prepared something which as an alternative I might or might not use. And that is because the cases seem to indicate that whether Hispanic is a race or national origin is something for the court to decide. It is a question of law.

I gave one case previously, the Serrano case, which is at 2013 WL6816787, Northern District of New York, December 20, 2013.

"In the present matter the court finds that since plaintiff asserted an EEOC national origin charge and described herself as Hispanic, the national origin charges are reasonably related to racial claims and therefore the plaintiff has sufficiently exhausted her administrative remedies in regard to her claims of race discrimination."

And also, as plaintiff cited in their supplemental memorandum, the Eastern District has treated Hispanic as a racial category in the case of Casanova v General Mills Restaurants, 1997 WL473840, Eastern District of New York, explaining that:

"Although the plaintiff contends that she was discriminated against on the basis of her Hispanic origin, the court construes the complaint as stating a claiming for racial rather than national origin discrimination since none of the papers submitted to the court indicate the plaintiff's national origin."

Another case cited by the plaintiff, Elias v New York City Transit Authority, 1997 WL214968, decided by the Southern District of New York, the court wrote: "I need not decide whether bias against Hispanics better fits within the rubric of race or national origin discrimination. I will refer to this claim as one of racial discrimination as the plaintiff does in his complaint."

Also, in the case cited by plaintiff in their supplemental memorandum, Ridgeway v International Brotherhood of Electrical Workers, 466 F. Supp. 595, Northern District Illinois in 1979, the court noted That Hispanics are often thought of as being a different race than Whites, citing Gomez v Pima County, 426 F. Supp. 816 District Court in Arizona 1976.

I agree with the plaintiff. The burden of deciding whether it is a race or a national origin is on the court. It is a question of law, apparently. And I think these cases show that it is a race rather than

national origin.  So therefore, I am going to add to the charge the following.

Throughout this trial you have heard evidence that the nonparty Miguel
Bermudez is both White and Hispanic.  At this time I instruct you that
for purposes of the discrimination laws, Hispanic is a type of race that
is a different race from White or Black.  However, in making your
ultimate determination of whether race played a motivating factor in
the defendant's decision to appoint him as Chief of Police instead of
Lieutenant Barrella, you may consider whether others perceived Bermudez
to belong to a different race.

That is what I'm going to charge the jury.

(Tr. at 1695-97.)

Not surprisingly, the Defendants' counsel objected to this proposed instruction regarding

the use of the term "hispanic."  First, the Village's counsel stated:

I do not believe the court'' instant ruling agreeing with the
plaintiff is in conformity with the law of this district or the federal courts
in general.  And, if you would, just let me explain.

In each of the cases your Honor has cited, they dealt with a plaintiff
who complained he was Hispanic.  The plaintiff claimed he was Hispanic.
The defendants tried to get those cases dismissed saying: No. I'm
sorry. You are not a race. You are a national origin.  And the court said:
Well, he can determine what he is and the court can finally go forward on
the Title VII 81 and the 1981 and 1983.

That is nowhere near what we have here.  The only issue of
Hispanic, or *Hispanicity*, I think is what plaintiff's counsel used at
one point, is an nonparty witness who is not a member of the case.
He is a nonparty witness who has clearly testified in his deposition and
here that he is White.  The mayor, an African-American
man, a Black man for this case, I would argue, says he was
White.  Who is a court, any court, in the United States to
determine the race of someone who says he is another race?
And it is an issue that our society has.  And I think the
courts acknowledge it and we all dance around it.  It is a
grey area of the law.  Our society likes to classify
people.  We do.  Hispanic happens to be anyone who has any
heritage that may speak the language Spanish.  Or Irish
people: Are they an Irish race or are they a national
origin?

38

We are always putting things in categories.  If we are going to now let
the jury decide. We made motions at the end of their trial.  We made motions
that were denied by this court.  And the court I think said they are
going to let the jury decide the issues.

That is fine.  If the jury is going to decide all the issues, then let them
decide all the issues.  The word that should be used is race.  Race.  Race.
They heard enough from plaintiff's counsel and defendants'
counsel for them to determine what race is at issue in this case.
It is for the jury to determine whether or not a nonparty who claims he is
White, national origin comes into play.  This is completely distinguishable
from every case that was read in by the court.  It is distinguishable
on the facts from the very case that plaintiff read in on
Thursday and read in today.  We are talking about a nonparty.
We are talking about an individual that has clearly testified under oath
that he is White. And we are going to tell him he is not White?
We are going to tell him he is Hispanic? Or the jury should consider him as
Hispanic when he doesn't even consider himself Hispanic?
This is a stretch under the federal law and under the case
law.  More importantly, your Honor, it goes down to a grey
area.  I think everyone here would agree that when you get
to this issue of race, especially in the case law in this
Circuit or any circuit, it gets into a gray area.

It started out when McDonnell Douglas first came into.  Can
White People be a protected class? And we can
argue that.  And can different races come in? And
religions.  And national origin.  It is the way we
classify people.

I submit to this court the very instance of what
society deems a race is a fact.  And it is a fact to be
decided by a jury in the context of this case.
Every single case cited was distinguishable.
Plaintiff's side and the court's side.  We are not dealing
with a party who is trying to get his day in court.  We
are not dealing with a party who is trying to get pushed
out of court by a defendant's counsel getting creative.
We are deciding to tell the jury that a nonparty to this
action is a race that that nonparty says it is not.  That
is essentially the ruling of this court.  I take issue
with it.  It is a fact to be decided by the jury.
To go one step further.  In your Honor's
presentation of the instructions, you mentioned the word
White a few times.  I would argue that the word White
should not even be used. Take the word right out.  I

think that was confusing to the jury. You consistently
said race, race, race. We all agree we are here on a race
charge. Race-based discrimination. That is what we
should be telling the jury. We can't lead them to believe
that someone is White. We can't lead them to believe that
someone is Black. We can't even focus on someone who's
Hispanic.

It is a simple case. Your Honor said it. All
we should be telling them is racial discrimination. They
heard enough from plaintiff's counsel to draw their own
conclusions as to whether he is Hispanic or is White.
They heard enough from plaintiff's counsel that
Plaintiff's white. They heard enough that Mayor
Hardwick's Black. They don't dispute that. If we're
going to put it on the jury, let's put it all on the jury.
We use the word race. We don't mention White. We don't
mention Black. We don't mention Hispanic. And let the
jurors come back.

To do anything other in this case where we are
trying to get into the race of someone who is not a party
who claims they are not that race, it is not American, it
truly isn't. And it is against the very essence of what
we are as a culture. I mean, it can't be done. He is a
White male. I don't even think the jury should be told
that Miguel Bermudez is White. They shouldn't be told
Mayor Hardwick is Black. They should be told it is a race
case. Decide it on the evidence of race. That is it.
That is the jury's prerogative. That is what the jury is
to do.

(Tr. at 1697-1701.)

Hardwick's counsel agreed with the Village's counsel:

Mr. Bermudez testified that he is not a minority. Plaintiff's entire case,
the allegations in the case and their presentation of the case is that Mayor
Hardwick wanted, and the first question out of the box:
Mayor Hardwick selected Chief Bermudez because he wanted a
minority in that place.

Chief Bermudez testified clearly and without any
rebuttal from plaintiff's counsel: I am not a minority.
I have never been a minority. I was here from Cuba when I
was nine months old. And essentially I am as American as

40

anybody else.  My race is White.  And I don't consider
myself any more or less of a minority than the plaintiff.

And counsel is correct, the cases that were
cited are not in the context of reverse discrimination
cases where a White plaintiff is asserting that a
nonparty, nonwhite is being – was elevated.  This is this
case.  And there is in case law, and we looked at it over
the weekend, there is no case law that addresses this

Now, also, your Honor, with all due respect, we
made motions for summary judgment.  And your Honor knocked
out as a matter of law the national origin discrimination
case.  There was no hidden words in those motions.  The
plaintiff says: He is Hispanic, therefore I have been
discriminated against on the basis of my national origin
because he is Hispanic.  Your Honor knocked that out as a
matter of law.

And further in your decision, your Honor I
thought highlighted what the issue would be to the jury:
The perception issue.  To us I have tried this case
entirely that this issue is an issue of fact for the jury
to determine.  And now, quite frankly, I think it is
prejudicial for this court to put its imprint on the jury
charge by saying I have ruled that a Hispanic is a racial
category merely because a few district courts within the
Second Circuit have addressed it in an entirely different
context than this case.  I think it unfair and prejudicial
to my client in the way we presented this case, your
Honor.

So with regard on that issue, I concur. I take exception to
the new charge that your Honor has just read into the record.
Also, to the extent that charge stays in, it shouldn't be others perceive
that Mr. Bermudez –

. . .

It shouldn't be others perceive Mr. Bermudez as White.  It should be,
following your Honor's decision, that Mayor Hardwick and Chief
Bermudez perceive themselves to be White.  What others may have
perceived them as really isn't relevant.  The only
relevance is whether Hardwick perceived him to be White
and Bermudez perceived himself to be White.

(Tr. at 1702-1703.)

The Plaintiff's counsel responded

First of all, Miguel Bermudez said he was Hispanic. He
testified that he was Hispanic. The semantics here is
whether being Hispanic is a national origin category or a
racial category. That is the question that we believe
should be determined as a matter of law, that being
Hispanic is a racial category. Whether he perceives
himself to be White, we are not asking for a jury
instruction that Miguel Bermudez is Hispanic. All we are
saying is that being Hispanic is a category of racial
discrimination. If they want to say that he is White,
that is fine.

Secondly, they are taking an issue that he perceives
himself to be Hispanic or he perceives himself to be White.
That, again, is not his determination to make.

(Tr. at 1704-1705.)

The Village's counsel then stated:

This is a simple case. It all comes down to what Mayor Hardwick believed.
Mayor Hardwick clearly testified at a deposition and again here before
this court under oath he believes him to be White. Believed him to be White.
Knew him for over 30 years. Knew the family. Went to school with his
own sister. Knew him to be White.

. . .

Just a few things to go through. Again, to
race, race. We shouldn't bring up White. We shouldn't
bring up Black. We shouldn't bring up Hispanic. If we
are going to put it all on the jury, then I think we should legitimately
put it all in the jury. And I think that is permissible in the case law.

(Tr. at 1705-1706.)

After recess, the Court stated as follows:

I have looked at the cases. I am not convinced
that it is the right thing to do. I think I'm going to
leave it to the jury.

42

(Tr. at 1722.)  The Court noted the Plaintiff's objection.

The following day, the Court reverted to its original view, stating as follows:

After considerable reflection and research, I came to the conclusion that I'm going to have to say something about Hispanic race.

Upon further review of the cases, I'm going to include an additional charge which I'll give you in a minute.  No party here cites to a failure to promote case, where as, here a relevant issue was the race of the nonparty who was, in fact, promoted.  The defendants argue that the cases that I cited, the Hispanic Individual was the party bringing the suit.  I don't know why this distinction should make a difference.

I think that the race of Bermudez is a relevant issue in this case, a very important issue in this case.  It's been raised by all the parties time and time again.  This issue of race is initially one for the court, not the jury, and in the court's view, if I do not give this determination, the jury will be thoroughly confused about the law, and would likely ask the court to clarify, and so that I believe that this instruction should be part of the initial charge.  Therefore, I'm going to give the following additional charge, and this is the charge:

Throughout this trial you have heard evidence that the nonparty, Miguel Bermudez, is both White and Hispanic.  At this time I instruct you that for purposes of the discrimination laws, Hispanic is a type of race that is different from White or Black.  However, in making your ultimate determination as to whether race played a motivating factor in the defendant's decision to appoint him as chief of police, you may consider whether others perceived Bermudez to belong to a different race, namely, the White race.

(Tr. at 1754-55.)

The Village's Counsel objected:

I believe there is no confusion to the jury if the court simply states national origin claims had been dismissed by the court already.  Let them know that they are not deciding national origin.  That's what the court said in its decision before we started the trial.  That allows them now to focus on race.

If they want to find Hispanic's a race, White's a race, Black's a race, that's their prerogative.  To now – now I think the court has a procedural problem.  I don't know if the court procedurally declare as a matter of law someone who is a nonparty, not properly before the court, is of a certain race even when that very person claims he is not of the race the courts wants everyone to view him as.

He is not a party to this action, and it's a big, big distinguishing factor, as the court acknowledges, the cases cited by the court, the cases cited by the plaintiff, those who plaintiff openly tells you he is Hispanic and the court allows them. We don't have here anybody openly Hispanic and we definitely don't have a party before the court that claims he is Hispanic. He is White of Cuban descent. If the court would just tell them national origin was dismissed, there is no confusion. They know they are deciding a race-based case.

The other issue, your Honor, and it kind of leaves us defendants in a catch-22. Your motion for summary judgment which was decided the Monday before we started here in court, I'm going to paraphrase a paragraph from there:

To the extent the defendants argue that neither Hardwick nor Bermudez perceived Bermudez to be a member of a minority group and that Bermudez had the same color complexion of the plaintiff, the court finds that this evidence simply raises factual disputes appropriately reserved for the fact finder.

So we have a motion that we all used as guidance for this case which said that issue, minority race, we are going to leave that for the fact finder, not a matter of law. Now we go through an entire trial. We present our defenses. They present their claims, and now we find at the end of the road, sorry. As a matter of law we are going to find someone who's a nonparty is a race he says he's not.

It is completely, highly prejudicial to the defendants.

. . .

Your Honor, again, it's very simple. National origin was dismissed by the court. That's true. It's a factual statement. It was. They decide race.

I went through a long list yesterday. This is very different than the cases you are relying upon. You are going to now declare that someone is a race they say they are not because society classifies everyone with a Hispanic tongue as Hispanic? No. His national origin is Cuban.

(Tr. at 1755-58.)

The Court responded:

The first question that I'm going to get if I don't charge this, and what you say has some impact, no question, on my decision, and it gives me thought about it, but the first question I'm going to get is; is Hispanic a race.

(Tr. at 1758.)

To this, the Village's counsel responded:

I think the appropriate answer is that's a decision for the fact finder to make.

You, the jury, heard what everyone said. You heard them. Test his credibility. He claims he's white. More importantly, as I have always said, it doesn't matter what race he is. That's not why we are here. We are here because of his race, and the only time he comes into being is when it's the way he perceived him.

He's not even a party to this case. He perceives him as White. He is White. This is an issue when it comes to you I think the court can properly and I think it would withstand any judicial scrutiny fact finder, you heard the evidence going to credibility your determination as to what race is.

Society hasn't even made that determination yet, and for a court of law –

(Tr. at 1758-59.)

On this topic, Hardwick's counsel stated:

Suffice it to say we tried this case believing that this was an issue of fact. Now we are telling the jury it's an issue of law. I think it's prejudicial. In addition to the mayor's perception, let's not forget that the record reflects, and I will mention in my closing arguments, that the plaintiff perceived Mr. Bermudez to be White, while he struggled to –

And fought me on this, when he stated on direct examination how they identified people as cops, White male, White female – I'm sorry – White male, White Black, White Hispanic, on cross-examination he was forced to admit that based on nothing else, if you just looked at Mr. Bermudez, he would identify him as a White male and I'm going to raise that to the jury.

I think your Honor, though, if you are going to make this now an issue of law, as I said in my motion to a directed verdict, I do think your Honor should take judicial notice of the census. But even beyond that, I think this brings to head a more fundamental question which I also raised on my motion for [a] directed verdict.

If the jury's going to be charged that they can consider what Mayor Hardwick perceived to be the race, then doesn't that then beg the question again of qualified immunity? If Mayor Hardwick believed that Bermudez was White, how could he held liable – yes, and I'll go back, clearly Title VII is out there, clearly the mayor knew that he couldn't discriminate on any protected class.

But if the mayor perceived the plaintiff to be White, and the mayor, as he testified, believes that race and White and Black, he can he be held liable, and therefore I would renew my motion for the directed verdict on that point.

(Tr. at 1760-61.)

The Plaintiff's counsel then stated as follows:

It is well settled that being Hispanic is not a form of national origin. We cited cases. They have not cited one case that being Hispanic is a question of fact. We have cited five or six cases that your Honor mentioned yesterday that even where a plaintiff checked the box for national origin under Hispanic, the court found that that stated a claim for race discrimination.

If the defendants didn't fully research this issue before the trial in order to prepare themselves for this, then that's at their own risk that they did that. And I think we need to make it clear that we are not asking the court to declare him, nor do I think your instruction declares that Miguel Bermudez is Hispanic. It's up to the jury to determine how he was perceived by others.

The issue here is that the question of whether Hispanic falls into the category of race or national origin is decided by the court.

(Tr. at 1761-1762.) After recess, the Court stated the following:

None of the cases made the statement that as a matter of law, Hispanic people belong to a separate race. There is no such case that says that. The cases are in between, and avoid making statement that as a matter of law Hispanics are a separate race.

If I tell this jury, as I propose to do, that for the purpose of discrimination laws Hispanic is a type of race that is a different race from White or Black, and also tell them that others perceived Bermudez to belong to a different race, I think I'm getting involved in a determination that the jury should make. This is a very difficult question, but looking at the cases they are in between whether it's race or national origin, and there is no appellate case that I saw that helps me in any way.

(Tr. at 1764.) The Plaintiff noted his exception. (Tr. at 1765.)

J.    The Closing Arguments

During the closing arguments, the Plaintiff's counsel stated as follows:

People who are Hispanic have said I'm White. People have testified that other people who other people have referred to as Hispanic are White. Howard Colton, the village attorney, went so far [as] to say that Asian people are White.

. . .

46

You have to use your good judgment.  You have to use your life experience.  Are people that are Hispanic not Hispanic?  Are they only Black and White?

. . .

I can't believe that Howard Colton said that people are only Black and White.  I think that it's actually insulting to the one-third of Freeport's population.  We had testimony even by Mayor Hardwick that the population is one-third Hispanic, one-third Black, one-third White, but according to Howard Colton, one-third of the population of Freeport is wrong.  They are not actually Hispanic, and the Asians are White people?

. . .

The defendants want you to believe that the only thing that makes Bermudez Hispanic is that his name sounds Hispanic, but that he's really White.  I ask you, please, use your common sense.  Use your good judgment.  Use your life experience.  Even Miguel Bermudez at his deposition admitted to being Hispanic.

(Tr. at 1766-1798.)

The Village's counsel stated as follows:

Christopher Barella, he's White. Look at him.  You can all see him.  Miguel Bermudez, I think he may be whiter than Christopher Barella.  You can all see him.

Race is why we are here.  We are not here for national origin.  As a matter of fact, you are going to get jury charges and you are going to listen to the judge, national origin won't come up.  We are here for race, and whose race are we really here for? Plaintiff spent a lot of time in this trial going after Miguel Bermudez, God bless the American jury system, right? He's not even a party to the case.  He is not a party.

. . .

How are we arguing that a White man was discriminated against if they are both white? Again, I remind you national origin is not the issue in this case.  You will hear it in your instructions.  Race is, race.

. . .

Now, I think plaintiff tried to indicate we are saying Hispanics don't exist.  We never said that, never once.  We are just saying we are here for race.  White, Black, Asian, American, races, commonly defined races.  That's racial discrimination.  National origin discrimination is something else, and that's not why we are here.

(Tr. 1799 -1811.)

During Hardwick's closing argument, his counsel stated:

Chief Bermudez is White and this is a race discrimination case and plaintiff's counsel made reference to Howard Colton, the only question that I'm going to ask, plaintiff's counsel asked him he testified there are two different types of lawsuits, one is race and one is national origin, ethnicity.

Well, I don't think it's going out on the limb that Mr. Bermudez does have an Hispanic or Latin sounding name so he is an ethnic Latino or ethnic Hispanic, whatever the terms are, but he is White. Plaintiff in his opening statement said to you, and I recall it vividly, ethnicity equals race. Okay. I sat back and was expecting some type of evidence to be put in on that issue. He put nothing in. He doesn't call an expert, he didn't call anybody. It's for you to determine respectfully whether race played a factor, whether Bermudez is White or not. He says he's White, he looks White. Even Mr. Barella, if you remember the testimony on direct examination he says well, the way we identify people is male White, male black or male Hispanic. Okay. What do I do? I asked him a simple question, knowing nothing about Mr. Bermudez, how would you identify him and he fought me and he fought me a little bit but then he had to concede, Mr. Bermudez is white. More importantly, Mayor Hardwick perceived Mr. Bermudez to be White. Had he known him for 30 or 35 years, he didn't think of him as anything other than White. Yes, his last name is Bermudez. That doesn't make him not white.

And you heard Mr. Bermudez. This entire case, the first question that plaintiff's counsel asked why are we here? And what did Mr. Barella say, I'm sorry, yes, what did Mr. Barella say, we are here because Mayor Hardwick wanted to appoint a minority.

Well, you heard Chief Bermudez. He has been in this country since he was nine months old. You heard him speak. You see everything about him. And what did he say on this question? I am not a minority, and I have never been a minority. He doesn't consider himself to be a minority.

And ladies and gentlemen, I would suggest that we can all use our common sense that they are minorities in this country, but if your color is White, unless your ancestors came from the Mayflower, we are all in the same boat.

(Tr. at 1813-1837.)

In rebuttal, the Plaintiff's counsel stated:

First of all in this case [] Miguel Bermudez's race does matter. It matter's that he's Hispanic. It matters that Mayor Hardwick referred to him as the first Latino Police Chief. That shows intent.

. . .

I want to address the issue of national origin versus race discrimination here. The defendants want to cloud the issues on that subject.

We're not claiming here national origin discrimination. We're not claiming because Christopher Barella is American that he didn't get this job. The Mayor, African-American, chose Miguel Bermudez because his race is Hispanic. Has nothing to do with national origin discrimination.

(1837-1845.)

K.   The Jury Charge, Deliberations and Verdict

During the Jury Charge, the Court instructed the jury on the elements of a discrimination claim based on race as set forth in McDonnell–Douglas Corp. v. Green, 411 U.S. 792, 802–03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

Also, in accordance with the Court's ultimate decision to treat the question of whether, for purposes of the anti-discrimination statutes, hispanic is a race different from the white or black race, as an issue of fact, the Court made no specific reference to this issue. In accordance with the summary judgment decision, the Court made no reference to and thus reserved for the jury the question of what race Bermudez, Hardwick, and others *perceived* Bermudez to be.

The Verdict Sheet simply asked: "Based on all the evidence presented, did the plaintiff Christopher Barella prove that his race was a motivating factor for the decision by former Mayor Andrew Hardwick to decline to appoint him to the position of Chief of Police of the Village of Freeport Police Department." (Exh. 19.)   Neither the Jury Charge nor the Verdict Sheet provided a separate claim for skin color. In so doing, the Court implicitly dismissed any claims based on skin color.

The Court also implicitly dismissed any claims against Hardwick in his official capacity. Davis v. Stratton, 360 F. App'x 182, 183 (2d Cir. 2010)("The suit against the mayor and police chief in their official capacities is essentially a suit against the City of [New York], because in a suit against a public entity, naming officials of the public entity in their official capacities 'add[s] nothing to the suit.'")(citation omitted); accord Davis v. Town of Hempstead, CV 09–1129(JFB)(ARL), 2013 WL 1623741 at *3 (E.D.N.Y. Feb. 6, 2013), report and recommendation adopted, 2013 WL 1623644 (E.D.N.Y. Apr.15, 2013); see also Coon v. Town of Springfield, Vt., 404 F.3d 683, 687 (2d Cir. 2005)("[A] § 1983 suit against a municipal officer in his official capacity is treated as an action against the municipality itself.").

On May 28, 2014, after five days of deliberations, a declaration of an "unresolvable impasse" or deadlock (Ct. Exh. 12.), and the issuance of an Allen charge, the jury returned a verdict in favor of the Plaintiff – in effect, finding that Hardwick engaged in intentional race discrimination in violation of 42 U.S.C. § 1981, 42 U.S.C. § 1983, Title VII, and the NYSHRL when he selected Bermudez, instead of the Plaintiff, to be the Village's Chief of Police. The jury rendered a verdict against the Defendants for the sum of $150,000 in back pay damages, $1,000,000 in front pay damages, and $200,000 in punitive damages as against Hardwick only. Judgment was entered on May 30, 2014.

L.  The Post-Verdict Motions

On June 11, 2014, the Plaintiff moved pursuant to Fed. R. Civ. P. 45(d) and 28 U.S.C. § 120 for an award of his attorneys' fees and costs.

On June 25, 2014, the Plaintiff moved for an order (1) upwardly adjusting the back pay and front pay award to account for the negative tax consequences he would suffer as a result of receiving the damages award in a lump sum; (2) awarding pre-judgment interest on his back pay

and costs; and (3) awarding post-judgment interest on the entire award he ultimately receives, including his attorneys' fees and costs.

On June 25, 2014, Hardwick filed a notice of appeal from the May 30, 2014 judgment. On June 27, 2014, the Village filed a separate appeal from the May 30, 2014 judgment. Those appeals are currently pending before the United States Court of Appeals for the Second Circuit.

On June 27, 2014, Hardwick moved pursuant to Fed. R. Civ. P. 50(b) for judgment as a matter of law on all claims for which the jury rendered a verdict in favor of the Plaintiff. Alternatively, Hardwick moved pursuant to Fed. R. Civ. P. 59(a) for a new trial. That same day, the Village moved pursuant to Fed. R. Civ. P. 50 for judgment as a matter of law, and alternatively, pursuant to Fed. R. Civ. P. 59(a) for a new trial or reducing the jury's award against the Village. The motions are fully briefed.

## II.    DISCUSSION

A.  <u>The Defendants' Rule 50 Motions</u>

1.  <u>The Standard for Evaluating A Motion Under Rule 50</u>

Rule 50(a) provides for the entry of a judgment as a matter of law on any issue, before submitting the matter to a jury, where "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Such a motion may, as here, be renewed after trial under subsection (b) of that Rule. A court may grant a motion under Rule 50(b) "only if after viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in favor of the non-moving party, it finds that there is insufficient evidence to support the verdict." <u>Fabri v. United Technologies Int'l, Inc.</u>, 387 F.3d 109, 119 (2d Cir. 2004). Importantly, the trial court "cannot set aside the jury's credibility findings and cannot find for the movant based on evidence the jury was entitled to discredit." <u>Id.</u>

Here, applying the McDonnell Douglas burden-shifting framework, the Defendants – in particular, the Village – contend that the Plaintiff failed to establish a *prima facie* case of race discrimination on the ground that no reasonable jury could find that the Hardwick's failure to promote the Plaintiff to the position of Chief of Police occurred under circumstances giving rise an inference of race discrimination.

However, as an initial matter, upon further review of the case law, the Court finds that it erred by including in the jury charge the elements of the McDonnell Douglas burden-shifting framework. Henry v. Wyeth Pharm., Inc., 616 F.3d 134 (2d Cir. 2010). In Henry, the Second Circuit addressed a challenge to a district court's inclusion of elements of the McDonnell Douglas burden-shifting framework into its jury charge. See id. at 153. Although it ultimately held that the jury charge was not reversible error, the Henry Court cautioned that the McDonnell Douglas framework was formulated for use by judges in determining whether a case should go to a jury and would not be helpful to the fact-finder in making its ultimate determination of whether plaintiff had "proved by a preponderance of the credible evidence that his race or color was a motivating factor in certain employment actions." Id. at 154 (citation and internal quotation marks omitted).

However, here, the Court concludes that the "inclusion of this superfluous language [did not] obscure[] the jury's ultimate task – to determine whether race was a motivating factor in an adverse employment action." Id. at 154. Further, as in Henry, the verdict sheet directed the jury to the correct question – whether the Plaintiff did "prove that his race was a motivating factor for the decision by former Mayor Andrew Hardwick to decline to appoint him to the position of Chief of Police of the Village of Freeport Police Department."

The Court also notes that it was the Plaintiff, rather than the Defendants, who sought to exclude the McDonnell Douglas framework from the jury charge. In this regard, the Court finds that the erroneous instruction of the McDonnell Douglas framework did not materially prejudice the Defendants, but in fact, worked in their favor. Further, the Court finds no prejudice to the Defendants in acknowledging this error at this juncture of the ligation. In the Court's view, the result here would be the same under either standard – that is, a reasonable jury could have concluded that, to the extent a substantive difference exists between the two standards, (1) under McDonnell Douglas, Hardwick's failure to promote the Plaintiff occurred under circumstances giving rise an inference of race discrimination and (2) under Henry, race played a motivating factor in this decision.

In this regard, the essential thrust of the Defendants' respective Rule 50 motions is that no reasonable jury could have found that Hardwick's failure to promote the Plaintiff rather than Bermudez, who has a white skin color, was motivated by unlawful racial considerations. However, the Defendants' entire argument presupposes that, given Bermudez's skin color and certain testimony suggesting that Bermudez belonged to the white race, no reasonable jury could find that Bermudez belonged to any race other than the white race for purposes of the anti-discrimination laws.

Indeed, as noted above, throughout the trial, the parties repeatedly clashed over whether hispanic is a race that is a different race than white, and whether this question should resolved as a matter of law or matter of fact. Upon extensive consideration of the issue, the Court declined to instruct the jury that hispanic is a race, rather than a national origin, for purposes of the anti-discrimination statutes, and therefore reserved this question for the jury.

"Laying aside the contentious debate regarding social and anthropological constructions of 'race' and how it should be defined," Salas, 2006 WL 1049469, at *5 (citing Saint Francis College v. Al-Khazraji, 481 U.S. 604, 610, 107 S. Ct. 2022, 95 L. Ed. 2d 582 (1987), the Court notes that the New Oxford American Dictionary 806 (2001) defines the word "Hispanic" as "of or related to Spanish-speaking countries, especially those of Latin America."  The American Heritage Dictionary 832 (4th ed. 2000) defines the word similarly and explains its usage as follows:

> Though often used interchangeably in American English, Hispanic and Latino are not identical terms, and in certain contexts the choice between them can be significant.  Hispanic, from the Latin word for "Spain," has the broader reference, potentially encompassing all Spanish-speaking peoples in both hemispheres and emphasizing the common denominator of language among communities that sometimes have little else in common  . . . In practice, however, this distinction is of little significance when referring to residents of the United States, most of whom are of Latin American origin and can theoretically be called by either word . . . Hispanic, the term used by the U.S. Census Bureau and other government agencies, is said to bear the stamp of an Anglo establishment far removed from the concerns of the Spanish-speaking community.

The EEOC defines "national origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the *physical, cultural or linguistic characteristics of a national origin group*," thus lending credence to the assertion that hispanic may be a form of national origin. 29 C.F.R. § 1606.1 (emphasis added).

That said, the Court recognizes "the uncertainty among [other] courts as to whether 'Hispanic' is better characterized as a race or a national origin." Alonzo v. Chase Manhattan Bank, N.A., 25 F. Supp. 2d 455, 460 (S.D.N.Y. 1998).  Courts have come down on both sides of the question, compare Serrano v. New York State Dep't of Envtl. Conservation, 12-CV-1592 (MAD)(CFH), 2013 WL 6816787, at *4 (N.D.N.Y. Dec. 20, 2013)("while national origin and

race are often distinct elements, the term 'Hispanic' may trigger the concept of race.")(citing Alonzo); Casanova v. Gen. Mills Restaurants, Inc., 94-CV-4386 (FB), 1997 WL 473840, at *1 n. 1 (E.D.N.Y. Aug. 15, 1997)("Although Casanova contends that she was discriminated against on the basis of her 'Hispanic origin,' the Court construes the complaint as stating a claim for racial rather than national origin discrimination since none of the papers submitted to the Court indicate Casanova's national origin.") with Salas, 2006 WL 1049469, at *6 ("Because the term Hispanic relates to language and culture, it is an ethnic designation more than a racial classification, used to refer to individuals of Spanish-speaking descent, whether from Spain itself or from Spanish-speaking Latin-American countries."), sometimes simultaneously. Lopez v. Texas State Univ., 368 S.W.3d 695, 703 (Tex. App. 2012)("the term 'Hispanic' does not literally designate either race or national origin and is instead commonly understood as implying both."), review denied (Jan. 18, 2013); Torres v. City of Chicago, No. 99 C 6622, 2000 WL 549588, at *2 (N.D. Ill. May 1, 2000)(race discrimination claim was related to EEOC charge alleging discrimination based on plaintiff's Hispanic ancestry because the term Hispanic encompasses the concepts of race and national origin)(citing Alonzo).

Where possible, courts have declined to answer the question. Elias v. New York City Transit Auth., 95 CIV. 1083 (CSH), 1997 WL 214968, at *1 n. 1 (S.D.N.Y. Apr. 28, 1997)("I need not decide whether bias against Hispanics better fits within the rubric of 'race' or 'national origin' discrimination.  I will refer to this claim as one of race discrimination, as Elias does in his complaint.") Welch v. U.S. Cellular Corp., 07 C 3465 (WTH), 2008 WL 4088797, at *1 n. 1 (N.D. Ill. Aug. 21, 2008)("For purposes of considering plaintiff's Title VII claims, it is unnecessary to resolve whether Hispanic is a racial, color, or some other classification.").

However, in this failure to promote case, given that the Court dismissed the national origin claims at the summary judgment stage on the legal assumption that hispanic is a race for purpose of the anti-discrimination laws, this case could not proceed to judgment without again addressing that assumption. In other words, the question whether hispanic is a race for purposes of the anti-discrimination laws was squarely presented here, and could not go unanswered. Nor, as the Village's counsel argued vehemently during the jury charge conference, did Bermudez's non-party status absolve this Court of the duty to address in some form the question of whether hispanic is a race for purposes of the anti-discrimination laws. Where, as here, Bermudez's race is a critical issue and repeatedly brought up by the Defendants, Bermudez's non-party status is, with respect to the above-cited cases, a distinction without a difference.

As noted above, at the Defendants' request, this Court treated the issue of whether hispanic is a race for purposes of the antidiscrimination laws as one of fact, and not of law. Also, as noted above, regardless of the answer, the courts appear to generally treat the question as one of law, rather than fact. However, whatever the propriety of this Court's decision to treat the question as one of fact, at this stage of the litigation, the Court declines to revisit that determination and, not surprisingly, the Defendants do not seek reconsideration of that determination.

This is presumably because the Court signaled on more than one occasion on the record that, were it necessary to decide this question as a matter of law, it would decide in favor of the Plaintiff that hispanic is a race rather than a national origin for purposes of the anti-discrimination statutes. Cognizant of the Court's leanings on the issue, the Village's counsel argued that it would be "not American" to decide this question as a matter of law, although they failed to point to one case where such an issue was decided as a matter of fact. (Tr. at 1701.)

56

Indeed, the Court pauses to note the breadth of that astounding argument. Contrary to the Defendants' contention, to find as matter of law that hispanic is a race *for purposes of the anti-discrimination laws* is no more objectionable than to say that "White" or "Black" is a race *for purposes of the anti-discrimination laws.* Nor would the Court have been telling any individual that his or her perception of his or her race in other contexts was somehow misguided or wrong.

The Court further notes that the decision to treat this question as an issue of fact was not, as the Defendants continually insisted at the trial, required by the Court's summary judgment finding that what race Bermudez and Hardwick *perceived* Bermudez was itself an issue of fact. The Defendants conflate the questions of Bermudez's race – which the Defendants' continually invoked during the trial as foreclosing the Plaintiff's claim – under the anti-discrimination laws versus the *perception* of his race by him and other individuals.

Circling to the Defendants' Rule 50 motions, the Defendants essentially argue that no reasonable jury could have found race discrimination here. The Court disagrees. The Defendants' argument rests on the debatable assumption that no reasonable jury could have found that that Bermudez, the non-party ultimately appointed to the position of Chief of Police, belonged to any race other than the white race, the same race as the Plaintiff.

If that assumption were true, the Defendants' motion would likely be meritorious. Indeed, a number of courts have held that a plaintiff fails to state a *prima facie* case of intentional racial discrimination where the position the plaintiff sought was filled by another individual of the same race as the plaintiff. See e.g., Babcock v. New York State Office of Health, 2009 U.S. Dist. LEXIS 47594 (S.D.N.Y. 2009)(dismissing a failure to promote claim where promotions were given to individuals in the same protected class); Constance v. Pepsi Bottling Co., No. 03-CV-5009 (CBA)(MDG), 2007 WL 2460688, at *20 (E.D.N.Y. 2007)("As two of the four

positions were given to black individuals, members of plaintiff's protected group, any inference of race discrimination is removed."); Nash v. New York State Executive Dep't, No. 96 Civ. 8354 (LBS), 1999 WL 959366, at *13 (S.D.N.Y. 1999)(same); Pointer v. Columbia Univ., No. 95 Civ. 8418(JFK), 1998 WL 898313, at *5 (S.D.N.Y. 1998)(dismissing race and gender discrimination claims where another black female was given the position the plaintiff sought); Samuels v. N.Y. Dep't of Correctional Services, No. 94 CIV. 8645 (SAS), 1997 WL 253209, at *5 (S.D.N.Y. 1997)(the black female plaintiff failed to establish a claim of race discrimination where two of the four promotions she complained of were given to black males); Scott v. Potter, 134 Fed. Appx. 989, 989 (8th Cir. 2005)("Furthermore, with regards to her race discrimination claim, [plaintiff] did not make out a prima facie case because the employee who was ultimately promoted was of the same race."); Kraemer v. Luttrell, 189 Fed. Appx. 361, 368 (6th Cir. 2006)("However, reading his claim as one for denial for promotion to lieutenant, we conclude that [plaintiff] would fail on the fourth element of the prima facie case because three other members of the same protected class did receive promotions to lieutenant.  Therefore, [plaintiff] has failed to set forth a prima facie case, and summary judgment was properly granted on his claim."); see also Harmon v. Runyon, No. 96 CIV. 6080 (SAS), 1997 WL 786383, at *5 (S.D.N.Y. 1997)(the plaintiff could not show she was treated differently than similarly situated individuals outside her protected class where three members of her protected class were not subjected to the same adverse employment action as was plaintiff); Smith v. Planas, 975 F. Supp. 303, 308 (S.D.N.Y. 1997)(the plaintiff could not state a discrimination claim where five of the seven individuals identified by plaintiff as having received higher paying assignments were members of plaintiff's protected class); but see Carroll v. City of Mount Vernon, 707 F. Supp. 2d 449, 454 n. 8 (S.D.N.Y. 2010)("it appears that the dispositive question may be whether the

decision not to promote was race-based, regardless of who was eventually awarded the position."), aff'd, 453 F. App'x 99 (2d Cir. 2011); Sonpon v. Grafton Sch., Inc., 181 F. Supp. 2d 494, 500 (D. Md. 2002)("the fourth prong of the [McDonnell Douglas *prima facie*] test is not whether the job was given to someone outside of the protected class, but whether discrimination could be inferred from the circumstances."). Thus, the Defendants argue that in a failure to promote case where, as here, the person promoted belonged to the same race as the Plaintiff, no reasonable jury could find race discrimination.

However, given the record as a whole, the Court finds that a reasonable jury could have concluded that (1) hispanic is a race for purposes of the anti-discrimination laws; and (2) that Bermudez's race was hispanic. In this regard, the Village of Freeport census indicated that Freeport is one-third white, one-third black, and one-third hispanic. The Village of Freeport census thus implied that hispanic is a type of race. (Tr. at 591.) Further, the jury could have reasonably concluded that Colton contradicted his deposition testimony that hispanic is a race as opposed to a national origin. (Tr. at 1259-60.) Also, the jury had heard Bermudez somewhat contradict his prior deposition testimony where he conceded that his race was hispanic and testified at trial that he now considered his race to be "white." (Tr. at 1551.)

Put simply, having repeatedly urged the Court to treat the issue of whether hispanic is a race for purposes of the anti-discrimination laws as a question of fact, the Defendants cannot now be heard to complain when the jury implicitly found against the Defendants on that factual question.

To be sure, the Defendants contend that, given that the Court ultimately determined that the issue of Bermudez's race was a factual issue for the jury, the Court erred in sustaining the Plaintiff's objection to the attempt by Hardwick's counsel to introduce the 2010 United States

Census into evidence for the jury's consideration of whether hispanic is a race. The Court agrees. At the juncture during the trial when the Court excluded this evidence, the Court expressed its intention to treat the question of whether hispanic is a race for purposes of the anti-discrimination laws, consistent with the summary judgment decision, as one of law. However, having ultimately treated this issue as one of fact, the exclusion of the 2010 United States Census, it turns out, was inconsistent with the Court's prior evidentiary rulings concerning the Plaintiff's counsel's questioning of numerous witnesses about a Village of Freeport Census. In other words, regardless of whether the Court erred in reversing its prior determination that the issue of whether hispanic is a race for purposes of the anti-discrimination laws was one of law, having ultimately submitted the question to the jury, it becomes clear that, in hindsight, the Court should have admitted in evidence the 2010 United States Census proffered by Hardwick.

However, as explained later, this evidentiary error does not warrant granting the Defendants' motion for a new trial under Rule 59. Nor, the Court finds, does it warrant granting the Defendants' motion for judgment as a matter of law. Indeed, properly framed, the crux of the Defendants' motion for judgment as a matter of law is that based on the evidence admitted into the record, no reasonably jury could find for the Plaintiff. This argument is conceptually distinct from the argument – advanced in connection with the Defendants' motion for a new trial – that this Court erred in excluding certain evidence from the record and such exclusion was sufficiently prejudicial as to justify a new trial.

Separately, the Court anticipates the Defendants' argument that, given that even the Plaintiff admitted that Bermudez's skin color was white, no reasonable jury could have found racial discrimination on the part of the Defendants. However, parsed closely, the Plaintiff said that Bermudez "look[s]" white and answered yes to the question, "is Chief Bermudez White?"

(Tr. at 211-12.)  The Plaintiff did not, as the Defendants suggest, characterize Bermudez as belonging to the white race as opposed having a white skin color.

Again, as they did throughout the trial, the Defendants conflate skin color and race, which are legally distinct concepts. Howell v. Rush Copley Medical Group NFP, No. 11 C 2689, 2012 WL 832830, at *3 (N.D. Ill. Mar. 12, 2012)(plaintiff's charge stating "I believe that I have been discriminated against because of my race, Black, in violation of Title VII" insufficient to allow federal suit alleging color discrimination because plaintiff "made no mention of the hue of her skin color," an EEOC investigation into her race discrimination charges "would not reasonably lead to an investigation into [the defendant's] conduct toward light-skinned individuals within her race," and "to the extent [she] intended to equate race with color in her charge, her color claim is duplicative of her race claim").

The reason for this confusion is clear:

> People often confuse skin color and race because skin color is used to assign people to racial categories.  Indeed, color is commonly used to describe the difference between racial categories (i.e., Black is used to describe African-Americans and White is used to describe Caucasians).

Trina Jones, Shades of Brown, The Law of Skin Color, 49 Duke L.J. 1488, 1497-98 (2000). "Although color may be a factor in racial discrimination (for example, when an employer prefers a white job candidate over an equally qualified black candidate), color discrimination refers specifically to preferring an individual because of the hue of his skin (for example, treating a light-skinned African woman more favorably than a dark-skinned African woman)." Salas, 2006 WL 1049469, at *6 (citing Nance, at 438-39.).

However, although courts often confuse the two, both Title VII and the NYSHRL treat claims for race as distinct from claims based on skin color. See 42 U.S.C.A. § 2000e-2 ("[i]t shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to

discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's *race*, *color*, religion, sex, *or* national origin)(emphasis added); New York Executive Law § 296(1)(McKinney's 2010)("It shall be an unlawful discriminatory practice . . . [f]or an employer or licensing agency, because of the age, *race*, creed, *color*, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, *or* marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.")(emphasis added); <u>compare</u> <u>Hyunmi Son v. Reina Bijoux, Inc.</u>, 823 F. Supp. 2d 238, 242 (S.D.N.Y. 2011) ("Only suits based on racial discrimination may be maintained under" Section 1981)(citation and quotation marks omitted).

Although the amended complaint could be construed as asserting a separate claim for color discrimination as opposed to race discrimination, the Court did not nor did the parties request the Court to submit such a claim to the jury. Rather, as noted above, the Court implicitly dismissed any such claims prior to jury deliberations. Therefore, although even the Plaintiff in his testimony referred to Bermudez as "white," it does not follow that the Plaintiff conceded that Bermudez belonged to the "white" race. Rather, the jury could have inferred that the Plaintiff was referring to Bermudez's skin color as opposed to his race.

Further, the fact that both Bermudez and Hardwick testified that they *perceived* Bermudez to belong to the white race and, therefore, could not have discriminated against the Plaintiff by promoting Bermudez, instead of the Plaintiff, presented, consistent with the summary judgment decision, a factual question for the jury. In other words, the jury was entitled to credit or discredit the testimony of Bermudez and Hardwick in this respect. In this regard, the

Defendants cite no authority for the proposition that, as a matter of law, an individual is the final arbiter of his or her own race for purposes of *the anti-discrimination laws.* To hold otherwise could sanction a viable discrimination claim in almost every employment situation, provided the plaintiff testifies that he belongs to a different race that the individual actually promoted.

In sum, the Court finds that a reasonable jury could have concluded that (1) hispanic is a race for purposes of the anti-discrimination laws; and (2) Bermudez's race was hispanic.

Drawing these reasonable inferences and considering the remainder of the evidence in the record, the Court finds that a reasonable jury could have concluded that Hardwick's decision not to appoint the Plaintiff to the position of the Chief of Police was, in fact, driven by unlawful race-based considerations. In addition to the fact that the jury could have reasonably concluded that Hardwick appointed an individual outside of the Plaintiff's protected class, the evidence indicated that: (1) the Plaintiff scored number one on the Police Chief Examination, while Bermudez scored number three; (2) the Plaintiff had a law degree and a Master's Degree, while Bermudez only had a high school diploma; (3) the Plaintiff had over 20 years of experience as a decorated member of the Village Police Department and had been promoted to Lieutenant before Bermudez, while Bermudez was tied for the least-tenured Lieutenant in the Village Police Department; (4) Hardwick did not interview the Plaintiff or review any of his personnel files.

Further supporting the Plaintiff's case were certain contemporaneous personnel decisions during Hardwick's tenure as Mayor. In this regard, the Court admitted into evidence two charts portraying the persons appointed for department head positions and those replaced. The first chart showed that 11 of 12 persons who "retired, resigned, or not reappointed" were white, which Hardwick confirmed, while the latter chart showed a majority of hispanic and black replacements. (Pl.'s Exhs. 17-18.)

The Defendants contend, as they did in their closing arguments (Tr. at 1810.), that Exh. 18 shows that 12 of 18 department heads appointed by Hardwick were white. Again, however, the Defendants conflate race and skin color. The jury could reasonably have concluded that, for those individuals indicated as white or black plus hispanic, the white/black designation referred to skin color rather than race.

Viewed this way, 10 of the 18 department heads appointed by Hardwick belonged to the black or hispanic race, while 8 belonged to the white race. Although this evidence is not overwhelming by itself, coupled with the other circumstantial evidence in the record, the Court finds that a reasonable jury could have reached this verdict. Moreover, on a Rule 50 motion, it is not the proper role of the Court to weigh the evidence. <u>Pouncy v. Danka Office Imaging Co.</u>, 393 F. App'x 770, 772-73 (2d Cir. 2010)("Pouncy's motion consisted largely of a challenge to the jury's determination concerning the proper weight afforded to the trial evidence, which is not a proper basis for a Rule 50(b) motion."); <u>Zellner v. Summerlin</u>, 494 F.3d 344, 370 (2d Cir. 2007)("In considering a motion for judgment as a matter of law, the district court must draw all reasonable inferences in favor of the nonmoving party, and it may *not make credibility determinations or weigh the evidence*.")(citations omitted).

Among Hardwick's personnel decisions that suggest he sometimes took race into account in personnel decisions was his attempt to promote Zina Leftenant to the Command Staff instead of the Plaintiff. Each witness asked about the subject, save for Colton, agreed that the Plaintiff was more qualified than Leftenant. (Tr. at 1156, 1273, 1329, 1578.) There was also evidence that Hardwick replaced, Lou DiGrazia, a white individual in the position of Superintendent of the Department of Public Works, with Scott Richardson, a less qualified African-American. (Tr. at 616-18, 1075-77) Finally, there was evidence that Hardwick replaced Joe Madigan, a white

Superintendent of the Buildings Department, with Richard Brown, a less qualified African-American. (Tr. at 620-21.)

As the Defendants did in moving for summary judgment and during the trial, they argue that that none of the witnesses who testified about the contemporaneous personnel decisions possessed first-hand knowledge of the events or circumstances surrounding Hardwick's failure to promote the Plaintiff to Chief of Police. However, an inference of discrimination "is a 'flexible [standard] that can be satisfied differently in differing factual scenarios.'" Howard v. MTA Metro–N. Commuter R.R., 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011)(quoting Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996)). "No one particular type of proof is required to show that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination." Ofoedu v. St. Francis Hosp. & Med. Ctr., No. 04–CV–1707 (PCD), 2006 WL 2642415, at *14 (D. Conn. Sept. 13, 2006). An inference of discrimination can be drawn from circumstances such as "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action]." Abdu–Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001)(quoting Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994)); see also Abdul–Hakeem v. Parkinson, 523 F. App'x 19, 20 (2d Cir. 2013)(finding that an inference of discrimination can be raised by "showing that an employer treated [an employee] less favorably than a similarly situated employee outside his protected group" (quoting Ruiz v. Cnty. of Rockland, 609 F.3d 486, 493 (2d Cir. 2010)).

Further, even if, as the Defendants argued throughout trial, many or all of these contemporaneous personnel decisions required approval by the Board of Trustees, those

decisions were relevant to the Plaintiff's claims insofar as Hardwick made the recommendations, in the first instance, to the Board of Trustees. The weight accorded this evidence rested within the province of the factfinder.

Contrary to the Defendants' contention, the cases of Cummings-Fowler v. Suffolk Co. Community College, 981 F. Supp. 2d 124 (E.D.N.Y. 2013)(Spatt, J.) and Levitant v. City of N.Y., Human Resources Admin., 914 F. Supp. 2d 281 (S.D.N.Y. 2012) are distinguishable.

In Cummings-Fowler, an African-American female claimed that she was discriminated against by her employer based upon her race. The Plaintiff accused her former supervisors of (1) often referring to African–Americans as "you people"; (2) expressing skepticism that the Plaintiff completed her doctorate in three years; (3) calling the Plaintiff "young lady" or "Michelle" instead of her professional title; (4) suggesting that African–Americans were "taking over" Suffolk County Community College ("SCCC"), in reference to SCCC's African–American President, Vice President and two executive deans; (5) remarking that Green was smart but "just happened to be black"; (6) suggesting to the Plaintiff that although Manning "looked like you people," he was "one of us"; (7) indicating that Caucasians "got the hell out of" Mount Vernon, New York when African–Americans moved in; (8) implying that a "fat black woman" would be threatened by "a skinny black woman" and (9) making negative comments about the President of SCCC, who was an African–American woman.

Nevertheless, the Court held that the Plaintiff failed to satisfy her *prima facie* burden of establishing circumstances giving rise to an inference of discrimination. However, unlike here, the racially-charged comments were not directly implicated in the promotion at issue and were not made by decision-makers who made the promotion decision that the plaintiff alleged to be discriminatory.

In <u>Levitant</u>, the Court granted the defendant judgment as a matter of law after a jury verdict on the plaintiff's failure to promote claim. In that case, two candidates had higher scores than the plaintiff and "[t]he only evidence plaintiff presented was his testimony that the interview was short and was asked 'routine questions.'" 914 F. Supp. 2d at 305-06. Here, by contrast, the Plaintiff had higher test scores than Bermudez, yet he was not interviewed.

2. <u>As to "Qualified Immunity"</u>

Hardwick also argues that he is entitled to judgment as a matter of law based on the affirmative defense of qualified immunity.

"Qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Zellner</u>, 494 F.3d at 367 (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). This analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." <u>Brosseau v. Haugen</u>, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004).

Here, Hardwick submits that it was not "clearly established" at the time he selected Bermudez to be the Chief of Police that hispanic was a race different than the white race for purposes of the anti-discrimination statutes. However, Hardwick fails to specify whether what is not "clearly established" is a question of law or a question of fact. Importantly, qualified immunity turns on whether the law is well-settled, not on whether factual determinations are well-settled in some sense. Here, the law is well-settled that intentional discrimination is illegal. <u>Hill v. Taconic Developmental. Disabilities Servs. Office</u>, 283 F. Supp. 2d 955, 958 (S.D.N.Y. 2003)("There can be no doubt that the law barring discrimination against a person on the basis of

race — including via a hostile work environment is 'well-settled.'"); <u>Griffin v. New York</u>, 122 Fed. App'x 533, 533 (2d Cir. 2004)("Griffin's right to be free from these alleged adverse employment actions based on race was therefore clearly established, and the district court properly refused to grant qualified immunity at this time on defendants-appellants' summary judgment motion.").

What is not well settled is – the issue of whether hispanic is a race different from the white or black race for purposes of the anti-discrimination statutes – the Court chose to treat this issue as a question of fact, at the Defendants' request. Again, at this stage of the litigation, the Court declines to revisit that holding.

Here, the fact-finder concluded that Hardwick intentionally discriminated against the Plaintiff on the basis of his race by failing to promote him to the position of the Chief of police, a violation of a clearly-established right. Thus, Hardwick cannot avoid liability on the basis of qualified immunity.

3. <u>The Monell Issue</u>

Finally, the Village argues that it is entitled to judgment as a matter of law in that the Plaintiff failed to establish that the Village had a policy, custom, or practice of discrimination as set forth in <u>Monell v. New York City Department of Social Services</u>, 436 U.S. 378, 109 S. Ct. 1197, 56 L. Ed. 2d 611 (1978).

To "prevail on a claim against a municipality under section 1983 [or section 1981] based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." <u>Roe v. City of Waterbury</u>, 542 F.3d 31, 36 (2d Cir. 2008). There must be a "direct causal link between a municipal policy

or custom and the alleged constitutional deprivation." City of Canton v. Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989); see Cash v. Cnty. of Erie, 654 F.3d 324, 333 (2d Cir. 2011)(a plaintiff asserting Monell claim must prove that action taken pursuant to official municipal policy caused the alleged injury). "Official municipal policy [ ] includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Connick v. Thompson, __ U.S. __ , __, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011)(citing Monell).

Here, the Court previously rejected this argument at the close of the Plaintiff's case, (Tr. at 1491-92.) and the Court identifies no reason to disturb that decision. Here, Hardwick conceded that he was the decision-maker as to the Chief of Police position. (Tr. at 490-91.) Under these circumstances, the record supported the jury's implicit conclusion that Hardwick served in a final policy-making position for the Village.

The Village's reliance on Jones v. Town of E. Haven, 691 F.3d 72, 80 (2d Cir. 2012) cert. denied, 134 S. Ct. 125, 187 L. Ed. 2d 255 (2013) is misplaced. In that case, the Second Circuit found that there was insufficient evidence at the trial to support a reasonable finding that Plaintiff's loss was attributable to a custom, policy, or usage of the Town of East Haven. Unlike this case, the complained-of-acts were perpetrated by non-policy-makers and there were questions whether the acts were brought to the attention of any supervisory persons. By contrast, here, the record indicates that Hardwick, as a policymaker, engaged in the discriminatory act.

4. As to Title VII

In any event, even if there were insufficient evidence to support municipal liability under Sections 1981 and 1983, the Court notes that the District would still be liable for Hardwick's unlawful discrimination under Title VII. Indeed, although employment discrimination claims

brought under Title VII and § 1983 are both analyzed under "the burden-shifting framework of Title VII claims," <u>Annis v. County of Westchester</u>, 136 F.3d 239, 245 (2d Cir. 1998), Title VII and § 1983 diverge in that a Title VII claim can be based upon *respondeat superior* liability, whereas a § 1983 claim cannot. <u>See</u> <u>Gierlinger v. New York State Police</u>, 15 F.3d 32, 33 (2d Cir. 1994)("a Title VII sex discrimination claim . . . carries *respondeat superior* liability, and a 42 U.S.C. § 1983 damage claim . . . does not impose *respondeat* liability").

In sum, the Court finds that (1) a reasonable jury could conclude that race played a motivating factor in Hardwick's decision to appoint Bermudez instead the Plaintiff to the position of the Chief of Police; (2) Hardwick cannot prevail on the affirmative defense of qualified immunity; and (3) the evidence supported a <u>Monell</u> claim against the Village. Therefore, the Court denies the Defendants' Rule 50 motions for judgment as a matter of law.

B.  <u>The Defendants' Rule 59 Motions</u>

    1.  <u>The Standard for Evaluating a Rule 59 Motion</u>

A motion for a new trial pursuant to Rule 59 should be granted only if "the jury has reached a seriously erroneous result or its verdict is a miscarriage of justice." <u>Nimely v. City of New York</u>, 414 F.3d 381, 392 (2d Cir. 2005)(citation and quotation marks omitted).  A new trial is necessary if "the introduction of inadmissible evidence was a clear abuse of discretion and was so clearly prejudicial to the outcome of the trial that . . . that the jury . . . reached a seriously erroneous result or . . . the verdict [was] a miscarriage of justice." <u>Id.</u> at 399 (internal quotation omitted).  Evidentiary errors by the trial court are deemed harmless unless they render the jury's verdict "contrary to the interests of 'substantial justice.'" <u>Id.</u> (quoting Fed. R. Civ. P. 61).

2. The 2010 United States Census

Here, Hardwick argues that this Court erred in sustaining the Plaintiff's objection to the attempt by Hardwick's counsel to introduce the 2010 United States Census into evidence for the jury's consideration of whether hispanic is a race. As noted above, this ruling was inconsistent with the Court's prior evidentiary rulings concerning the Plaintiff's counsel's questioning of numerous witnesses concerning a Village of Freeport Census. In this regard, over the Defendants' objection, the Court allowed the Plaintiff's counsel to question Hardwick on whether the Village of Freeport Census defined and/or treated hispanic as a race. (Tr. at 591.) Under these circumstances, the Court recognizes some degree of prejudice suffered by the Defendants.

Nonetheless, the Court finds that the error in failing to admit the 2010 United States Census was harmless for purposes of Fed. R. Civ. P. 59. In the Court's view, the Defendants were able to effectively contest the issue of hispanic as a race versus national origin. In this regard, the Defendants continually argued that hispanic is not considered a race. Indeed, there was testimony by Bermudez and Hardwick, among others, that Bermudez belonged to the white race.

Also, the Plaintiff's Exh. 18 indicated that certain new appointees during Hardwick's term were both "white" and "Hispanic." Although the Court previously noted that the jury could reasonable construe this document as referring to skin color and race, respectively, it also could have reasonably construed this document as referring to race and national origin, respectively. The jury was free to draw competing, yet reasonable, conclusions based on the evidence.

In sum, the prejudice the Defendants suffered by not being allowed to introduce the 2010 United States Census to defend against the Plaintiff's assertion that hispanic is a race for

purposes of the anti-discrimination statutes did not render the jury verdict in favor of the Plaintiff "contrary to the interests of substantial justice."

Any argument that the shift by the Court in view of the question – namely, whether hispanic is a race for purposes of the antidiscrimination laws – from one of law to one of fact does not, under these circumstances, constitute reversible error warranting a new trial. The Court notes it was the Defendants that sought to have this question decided as a matter of fact, even though such was not demanded by the Court's summary judgment decision. Further, the record indicates that, were this Court to decide the issue as a matter of law, it likely would have decided it in the Plaintiff's favor. Under these circumstances, this shift, which could constitute reversible error in other contexts, does not constitute reversible error here because the error plainly worked in the Defendants' favor.

Nor can the Defendants be heard to argue that the shift in treating the question of whether hispanic is a race for purposes of the anti-discrimination laws as one of law to one of fact was unduly prejudicial in that the Defendants had relied on that issue being resolved as a matter of law. Rather, the Defendants represented at the trial that they based their trial strategy on the assumption – which was faulty – that the summary judgment decision mandated that the question of whether hispanic is a race for purposes of the anti-discrimination laws was one of fact. To the contrary, as noted above, the summary judgment decision treated this question as one of law. Given that the Court ultimately treated this question, as the Defendants repeatedly asked, as one of fact – a finding the Defendants concededly used to craft their trial strategy – there is no discernible prejudice to them.

To clarify, the Court could conceive of an alternative scenario which would have been prejudicial to the Defendants. If, for example, the Defendants had represented at the trial that

they relied on the fact that the Court, in its summary judgment decision, treated the question of whether hispanic is a race for purposes of the anti-discrimination laws as one of law, the Defendants would have been prejudiced by this Court's later decision after the close of evidence to treat the question as one of fact. However, such is not the case here. Rather, the Defendants represented during the jury charge conference that they based their trial strategy in part on the assumption that whether hispanic is a race for purposes of the anti-discrimination laws was a question of fact.

       3.  <u>The Weight of the Evidence</u>

The Village argues that it is entitled to a new jury trial under Fed. R. Civ. P. 59 because the verdict was against the weight of the evidence. The Court disagrees.

"Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. Moreover, a trial judge is free to weigh the evidence [her]self, and need not view it in the light most favorable to the verdict winner." <u>DLC Mgmt. Corp. v. Town of Hyde Park</u>, 163 F.3d 124, 133 (2d Cir. 1998). "A new trial must be granted if the court determines that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." <u>Santa Maria v. Metro–North Commuter R.R.</u>, 81 F.3d 265, 273 (2d Cir. 1996). The grant of a new trial is also appropriate when, "in the opinion of the district court, the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice." <u>DLC Mgmt. Corp.</u>, 163 F.3d at 133.

In this case, although no witness other than Hardwick or Colton had personal knowledge concerning the appointment of the Chief of Police or the appointment of various department heads in the Village and Hardwick never made any disparaging comments about any race, the

Defendants are well aware that "direct evidence of an employer's discriminatory intent is rare and 'must often be inferred from circumstantial evidence.'" Serby v. New York City Dep't of Educ., No. 09–CV–2727 (RRM)(VVP), 2012 WL 928194, at *5 (E.D.N.Y. Mar. 19, 2012) (quoting Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006)).

Framed in these terms, the Court concludes that the cumulative circumstantial evidence supports the jury verdict. The record indicates that the Plaintiff was qualified for the position of Chief of Police, having, among other things, attained the top score on the qualifying examination and the requisite rank of Lieutenant. There was also evidence that Hardwick had a pattern and practice of making personnel decisions whereby he replaced qualified white employees with candidates of other races with inferior credentials. Woodward, the former Police chief, credibly testified that Hardwick discriminated against certain employees in the Village. (Tr. at 1158.) In the Court's view, particularly detrimental to Hardwick was his admission that he did not interview the Plaintiff or review any of his personnel files.

Thus, based on the record, the Court finds that the weight of the evidence supported the jury verdict in favor of the Plaintiff.

4. Damages

The Village also requests a reduction for each category of damages awarded by the jury against it.

Fed. R. Civ. P. 59 permits a court to reduce the amount of damages awarded by a jury on a particular claim. See e.g., Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 50 (2d Cir. 1998); see also Minshall v. McGraw Hill Broadcasting Co., 323 F.3d 1273, 1287 (10th Cir. 2003). "It is [the court's] function, while appropriately respecting the jury's crucial role, to guard against [ ] speculative damage awards." McIntosh v. Irving Trust Co., 887 F. Supp. 662, 665 (S.D.N.Y.

1995)(granting the defendant's motion under Rule 59 and reducing the award in a retaliation case). "It does not follow that simply because there was [a violation], there must be an award of compensatory damages; rather, the compensatory damages must be proven and not presumed." McIntosh, 887 F. Supp. at 665.

In the present case, the Village argues that the front pay award is speculative because the term of Chief of Police is only two years. However, the Village fails to consider that, as a civil service position, the Chief of Police may not be removed from office, except for "cause." (Tr. at 532-33.) Indeed, the evidence at the trial established that the prior Chief of Police, Woodward, held his position for more than 12 years. (Tr. at 1091.)

The Village also seeks a reduction of the punitive damages awarded against Hardwick, although, curiously, this argument was not raised by Hardwick himself.

As the Second Circuit has recognized, "[a]wards of punitive damages are by nature speculative, arbitrary approximations. No objective standard exists that justifies the award of one amount, as opposed to another, to punish a tortfeasor appropriately for his misconduct. Nor is there any formula to show the dollar amount needed to effectuate deterrence." Payne v. Jones, 696 F.3d 189, 196 (2d Cir. 2012) opinion amended and superseded, 711 F.3d 85 (2d Cir. 2013). However, "[e]ven if there is no such thing as a correct amount of punitive damages, however, a legal system has an obligation to ensure that such awards for intangibles be fair, reasonable, predictable, and proportionate. Id. at 196-97.

The Court considers three "guideposts" in determining the validity of a punitive damages award: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties

authorized or imposed in comparable cases." State Farm Mutual Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003).

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996). "[I]n assessing the degree of reprehensibility of defendants' conduct, the court must consider whether certain 'aggravating factors' generally associated with highly reprehensible conduct are present. Those factors include '(1) whether a defendant's conduct was violent or presented a threat of violence, (2) whether a defendant acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant has engaged in repeated instances of misconduct.'" Thomas v. iStar Fin., Inc., 508 F. Supp. 2d 252, 262 (S.D.N.Y. 2007)(quoting Lee v. Edwards, 101 F.3d 805, 809 (2d Cir. 1996)).

"This is not a case involving violence or the threat of violence. However, the jury, in order to find punitive damages were warranted, had to find that defendants' conduct was more than merely negligent." Thomas, Inc., 508 F. Supp. 2d at 262. In addition, here evidence was presented at the trial that Hardwick was influenced by unlawful racial considerations in making other personnel decisions. "Thus, there is certainly sufficient evidence of reprehensible conduct to warrant a punitive damage award. However, the reprehensibility should not be overstated." Id.

With respect to the second State Farm guide post, although there is no "bright-line ratio which a punitive damages award cannot exceed," the Supreme Court has held that "[s]ingle digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." State Farm, 538 U.S. at 425, 123 S. Ct. 1513. Furthermore, "[w]hen

compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." Id. Of course, "[t]he precise award in any case . . . must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." Id.

Here, the ratio of punitive to compensatory damages awarded by the jury is 1:5.75. "Such a ratio falls within acceptable limits." Anderson v. Aparicio, CV 09-1913 (GRB), 2014 WL 2619062, at *7 (E.D.N.Y. June 12, 2014)(declining to disturb a punitive damages award where the ratio of punitive award to compensatory award was more than four to one). Here, the jury's award of punitive damages was significantly less than the total compensatory damages the jury awarded. "The [C]ourt finds all of the punitive damages awards to be clearly within the bounds of constitutional propriety and the realm of reason." Barkley v. United Homes, LLC, 04-CV-875 (KAM)(RLM), 2012 WL 2357295, at *16 (E.D.N.Y. June 20, 2012) aff'd sub nom. Barkley v. Olympia Mortgage Co., 557 F. App'x 22 (2d Cir. 2014), as amended (Jan. 30, 2014).

The final State Farm factor involves comparing the award to "civil and criminal penalties for comparable misconduct." DiSorbo v. Hoy, 343 F.3d 172, 187 (2d Cir. 2003). Title VII imposes a $300,000 cap on punitive damages. 42 U.S.C. § 1981a(b)(3)(d). In addition, Title VII only allows for an award of punitive damages "if the complaining party demonstrates that the respondent engaged in a discriminatory practice . . . with malice or reckless indifference." 42 U.S.C. § 1981a(b)(1). There are no such caps under Sections 1981 or 1983. Bogle v. McClure, 332 F.3d 1347, 1362 (11th Cir. 2003)("Congress has not seen fit to impose any recovery caps in cases under § 1981 (or § 1983), although it has had ample opportunity to do so since the 1991 amendments to Title VII."). Finally, "[t]he NYSHRL does not provide for punitive damages." Syrnik v. Polones Const. Corp., 918 F. Supp. 2d 262, 265 (S.D.N.Y. 2013).

Although "most 'comparable cases' (that is, New York State and Title VII discrimination claims) have allowed punitive damages of only $300,000 or less," <u>Zakre v. Norddeutsche Landesbank Girozentrale</u>, 541 F. Supp. 2d 555, 566 (S.D.N.Y. 2008)(quotation marks omitted), the Second Circuit has upheld a punitive damages award of $600,000 in an action brought under Title VII and the NYSHRL, the Title VII cap notwithstanding, <u>see</u> <u>Zakre v. Norddeutsche Landesbank Girozentrale</u>, 344 Fed. Appx. 628, 631 (2d Cir. 2009).

Given the <u>State Farm</u> factors as applicable to this action, the Court finds that the jury's $200,000 punitive damages award to the Plaintiff is not excessive.

C. <u>Enhanced Damages for Excess Tax Liability</u>

The Plaintiff also seeks to enhance his economic damages award to compensate him for the increased tax liability he will incur from the projected lump sum damages award. "Although there is precedent for such an award, the [C]ourt declines to award the plaintiff an additional monetary amount to offset the increased tax consequences of the economic damages award []he will receive." <u>Morgenstern v. Cnty. of Nassau</u>, CV 04-58 (ARL), 2009 WL 5103158, at *6 (E.D.N.Y. Dec. 15, 2009); <u>see</u> <u>Hukkanen v. International Union of Operating Eng'rs, Hoisting & Portable Local No. 101</u>, 3 F.3d 281, 287 (8th Cir. 1993)(refusal to enhance monetary award for increased tax liability); <u>Belleville v. United Food and Commercial Workers Int'l Union Indus. Pension Fund</u>, 620 F. Supp. 2d 277, 281 (D.R.I. 2008)(damages for increased tax liability denied in ERISA case); <u>Kelley v. City of Albuquerque</u>, 2006 U.S. Dist. LEXIS 28785, at *21–22, 2006 WL 1304954 (D.N.M. Mar. 31, 2006)(declining to exercise discretion to award additional money for tax liability in Title VI case); <u>Best v. Shell Oil, Co.</u>, 4 Supp.2d 770 (N.D. Ill. 1998)(denial of request for enhanced monetary award); <u>cf.</u> <u>Eshelman v. Agere Sys.</u>, 554 F.3d 426, 440 (3d Cir. 2009)(awarding supplemental monetary award for increased tax liability).

D. <u>As to the Attorneys' Fees Award</u>

The Plaintiff seeks attorneys' fees in the amount of $825,927.50, based on the following hourly rates: $400 for partners Amanda M. Fugazy, Adam C. Weiss, and Paul P. Rooney; $325 for Senior Associate Holly Froum, $300 for Senior Associate Jordan Wolff; $250 for Associates Sheryl Maltz and Justin Weitzman; and $115 for paralegals Allison Vieyra, Kim Myers, and Jenna Katusa.

"In the United States, parties are ordinarily required to bear their own attorney's fees — the prevailing party is not entitled to collect from the loser. . . . Congress, however, has authorized the award of attorney's fees to the 'prevailing party' in numerous statutes." <u>Buckhannon Bd. & Care Home, Inc., v. West Virginia Dept. Of Health & Human Res.</u>, 532 U.S. 598, 602, 121 S. Ct. 1835, 149 L. Ed. 2d 855 (2001). 42 U.S.C. § 1988(b) provides:

> In any action or proceeding to enforce a provision of [Section 1983] . . . the court, in its discretion, may allow the prevailing party . . . a reasonable attorneys' fee as part of the costs.

42 U.S.C. § 1988(b). The Defendants do not dispute that the Plaintiff is a prevailing party whose reasonable attorneys' fees and costs are compensable. However, the Defendants do argue that the fee request is unreasonable.

Courts assess the reasonableness of attorney's fees using a variation on the "lodestar" method that generates a "presumptively reasonable fee." <u>Arbor Hill Concerned Citizens Neighborhood Assoc. v. Cnty. of Albany</u>, 522 F.3d 182, 183 (2d Cir.2008); <u>McDaniel v. Cnty. of Schenectady</u>, 595 F.3d 411, 420 (2d Cir. 2010). While <u>Arbor Hill</u> eschews the term "lodestar" in favor of the term "presumptively reasonable fee," 522 F.3d at 189, "the Court does not believe that <u>Arbor Hill</u> holds that there is a substantive distinction between the two terms." <u>Orient Overseas Container v. Crystal Cove Seafood</u>, 10 CIV 3166 (PGG)(GWG), 2012 WL 6720615, at

*2 n.1 (S.D.N.Y. Dec. 28, 2012).  The Court uses the term "lodestar" herein because it is the term used by the Supreme Court, see e.g., Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 551, 130 S. Ct. 1662, 1672, 176 L. Ed. 2d 494 (2010), and because it is nomenclature used by the Second Circuit even after Arbor Hill, see e.g., Millea v. Metro–North R.R. Co., 658 F.3d 154, 166–69 (2d Cir. 2011).

The "lodestar" is "the product of a reasonable hourly rate and the reasonable number of hours required by the case." Millea, 658 F.3d at 166; see also McDaniel, 595 F.3d at 420.

A reasonable rate is the rate that a "reasonable, paying client would be willing to pay." Id. at 184, 190.  "To assist courts in 'stepping into the shoes of the reasonable, paying client,' the Second Circuit has outlined a number of 'case-specific variables' for courts to consider." Broad. Music, Inc. v. Pamdh Enterprises, Inc., 13-CV-2255 (KMW), 2014 WL 2781846, at *6 (S.D.N.Y. June 19, 2014).

These variables include the twelve factors set forth in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717–19 (5th Cir. 1974), which are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Arbor Hill, 522 F.3d at 186 n. 3.  Other variables are:

> the complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing demands of the case, whether an attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether an attorney might have initially acted pro bono (such that a client might be aware

that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) that an attorney might expect from the representation.

Id. at 184.

However, "'the most critical factor' in a district court's determination of what constitutes reasonable attorney's fees in a given case 'is the degree of success obtained' by the plaintiff." Barfield v. New York City Health and Hospitals Corp., 537 F.3d 132, 151–52 (2d Cir. 2008) (quoting Farrar v. Hobby, 506 U.S. 103, 114, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992)). "A district court's assessment of the 'degree of success' achieved in a case is not limited to inquiring whether a plaintiff prevailed on individual claims." Barfield, 537 F.3d at 152. "Both 'the quantity and quality of relief obtained,' as compared to what the plaintiff sought to achieve as evidenced in [his or] her complaint, are key factors in determining the degree of success achieved." Id.; see also Farrar, 506 U.S. at 114, 113 S. Ct. 566, 121 L. Ed. 2d 494 ("Where recovery of private damages is the purpose of . . . civil rights litigation, a district court, in fixing fees, is obligated to give primary consideration to the amount of damages awarded as compared to the amount sought." (quotations and citation omitted)).

Here, the Plaintiff's supporting affidavit indicates that attorney Fugazy, Weiss, and Rooney, have 15, 11, and 19, years of experience practicing labor and employment law respectively. The Court notes that this was a three-week trial preceded by 27 months of intense litigation, in which the Plaintiffs were required to bring six motions to compel; undertake eight depositions, oppose to two motions for summary judgment, and respond to several motions *in limine*. As to the novelty and difficulty of the questions involved, the Court notes that, although "reverse discrimination" cases are common, this case involved extensive litigation over whether hispanic is a race different than the white or black race for purposes of the anti-discrimination statutes, and whether such a question needed to be resolved before jury deliberation. Although

the Court ultimately declined to make any determinations regarding this issue as a matter of law, the Court received helpful guidance regarding the case law on the issue from the Plaintiff's counsel.

The rates that the partners request are at the high end, but in line with market rates. "Courts have awarded rates of $200 to $400 per hour for partners in this district." Capone v. Patchogue–Medford Union Free Sch. Dist., No. 04–CV–2947 (JS)(MLO), 2011 WL 743573, at * 2 (E.D.N.Y. Feb. 23, 2011); see also Konits v. Valley Stream Cent. High Sch. Dist., No. 01–CV–6763 (LDW), 2010 WL 2076949, at *2 (E.D.N.Y. May 19, 2010)("The Court finds that the range of $300–400 per hour is an appropriate range for experienced attorneys in employment discrimination actions in this district."), aff'd sub nom. Konits v. Karahalis, 409 F. App'x 418 (2d Cir. 2011); Todaro v. Siegel Fenchel & Peddy, P.C., 697 F. Supp. 2d 395, 399 (E.D.N.Y. 2010)(holding that $400 per hour was a reasonable rate for a partner with seventeen years of employment discrimination litigation experience). The Plaintiff bolsters his fee request with numerous affidavits from other experienced civil rights attorneys who practice in the Eastern District; each attests to the reasonableness of the Plaintiff's requested rate. Lastly, the Village concedes that the Plaintiff's counsel's customary rates are within the normal range.

Accordingly, the Court finds that $400 per hour is appropriate here for the partners, particularly given the degree of success obtained by the Plaintiff. Indeed, the Plaintiff's expert witness testified at the trial that as a result of the Defendants' failure to promote the Plaintiff, he suffered economic damages of $1,258,000. The jury ultimately found in favor of the Plaintiff for $1,150,000 in economic damages, or nearly 92% of that which was sought. The Plaintiff also obtained $200,000 in punitive damages.

The Court further finds that the requested rates for the Senior and Junior Associates to be reasonable in light of market rates. Olsen v. County of Nassau, No. CV 05-3623(ETB), 2010 WL 376642, at *3 (E.D.N.Y. Jan.26, 2010)(noting that the range of appropriate billing rates in the Eastern District "is $200–$375 per hour for partners and $100–$295 per hour for associates"); Gutman v. Klein, No. 03 Civ. 1570(BMC), 2009 WL 3296072, at *2 (E.D.N.Y. 2009)(awarding between $300 -$400 for partners, between $200 - $300 for senior associates, $100 - $200 for junior associates).

However, the Court finds that $115 an hour for paralegal services is excessive. Compare Todaro v. Siegel Fenchel & Peddy, P.C., 697 F. Supp. 2d 395, 400 (E.D.N.Y. 2010)($85/hr for paralegal); Finkel v. Jones Lang LaSalle Americas, Inc., 08–CV–2333 (RRM)(RML), 2009 WL 5172869, at *5 (E.D.N.Y. 2009)($80/hr for paralegals); Morgenstern v. County of Nassau, 2009 WL 5103158, at *9 ($100/hr for paralegals). Accordingly, the Court reduces the paralegals' hourly rate to $100 per hour.

Having determined the hourly rates to be used, the Court now turns to the reasonableness of the hours billed in this matter. As required by New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983), the Plaintiff's counsel has submitted contemporaneous billing records setting forth the date and amount of time when services were rendered, along with the name of the attorney and/or paralegals, and a description of the services performed. Those billing records reflect that the attorneys and paralegals spent a total of 2594 hours on this matter. The Village points to various figures in these billing records which it contends constitute excessive, unnecessary, and duplicate billing.

However, the Second Circuit has stated that the district court is not required to "set forth item-by-item findings concerning what may be countless objections to individual billing items."

Lunday v. City of Albany, 42 F.3d 131, 134 (2d Cir.1994); see also Daiwa Special Asset Corp. v. Desnick, No. 00 CV 385 (SHS), 2002 WL 31767817, at *5 (S.D.N.Y. Dec. 3, 2002)(reducing fee award by 50% due in part to excessive billing). Particularly where, as here, the billing records are voluminous, "it is less important that judges attain exactitude, than that they use their experience with the case, as well as their experience with the practice of law, to assess the reasonableness of the hours spent." Amato v. City of Saratoga Springs, 991 F. Supp., 62, 65 (N.D.N.Y. 1998)(citing Clarke v. Frank, 960 F.2d 1146, 1153 (2d Cir. 1992).

Here, the Court is satisfied that the Plaintiff's billing records are reasonable and sufficient except as follows: the billing records indicate that the Plaintiff's attorneys billed $422,532.50 over a two-year period from October 2011 through November 2013, and then billed $403,395.00 from December 2013 to May 2014, a five-month period after the close of discovery. Although this latter five-month period directly preceded the trial and was the subject of significant motion practice, the Court finds this disparity to be unreasonable.

Based on an overall assessment of the entire billing record, the Court will apply a 40% reduction in the number of hours expended from December 2013 to May 2014. See Francois v. Mazer, 523 F. App'x 28, 29 (2d Cir. 2013)(upholding forty percent across-the-board reduction in hours following a jury trial). Taking into account the reduced rate awarded for paralegal services, $100/hr, the adjusted total is $419,480 for the period from October 2011 to November 2013, plus $241,659 for the period from December 2013 to May 2014, totaling $661,139.

Even with this downward adjustment, the Court anticipates the Village's argument that no reasonable client would pay $661,139 to litigate a case seeking damages of $1,350,000. However, there is no requirement that the amount of an award of attorneys' fees be *proportional* to the amount of damages. The Second Circuit has held: "'[W]e have repeatedly rejected the

notion that a fee may be reduced merely because the fee would be disproportionate to the financial interest at stake in the litigation.'" Barbour v. City of White Plains, 700 F.3d 631, 635 (2d Cir. 2012)(quoting Kassim v. City of Schenectady, 415 F.3d 246, 252 (2d Cir. 2005)). Last year, the Second Circuit held that "[t]he proportionality of the $3.42 million fee award is not to be judged, as Gristede's urges, against the dollar value of the $3.53 million settlement." Torres v. Gristede's, 519 Fed. Appx. 1, 5 (2d Cir. 2013).

Nor is the Court required to reduce the fee award because certain of the Plaintiff's claims were unsuccessful. Indeed, courts need not reduce a fee award where the "successful and the unsuccessful claims were interrelated and required essentially the same proof." Murphy v. Lynn, 118 F.3d 938, 952 (2d Cir. 1997)(collecting cases); Green v. Torres, 361 F.3d 96, 98 (2d Cir. 2004)(noting that when claims contain "common core facts" they are not severable and attorneys fees are properly awarded).

As a general matter,

unrelated claims are unlikely to arise with great frequency. Many civil rights cases will present only a single claim. In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

Hensley v. Eckhart, 461 U.S. 424, 433, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983).

In this case, needless to say, given the extended dispute over whether hispanic is properly considered a race or a national origin coupled with the fact the claims arise from the same core set of facts, the Court declines to reduce the fee award because the Plaintiff unsuccessfully pursued certain claims.

The Village cites, among other cases, a § 1983 retaliation case, <u>Konits v. Valley Stream Cent. High Sch. Dist.</u>, CV 01-6763 (LDW), 2010 WL 2076949 (E.D.N.Y. May 19, 2010) <u>aff'd sub nom. Konits v. Karahalis</u>, 409 F. App'x 418 (2d Cir. 2011) for language from Judge Leonard Wexler that "$500,123 is at the upper end of what constitutes a reasonable attorney's fee." However, the Village selectively quotes from <u>Konits</u>.  Judge Wexler stated that $500,123 approached the limits of a reasonable fee "considering the degree of success and result in this action."  There, the jury returned a verdict for the Plaintiff for $400,000.  After the individual defendant moved to set aside the verdict, the parties settled for $175,000.  Here, by contrast, the Plaintiff's counsel obtained a verdict for $1,150,000, plus $200,000 in punitive damages.

E.  <u>As to Costs</u>

The Plaintiff also seeks costs of $28,238.67.  A prevailing party is also entitled to compensation for "those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." <u>LeBlanc–Sternberg</u>, 143 F.3d at 763 (internal quotation marks omitted).

Under federal civil rights law, costs awarded to successful parties may "include not only those ordinarily recoverable pursuant to 28 U.S.C. § 1920 and Rule 54(d)(1) of the Federal Rules of Civil Procedure, but also any additional expenses ordinarily charged in the particular legal marketplace." <u>Robinson,</u> 2009 WL 3109846, at *34–35 (citing <u>U.S. Football League v. Nat'l Football League</u>, 887 F.2d 408, 416 (2d Cir. 1989)(holding that reasonable, identifiable out-of-pocket disbursements ordinarily charged to clients are recoverable); <u>see also</u> <u>Kuzma v. I.R.S.</u>, 821 F.2d 930, 933–34 (2d Cir. 1987)(providing a non-exclusive list of recoverable costs, including photocopying, travel and telephone costs); <u>Anderson v. City of New York</u>, 132 F. Supp. 2d 239, 245 (S.D.N.Y. 2001).

However, the Plaintiff's itemized list of costs includes a charge for miscellaneous supplies for trial, binders, and exhibit tabs, expenses that are considered non-compensable general office overhead. Manzo v. Sovereign Motor Cars, Ltd., 08-CV-122 (JG)(SMG), 2010 WL 1930237, at *11 (E.D.N.Y. May 11, 2010) aff'd, 419 F. App'x 102 (2d Cir. 2011).

In addition, Plaintiff's seeks reimbursement for $175.98 in secretarial overtime, which is also considered non-recoverable overhead. Marisol A. ex rel. Forbes v Giuliani, 111 F. Supp. 2d 381, 390 (S.D.N.Y. 2000)("clerical and secretarial services are part of overhead and are not generally charged to clients").

The Court also declines to tax the costs of a "memory stick to download research from 2d Cir library." It is well-established that "computer research is merely a substitute for an attorney's time that is compensable under an application for attorneys' fees and is not a separately taxable cost." United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp., 95 F.3d 153, 173 (2d Cir. 1996).

Nor does the Court find that the Plaintiff's claimed cost of $1,250 for press releases should be included. In this regard, the Plaintiff has not established that such a cost would normally be charged to the fee-paying client.

With the exception of the above-mentioned non-taxable costs, which have been deducted, the Plaintiff's request for costs is granted in the amount of $26,612.42.

F.  Pre-Judgment Interest on Back Pay Award

As the Second Circuit has made clear, where "damages awarded to the plaintiff [in a Title VII action] represent compensation for lost wages, 'it is ordinarily an abuse of discretion *not* to include pre-judgment interest." Gierlinger v. Gleason, 160 F.3d 858, 873–74 (2d Cir. 1998)(citation omitted). No federal statute specifies the rate at which pre-judgment interest

should be calculated, and courts in this district have utilized a number of different rates. See Hollie v. Korean Air Lines Co., Ltd., 834 F. Supp. 65, 69 (S.D.N.Y. 1993)(citing cases applying various rates).  Most commonly, courts have borrowed the statutory post-judgment interest rate specified in 28 U.S.C. § 1961(a) in order to calculate prejudgment interest. See Cioffi v. N.Y. Cmty. Bank, 465 F. Supp. 2d 202, 222 (E.D.N.Y. 2006)("In cases where the judgment is based on violations of both state and federal law, it is common practice in the Second Circuit to apply the federal interest rate pursuant to 28 U.S.C. § 1961(a).").

The Court observes no reason to depart from this ordinary practice.  In accordance with other district courts in this Circuit, the Court will direct the Clerk to calculate pre-judgment interest based on the United States 52–week treasury bill rate referred to in 28 U.S.C. § 1961, compounded annually.  Luciano v. Olsten Corp., 912 F. Supp. 663, 676–77 (E.D.N.Y. 1996) (using 28 U.S.C. § 1961 to award prejudgment interest on plaintiffs back-pay award under Title VII of the Civil Rights Act of 1964), aff'd 110 F.3d 210 (2d Cir.1997).  Also, the Court finds that pre-judgment interest runs from August 1, 2012, which is roughly the midpoint between when Bermudez was promoted and the date of the motion for pre-judgment interest on the back pay award, through the date the judgment was entered.  Indeed, "[w]here prejudgment interest is given, it should be assessed upon damages only as they become due." Chandler v. Bombardier Capital, Inc., 44 F.3d 80, 84 (2d Cir. 1994).  "Utilizing the midpoint date is a practical method of accounting for the fact that [the Plaintiff]'s damages accrued over a period of time while 'avoiding the need for numerous calculations establishing a separate interest figure for each lost monthly payment.'" Manzo, 2010 WL 1930237, at *12 n. 21 (quoting Chandler).

The Plaintiff does not appear to request pre-judgment interest on the punitive damages award or the front pay award.  However, for the sake of a complete record, the Court notes that

as a matter of federal law, the Plaintiff cannot recover pre-judgment interest on the punitive damages award because punitive damages are penalties. See Wickham Contracting Co., Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, 955 F.2d 831, 833–34 (2d Cir. 1992)(noting that because punitive damages are a penalty and not awarded as compensation, pre-judgment interest is not necessary to make a party whole and would in fact result in over-compensation); Cioffi v. New York Cmty. Bank, 465 F. Supp. 2d 202, 223 (E.D.N.Y. 2006)("Since punitive damages are not intended to provide full compensation to plaintiff, there is no basis for applying pre-judgment interest to the punitive damage award in this case.").

Similarly, the rationale for awarding pre-judgment interest – to make the Plaintiff whole – only applies to back pay, not front pay. Scarfo v. Cabletron Systems, Inc., 54 F.3d 931, 961 (1st Cir. 1995)(affirming district court's denial of pre-judgment interest on front pay award); Ranquist v. M & M Indus., Inc., 2:11-CV-387 (DBH), 2012 WL 1899540, at *9 (D. Me. May 2, 2012)("An award of prejudgment interest is appropriate with respect to back pay and compensatory damages only."); report and recommendation adopted, 2:11-CV-387 (DBH), 2012 WL 1899438 (D. Me. May 23, 2012).

G.  Post-Judgment Interest on the Full Judgment Award

Under 28 U.S.C. § 1961(a), a plaintiff is entitled to post-judgment interest on "any money judgment in a civil case recovered in a district court."  The rate of post-judgment interest is governed by 28 U.S.C. § 1961(a) & (b), which direct that interest be calculated from the date judgment is entered, at a rate equal to the weekly average 1–year constant maturity Treasury yield, compounded annually.

"Postjudgment interest is designed to compensate the plaintiff for the delay it suffers from the time damages are reduced to an enforceable judgment to the time the defendant pays the

judgment." Andrulonis v. United States, 26 F.3d 1224, 1230 (2d Cir. 1994). "The postjudgment amount upon which the interest accrues includes compensatory damages [and] punitive damages." Koch v. Greenberg, 07 CIV. 9600 (JPO), 2014 WL 1284492, at *30 (S.D.N.Y. Mar. 31, 2014).

H.  Pre and Post-Judgment Interest on the Fee Award

The Plaintiff seeks post-judgment interest on the fee award, but apparently not pre-judgment interest on the fee award. "[P]ost-judgment interest is available for an award of attorneys' fees arising out of a judgment in the district court." Brady v. Wal-Mart Stores, Inc., 03-CV-3843 (JO), 2010 WL 4392566, at *9 (E.D.N.Y. Oct. 29, 2010). Rule 54(d)(2)(B) requires that a motion for attorney's fees be filed within fourteen days after entry of judgment.

Here, the Plaintiff filed his request for post-judgment interest on the fee award on June 25, 2014, more than 14 days after the entry of judgment, on May 30, 2014. Therefore, the request is untimely and is denied. Id. (the plaintiff forfeited his right to post-judgment interest on attorneys' fees after not requesting the same in his initial fee application and failing to cross-appeal a challenge). Although the Plaintiff filed his initial motion for attorneys' fees on June 11, 2014, the Plaintiff did not include in that motion any request for post-judgment interest on the fee award.

I.  Pre and Post-Judgment Interest on Costs

The Plaintiff also seeks pre-judgment interest on the costs award. "Courts in this Circuit have awarded interest on the costs incurred during litigation." Tatum v. City of New York, 06-CV-4290 (PGG)(GWG), 2010 WL 334975, at *14 (S.D.N.Y. Jan. 28, 2010). Indeed, an award of interest on costs is appropriate "since counsel have been out-of-pocket for those costs for a

substantial period of time." <u>Rozell v. Ross-Holst</u>, 576 F. Supp. 2d 527, 548 (S.D.N.Y. 2008). The Plaintiff also seeks post-judgment interest on costs.

The Defendants contend that the Plaintiff's requests in this regard are untimely as filed more than 14 days after entry of the judgment. However, the Defendants conflate the timing of an application for attorneys' fees versus the timing of an application for costs. Local Rule 54.1 governs the timing and mechanics of an application for costs:

> (a) Request to Tax Costs. Within thirty (30) days after the entry of final judgment, or, in the case of an appeal by any party, within thirty (30) days after the final disposition of the appeal, unless this period is extended by the Court for good cause shown, any party seeking to recover costs shall file with the Clerk a request to tax costs annexing a bill of costs and indicating the date and time of taxation. Costs will not be taxed during the pendency of any appeal. Any party failing to file a request to tax costs within the applicable thirty (30) day period will be deemed to have waived costs. The request to tax costs shall be served upon each other party not less than seven (7) days before the date and time fixed for taxation. The bill of costs shall include an affidavit that the costs claimed are allowable by law, are correctly stated and were necessarily incurred. Bills for the costs claimed shall be attached as exhibits.

In any event, "[t]he local rule, however, transparently pertains to 'costs,' and post-judgment interest is not a 'cost.'" <u>AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC</u>, 01 CIV 11448 (JGK), 2011 WL 102715, at *3 (S.D.N.Y. Jan. 6, 2011). Thus, "[t]he [P]laintiff[] ha[s] not waived their right to an award of such interest by failing to request it within the thirty-day period prescribed for requests for costs." <u>Id.</u> Nor, the Court finds, is pre-judgment interest on costs a "cost" within the meaning of Local Rule 54.1.

With respect to pre-judgment interest on costs, the Plaintiff requests that the Court apply the interest rate specified in 28 U.S.C. § 1961(a), which provides in relevant part:

> Interest shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.

91

28 U.S.C. § 1961(a).  The Defendants have made no objection to the Plaintiff's request.

Accordingly, this Court will award pre-judgment interest on the costs award of $26,612.42, at the

rate specified in 28 U.S.C. § 1961(a), compounded annually.

As to post-judgment interest on costs, case law is inconsistent on when the interest

accrues and there is no controlling law in this circuit.  Again, post-judgment interest on costs is

governed by 28 U.S.C. § 1961(a).  As relevant here, the statute reads: "Interest shall be allowed

on any money judgment in a civil case recovered in a district court. . . . Such interest shall be

calculated from the date of the entry of the judgment." 28 U.S.C. § 1961(a).

"Determining whether § 1961 postjudgment interest should accrue from the date of

judgment establishing the right to an award of attorneys' fees and costs or from the date of the

judgment 'establishing its quantum' has resulted in a split amongst the Circuits that have

addressed it and remains an open issue for both the Supreme Court and the Second Circuit."

Natural Organics, Inc. v. Nutraceutical Corp., 01 CIV. 0384 (GBD)(RLE), 2009 WL 2424188, at

*10 (S.D.N.Y. Aug. 6, 2009)(internal citation omitted).  The Court's research found no binding

precedent addressing solely the issue of post-judgment interest on taxable costs.  "Other Circuits

have treated the question of postjudgment interest for such costs similarly to the treatment of

attorneys' fees, and the Court looks to these cases for possible analysis." Natural Organics, Inc.,

2009 WL 2424188, at 10 n. 9; see also Forest Labs., Inc. v. Abbott Labs., 96-CV-159S (WMS),

2006 WL 7077571, at *4 (W.D.N.Y. May 17, 2006)("While the parties have not cited, nor has

the Court found, any cases on point with respect to awarding postjudgment interest on costs, the

Court has found cases addressing the analogous issue of postjudgment interest on an attorneys'

fees award.").

The "majority approach" followed by the Fifth, Sixth, Eighth, Ninth, Eleventh, and Federal Circuits uses the date "the party becomes entitled to the award even if that award is not quantified until a later point." Fresh Meadow Food Servs., LLC v. RB 175 Corp., 04-CV-4767 (TLM), 2013 WL 527199, at *13 (E.D.N.Y. Feb. 11, 2013)(quotation marks and citations omitted), aff'd, 549 F. App'x 34 (2d Cir. 2014). Many district courts from the Second Circuit, and particularly from the Eastern District of New York, have adopted the majority approach, which is now considered the dominant standard within the Second Circuit." Id. (quotation marks and citations omitted). The rationale of those cases is that the fee-paying party "suffers no prejudice from any delay in quantifying the award because it has use of the money in the interim and because the statutory interest rate is tied to the U.S. Treasury Bill rate." Jenkins by Agyei v. Missouri, 931 F.2d 1273, 1277 (8th Cir. 1991), cert. denied, 502 U.S. 925, 112 S. Ct. 338, 116 L. Ed. 2d 278 (1991).

The "minority approach" reasons that interest should only run from the date the fee award is quantified "since before then the [prevailing party's] claim for unpaid attorney's fees is unliquidated and therefore is not a 'money judgment' for purposes of Section 1961." Albahary v. City & Town of Bristol, Conn., 96 F. Supp. 2d 121, 123 (D. Conn. 2000); Auto. Club of New York, Inc. v. Dykstra, 04 CIV 2576 (SHS), 2010 WL 3529235, at *5 (S.D.N.Y. Aug. 24, 2010)("other circuits have held — correctly, in this Court's view — that prior to the date the amount of attorneys' fees is actually quantified, the damages are unliquidated and therefore are not a 'money judgment' within the meaning of section 1961.")

In determining the date on which post-judgment interest on costs accrues, the Court adopts the approach followed by the majority of the circuits and adopted by the district court in Albahary. Therefore, the Plaintiff is awarded post-judgment interest on costs from the date he

became entitled to that award at the U.S. Treasury Bill rate, as specified in 28 U.S.C. § 1961, until the award is paid. That date is determined to be May 30, 2014, the date the Court entered judgment. "Post-judgment interest on federal judgments is compounded annually." <u>Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.</u>, 689 F. Supp. 2d 585, 625 (S.D.N.Y. 2010).

## III. CONCLUSIONS

For the foregoing reasons, the Court denies the Defendants' Rule 50 motions for judgment as a matter of law. In this regard, the Court finds, among other things, that (1) a reasonable jury could conclude that race played a motivating factor in Hardwick's decision to appoint Bermudez instead of the Plaintiff to the position of the Chief of Police; (2) Hardwick cannot prevail on the affirmative defense of qualified immunity; and (3) the evidence supported a <u>Monell</u> claim against the Village.

The Court also denies the Defendants Rule 59 motions for a new trial. In particular, the Court finds that although it erred in excluding the 2010 U.S. Census from the evidence, that error did not arise to the level warranting a new trial. Stated otherwise, the Court is not convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice. The Court further finds that the jury verdict was not contrary to the weight of the evidence.

The Court grants the Plaintiff's motion for attorney's fees and costs to the extent that the Plaintiff is awarded $661,139 in attorneys' fees and $26,612.42 in costs.

The Court grants in part and denies in part the Plaintiff's motion to amend or "mold" the jury verdict. The Court grants the motion insofar as the Plaintiff is awarded (1) pre-judgment interest on the back pay award of $150,000 to be calculated by the Clerk of the Court at the rate prescribed in 28 U.S.C. § 1961(a), compounded annually, from August 1, 2012 through the date of the judgment, May 30, 2014; (2) pre-judgment interest on the costs award of $26,612.42, at

the rate prescribed by 28 U.S.C. § 1961(a), compounded annually, from August 1, 2012 through the date of the judgment, May 30, 2014; and (3) post-judgment interest on the judgment amount of $1,350,000, plus costs of $26,612.42 from May 30, 2014, at the rate prescribed by 28 U.S.C. § 1961(a) compounded annually, until paid.  The Court denies the motion insofar as the Plaintiff seeks (1) an upward adjustment of the jury award to account for negative tax consequences and (2) post-judgment interest on the attorneys' fees award.

**SO ORDERED.**
Dated: Central Islip, New York
August 28, 2014

_ *Arthur D. Spatt*
ARTHUR D. SPATT
United States District Judge